**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-204 (BAH)** |
| v. | : | |
| | : | |
| **BLAKE AUSTIN REED,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Blake Austin Reed ("Reed") to three months' incarceration, twelve months' supervised release, and $500 in restitution, the same recommendation made by the Probation Office for this defendant.

## I.     Introduction

The defendant, Blake Austin Reed, and his three co-defendants participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forcibly interrupted the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' of damage to United States property.

Reed pled guilty to one count of violating 18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds. Reed's actions on January 6th took place in the context of a large and violent riot in which sheer numbers combined with violence to overwhelm law enforcement, allowing rioters to breach the Capitol and disrupt the proceedings. The riot would

not have happened without people like Reed who chose to join with so many others to overwhelm law enforcement and breach the building.

A custodial sentence of three months' incarceration, to be followed by one year of supervised release, is warranted in this case because Reed:

(1) posted a statement on Facebook on December 8, 2020, warning that we Republicans would create "anarchy" and "rebellion" if the results of the 2020 presidential election were not "overturned";

(2) later in December, discussed joining the Proud Boys. The Proud Boys describes itself as a "pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists." Proud Boys members routinely attend rallies, protests, and other events, some of which have resulted in violence involving members of the group. There is an initiation process for new members of the Proud Boys, and members often wear black and yellow polo shirts or other apparel adorned with Proud Boys logos to public events. It is also described as "a right-wing extremist group with a violent agenda," https://www.adl.org/proudboys, visited March 22, 2022;

(3) posted a video of the crowd marching towards the Capitol and included the threat, "we are coming for you" in the title;

(4) witnessed and filmed the riotous crowd as they gathered outside the Capitol in the early afternoon of January 6 while some of their number chanted "hang 'em high";

(5) witnessed and filmed rioters assaulting law enforcement outside of the Capitol and persisted in entering;

(6)_was exposed to chemical irritants and persisted in entering;

(7) brought and used protective gear, including a respirator and ski goggles, to ward of officers' attempts to protect the Capitol;

(8) climbed a purloined bike rack fence and stood on the balustrade of the North West Stairs;

(9) entered the Capitol building through the Senate Wing door not long after it was violently breached with the damage still visible and the alarm sounding;

(10) traveled through many non-public areas including the hall near the Senate Wing Door, the area around the Memorial Door, and the hallways around the House Chamber;

(11) traveled through the Crypt on the ground floor of the Capitol, up the stairs by the Memorial Door near the Speaker of the House's office suite as rioters mockingly chanted, "Nancy, Nancy, Nancy," to the Rotunda, and joined a mob in the Statutory Hall Connector directly outside the House Chamber divided from Members of Congress only by a door, a make-shift barricade, and a handful of armed officers;

(12) joined the group of rioters attempting to break into the House Chamber as Members of Congress were trapped inside;

(13) spent more than 20 minutes in the building and more than an hour and a half on the restricted Capitol grounds;

(14) posted and then deleted evidence of his participation in the riot from his social media and encouraged his co-defendant to remove evidence also; and

(15) took steps pre- and post-indictment to conceal electronic evidence on his phone.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 3-9. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Reed's conduct and behavior on January 6.

### *Blake Reed's January 6, 2021 Involvement[1]*

Blake Reed traveled from Tennessee to Washington D.C. to attend a rally protesting the election results on January 6, 2021.  Before traveling to D.C., he posted on Facebook that he was "feeling pissed off" and that "you will see the Republican side of this country go into anarchy stronger than 1776 . . . The Republican Rebellion is coming soon!"

> **Time**  2020-12-08 04:08:14 UTC
> **Story**  Blake Austin Reed is feeling pissed off.
> **Message**  I absolutely 100% disagree with acknowledging Biden being elect anything other than a moron. This is the biggest scam even from statistical data. If this doesn't get overturned you will see the Republican side of this country go into an anarchy stronger than 1776 because we've tried to work with the government, we've tried the court system and it has utterly failed so far! Blatant proof is being presented and ignored by democratic and some Republican politicians (Georgia)! The Republican Rebellion is coming soon!

And, on December 27, 2020, he conferred with a friend of his about joining the Proud Boys:

---

[1] The government incorporates by reference the video submissions supporting the plea agreement. United States' Report & Position Regarding Public Release of Video Evidence Re: Blake Austin Reed Plea (Dkt. 147).



On January 4, 2021, Reed posted on Facebook again: "We leave tonight to head to DC from Nashville!!! Who all is going?"  He brought a respirator and ski goggles to D.C.

On January 6, 2021, Reed continued to post on Facebook from Washington D.C. at the Stop the Steal Rally and later at the Capitol.  Referring to then-Vice President Mike Pence's decision to refrain from interfering with the certification vote, Reed posted, "Mike Mike Mike Mike Mike, why Mike?" He also shared the photos directly below that he took at the rally with the

post "Would you look at this crowd!!!!! We're ALL here!!!! #MarchforTrump

#AmericanNationalAnthem          #AmericanFlag          #Trump          #StopTheSteal

#LandOfTheFreeHomeOfTheBrave."





Reed then walked to the Capitol.  He passed signs noting that the Capitol grounds were

restricted.



*See, e.g.*, ECF 147, file 43 – 20210106_133734.mp4 – at 00:31.  Shortly before 2:00 p.m. he settled in the area to the north of the inauguration stage, near the Northwest scaffolding and stairs.  The crowd there began chanting, "Hang 'em high!  Hang 'em high!" over and over again. *See, e.g.*, ECF 147, file 45 – 20210106_134746.mp4 – at 00:00-00:23.  He watched and recorded the scene as the vastly outnumbered Capitol Police attempted to defend the building and the people inside from the rioters.





*See, e.g.*, ECF 147, file 45 – 20210106_134746.mp4 – at 00:33 and 00:37.





*See e.g.* ECF 147, file 49 – 20210106_135450.mp4 – at 00:02 and 00:59.  He also saw tear gas being deployed into the crowd.



*See, e.g.*, ECF 147, file 49 – 20210106_135450.mp4 – at 00:56.  Despite witnessing the calls for the death of lawmakers (i.e. the "Hang 'em high!" chant), continued attacks on officers, the destruction of Capitol property, and tear gas being deployed to disperse the crowd, he stayed and continued participating in the riot.

Reed donned his ski googles and respirator to protect himself from the officers who were defending the building and themselves.



*See, e.g.*, ECF 147, file 73 – 20210106_135953.mp4 – at 00:00.  He saw members of the crowd attacking Metropolitan Police Department officers as they pushed through the crowd to back up the Capitol Police.



*Id. at 00:15.*  He was also in a position to hear an explosion and see the tear gas billowing up from the inauguration stage area.



*See, e.g.*, ECF 147, file 74 – 20210106_140204.mp4 – at 00:00.  One of the tear gas canisters landed near him and a member of the crowd yelled for someone to throw it back at the Capitol.



*See, e.g.*, ECF 147, file 74 – 20210106_140204.mp4 – at 02:02.  Instead of leaving, he continued

participating in the riot.

Around 2:09 p.m., Reed observed rioters pushing over barriers and attacking Capitol

Police, who were forced to retreat.





*See, e.g.*, ECF 147, file 81 – 20210106_140917.mp4 – at 00:24 and 00:44.  He watched as rioters

climbed up the walls of the Capitol's northwest side.  He then turned the camera on himself,

selfie style, and said, "This is insane!  Woohoohoohoo!" in a gleeful manner.  *Id.* at 01:55

Reed joined other rioters in using purloined bike rack fencing as a ladder to climb up onto the north balustrade of the North West Stairs.



*See, e.g.*, ECF 147, file 95 – 20210106_141546.mp4– at 00:02; see also ECF 147, file 94 – 0609_USCG_00_West_Front_North_-_2021-01-06_19h09min25s – at 08:00-08:05.   From there, he stood on the balustrade filming the chaos around him.



*See* ECF 147, file 97 – (Clip_1.1)_0924_USCG_00_ST22_Exterior_-_2021-01-06_19h16min11s

– at 00:45.



*See* ECF 147, file 97 – 20210106_141810.mp4 – at 00:00.  He then hopped onto the stairs and

went up to the northwest terrace, by the Senate wing of the building. He filmed outward towards

Pennsylvania Avenue and exclaimed, "Where's your 80 million now, Biden!  Ha, ha, ha!"



*See* ECF 147, file 100 – 20210106_142115.mp4 – at 00:21-00:26.

Reed joined another group of rioters and entered a door to the Capitol which had been

broken open by other rioters.

17



*See* ECF 147, file 101 – 20210106_142341.mp4 – at 00:04.  He entered shortly after his co-defendants Eric Chase Torrens, Jack Jesse Griffith, and Matthew Bledsoe.



Reed joined a large group of rioters in the Crypt who pushed up to the second floor by a set of stairs near the Memorial Door. As they did so, some of the rioters chanted, "Nancy, Nancy, Nancy, Nancy" over and over.  *See* ECF 147, file 131 – 20210106_143311.mp4 – at 00:00-00:17.  Of note, Speaker Nancy Pelosi's offices are immediately across the hall from the top of these stairs.

Reed did not choose to turn around and leave or to exit the Memorial Doors which were directly in front of him.



*See* ECF 147, file 131 – 20210106_143311.mp4 – at 00:15.  Instead, he went up the stairs, into the Capitol Rotunda, and through Statuary Hall.  He joined a large group of rioters who moved into the Statuary Hall Connector and just outside the House Chamber.  There the crowd chanted, "Stop the steal!" and "Break it down!" repeatedly.



*See* ECF 147, file 143 – 20210106_143839.mp4 – at 00:01; *see also* ECF 147, file 144 –

9d7de52208ae7577d9e67f47ea88ab40.mp4 – at 07:07-07:25.  Meanwhile inside the gallery,

lawmakers sheltered in place as officers stood with guns drawn and barricaded that door.



*See* https://www.readingeagle.com/2021/01/06/trump-protesters-riot-at-us-capitol-in-

washington-dc-photo-gallery/ (last accessed March 21, 2022).  Instead of leaving, Reed

continued participating in the riot, taking a selfie photo with co-defendant Bledsoe.



*See* ECF 147, file 145 – MB 3.jpg.  He moved with the crowd around the hallways outside the House Chamber, then lingered in a hallway to the east of the House Chamber despite seeing the doorway to the outside at the end of a nearby access hall.



*See* ECF 147, file 150 – (Clip_1.1)_0264_USCH_02_Upper_House_Door_Interior_-_2021-01-06_19h36min17s – at 02:45.  He finally choose to leave through the Upper House Door about 24 minutes after he entered the Capitol.

Once outside the building, he lingered on the balcony outside the Upper House Door eventually walking around the Senate side of the building and back up onto the Northwest terrace where he took another selfie and several photos of the ongoing riot.  He then ultimately walked back towards the Mall more than an hour and a half after he arrived on the Capitol grounds.

Reed posted the following compilation of photos on Facebook:



*See* ECF 147, file 145 – MB 6.jpg.  Later that day on January 6th, he exchanged messages on Facebook with his co-defendant and acquaintance, Matthew Bledsoe.  Reed stated: "Good times man" and "Well I'm banned for 7 days.  Because I texted 'we are coming for you', for the title of a video where we were marching towards the Capitol . . ."

*Blake Reed's Post-January 6th Conduct*

Following January 6, 2021, Reed continued to communicate with Bledsoe requesting that he conceal evidence of their crime.  On January 8, 2021, Reed texted Bledsoe to share that he had taken down his Facebook, Instagram, and Twitter accounts.  The following day, Reed sent Bledsoe a number of text messages to concoct a false defense, writing:

- I've never been to DC, there were not any 'no trespassing' signs either.  I thought it was a public building where we could document what was going on.

- We were PRESS documenting the event for our followers.  We never obstructed anything only documented.  I was never told to leave or move the area.  When I was told to leave we left the area immediately as instructed. Download this and read it. [weblink omitted].[2]

On January 12, 2021, Reed followed up with Bledsoe again: "Have you taken down all the pictures and videos, well at least the picture you posted of me?" in relation to the January 6th posts.

On January 16, 2021, FBI agents traveled to Reed's residence in Nashville, Tennessee to execute an arrest warrant for Reed and a search warrant for his residence.  When the agents arrived, they saw a note that Reed had written for them: "Please don't break down the door.  Both my dogs are inside in their kennels and are not aggressive.  Please call me if you need in

---

[2] With this message Reed included a link to a resource from the Reporters Committee for Freedom of the Press.

and I can give you the code for the garage.   Thanks!" (photo below with phone number redacted).



*See* ECF 147, file 202 – Resized_20210117_073740.jpg.

Reed was inside the residence when the agents arrived. The agents searched the residence and seized one cell phone. While there, agents noticed a charger that was plugged into the wall for a different phone than the one they had seized. Upon a search of the seized phone, the agents learned that it was not the phone Reed normally used.

On January 27, 2021, a week and a half after he was arrested, Reed messaged his friend: "20 FBI SWAT showed up in an armored truck Sunday morning in full tacticle [sic] gear with flashbangs and broke my front door in at 6 a.m. Lol it took him 5 hits to get the front door open because I had reinforced it so much with 3" screws." Reed's friend stated, "I figured they went through all your phones stuff and I figured they would say something to me for being in your recent messages lol." Reed responded, "All they got was a $60 go phone from Walmart."

After Reed was indicted in this case, Reed turned over to FBI agents the phone he used to record the riot on January 6, 2021. The phone had no memory card or SIM card and as yet the FBI has not been able to access the phone despite using the codes provided by the defense and making ongoing technical efforts to unlock it.

*The Charges and Plea Agreement*

On January 16, 2021, Reed was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). *United States v. Reed*, Case No. 21-mj-089, ECF No. 1. On January 16, 2021, he was arrested at his home in Tennessee. On March 10, 2021, Reed and his co-defendants were indicted by a grand jury, which charged Reed with the same crimes as those laid out in the complaint. ECF No. 23. Almost one year later, on January 11, 2022, he pleaded guilty to Count Two of the Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building or Grounds. By plea agreement, Reed agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Reed now faces a sentencing on a single count of 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Reed faces up to one year of imprisonment and a

fine of up to $100,000. Reed must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

The defendant agreed under the terms of the plea agreement to pay $500 in restitution. The government has previously briefed the restitution issue before this Court in relation to Co-Defendant Torrens. ECF 99. The numbers for restitution have slightly changed.  In response to the Court's request, the updated calculations on restitution are set forth as follows:

| Architect of the Capitol | $1,234,354.01 |
| House Chief Administrative Officer | $338,294.83 |
| Secretary of the Senate | $32,075.00 |
| Senate Sargent of the Arms | $79,490.05 |
| Total | $1,574,213.89 |

Capitol Police:

| Lost and Damaged Property | $41,719.90 |
| Medical Payments | $73,719.55 |
| Continuation of Pay (COP)/ Workers Compensation | $1,045,129.80 |
| Total | $1,160,569.25 |

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence.

*Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Sentencing Guidelines calculation set forth in the PSR mirror that to which the parties stipulated in the plea agreement:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | 4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)(vii)) | 2 |
| Adjustment for Obstruction of Justice (USSG §3C1.1) | 2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 6 |

*See* PSR at ¶¶ 41-50; ECF 150, page 3.

The U.S. Probation Office calculated Reed's criminal history as a category I, which is not disputed. PSR at ¶ 53. Accordingly, the U.S. Probation Office calculated Reed's total adjusted offense level, after acceptance, at 6, and his corresponding Guidelines imprisonment range at 0-6 months. PSR at ¶¶ 50, 92. Reed's plea agreement contains an agreed-upon Guidelines calculation that mirrors the U.S. Probation Office's calculation.

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided

by professional staff with appropriate expertise,'" and "to formulate and constantly refine

national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give

"respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States
> Sentencing Commission's in-depth research into prior sentences,
> presentence investigations, probation and parole office statistics,
> and other data. U.S.S.G. §1A1.1, intro, comment 3. More
> importantly, the Guidelines reflect Congress's determination of
> potential punishments, as set forth in statutes, and Congress's
> on-going approval of Guidelines sentencing, through oversight of
> the Guidelines revision process. See 28 U.S.C. § 994(p) (providing
> for Congressional oversight of amendments to the Guidelines).
> Because the Guidelines reflect the collected wisdom of various
> institutions, they deserve careful consideration in each case.
> Because they have been produced at Congress's direction, they
> cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both*

determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary'

requirement)," and that *significantly* increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that

might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and

appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this

Court knows, the government has charged a considerable number of persons with crimes based

on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected

to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a

backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class A misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only a handful of times in our history when the building was literally occupied by hostile forces. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. Indeed, as explained above, Reed was fully aware of the unfolding violence and attacks against police as he approached the Capitol that day. He knew there were no tourists there that day, only rioters.

Additionally, while looking at Reed's individual conduct, this Court, in determining a fair and just sentence based on the spectrum of aggravating and mitigating circumstances, should look

to a number of critical factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

Had Reed personally engaged in violence or destruction of property, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on Reed's part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish Reed from most other misdemeanor defendants.

The nature and circumstances of this offense are serious. Prior to arriving in Washington D.C., Reed stated in his December 8, 2020 Facebook post that he was "feeling pissed off" and that "you will see the Republican side of this country go into anarchy stronger than 1776 . . . The Republican Rebellion is coming soon!" As January 6th approached, his behavior escalated. On December 27, 2020, he apparently considered joining the Proud Boys. On January 4, 2020, he used Facebook to coordinate and find out who else was going to D.C.

Once he arrived in D.C., he showed up with protective gear of ski goggles and a respirator mask—ready for violence. As police were attacked near the Northwest scaffolding and tear gas was deployed to ward off the rioters, he took videos of the violent scene. He heard the crowd literally calling for lawmakers to be hung.

Rather than turning around, he donned his protective gear and went further into the restricted grounds, entering the Capitol through a door that someone else had broken open. He entered in the face of a blaring alarm and shattered glass. There is no question that he knew his actions were wrong and unlawful. Any reasonable person would have long-since gathered that the barriers were set up to show where the restricted grounds began, that the tear gas was not a welcome signal, and that this large group of people attacking officers was not an organized tour.

He demonstrated a complete lack of remorse for his actions. He shared a number of troubling posts from the day and reflected with his co-defendant, "Good times man." Facebook even banned him for 7 days for adding a threat to Congress, "we are coming for you," to his video of the crowd marching towards the Capitol.

Unlike his Co-Defendants Torrens and Griffith—who have already been sentenced—Reed took active steps to conceal his crimes and to coach Co-Defendant Bledsoe on how to conceal them as well. This post-January 6th conduct increases the seriousness of his offense and is reflected in the applicable sentencing enhancement. Not only did Reed delete his social media, he asked his Co-Defendant to do so as well.

In anticipation of being arrested and searched, Reed concealed the phone he used on January 6th. After he was arrested, he exchanged messages with a Facebook friend about how he had successfully concealed that phone from investigators and made light of the investigation. Even after being charged in this case, Reed took it further. When the government asked him to turn over the phone he used on January 6th, Reed gave them a phone that had no SIM/memory card, and he provided access codes that did not open the phone. As Reed acknowledged in his guilty plea, his conduct amounted to obstruction of justice for purposes of U.S.S.G. § 3C1.1.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Reed's History and Characteristics

As set forth in the PSR, Reed has no criminal history, has a bachelor's degree, and has a history of employment. ECF No. 165, ¶¶ 51-57, 75-84. Reed appears to have been compliant with his conditions of pre-trial release. However, the investigation in this case has shown the lengths that Reed was willing to take to avoid facing the consequences of his actions. Unlike many other defendants charged in these types of cases, Reed knew that the social media and electronic evidence would certainly lead to his conviction and he took calculated steps to avoid it. First, he removed all of his social media and asked his co-defendant to do the same—more than once. Second, he knew law enforcement was surveilling him, so he concealed the phone that had evidence of his crime. Third, after being charged in this case, he continued to play games by turning in a phone without the SIM/memory card and without notifying the government of its location.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Reed's conversations with his friend on Facebook and with his co-defendant show that he does not grasp the seriousness of his conduct. His history and characteristics support a custodial sentence in this case. The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House

supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan). A sentence of probation or home confinement would be insufficient in Mr. Reed's case.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6th was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that Reed accepted responsibility by entering into this plea agreement. On the other hand, Reed's conduct on January 6, 2021—even after seeing officers being attacked, his statements on social media, and his continued obstructive conduct before and after his arrest clearly demonstrate the need for specific deterrence for this defendant in the form of a custodial sentence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not become the default.[5] *See United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19 ("I don't want to create the impression that probation is the automatic outcome here because it's not going to be.") (statement of Judge Lamberth).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether

---

[4] Attached to this memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.   And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.   *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).   In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may also consider the sentences imposed against Reed's

36

co-defendants, Griffith and Torrens.   The government requested three months' incarceration for Griffith and 14 days' incarceration for Torrens. The request for a higher sentence for Griffith revolved primarily around his post-arrest conduct. Both co-defendants were sentenced to probationary terms, but both of them were also convicted of Class B misdemeanors unlike Reed who is convicted of a Class A misdemeanor.   Reed's crime and conduct—including the enhancement for obstruction—warrant a more serious sentence than that of his co-defendants. Reed spent longer inside the Capitol building.   He went into more restricted areas—coming close to Members of Congress sheltering inside the House Chamber and Gallery.   Reed made more egregious statements before, during, and after January 6th and planned ahead to bring the protective gear. He obstructed the investigation into his conduct. Finally, Reed did not plead early like his co-defendants.

In addition, the Court should also consider the sentences imposed on other January 6th defendants who, like Reed, pleaded guilty to violating 18 U.S.C. § 1752(a)(1) and engaged in similar conduct. *See United States v. Schornak*, 21-cr-278-BAH (sentenced to 28 days incarceration; aggravating factors include preparing for the riot, witnessing violence against law enforcement, making social media posts, asking others to delete their social media, and lack of remorse); *United States v. Tryon*, 21-cr-420-RBW (sentenced to 50 days incarceration; aggravating factors included defying law enforcement commands, witnessing property destruction and proclaiming an intent to interfere with the certification vote); *United States v. Bonet*, 21-cr-121-EJS (sentenced to 3 months incarceration; aggravating factors included entering the Capitol, posting on social media, and making inflammatory statements).

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Blake Austin Reed to three months' incarceration, 12 months of supervised release, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.


Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:     /s/ *Mitra Jafary-Hariri*
MITRA JAFARY-HARIRI
Assistant United States Attorney
Detailee
MI Bar No. P74460

211 W. Fort Street, Suite 2001
Detroit, MI 48226
mitra.jafary-hariri@usdoj.gov
(313) 226-9632

 /s/ *Jamie Carter*
Jamie Carter
Assistant United States Attorney
D.C. Bar No. 1027970
555 Fourth Street, N.W.
Washington, DC 20530
Jamie.Carter@usdoj.gov
(202) 252-6741