UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

* * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Action |
| | ) | No. 21-204-03 |
| vs. | ) | |
| | ) | |
| BLAKE AUSTIN REED, | ) | April 14, 2022 |
| | ) | 12:28 p.m. |
| Defendant. | ) | Washington, D.C. |
| | ) | |

* * * * * * * * * * * * * * * *

**TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE BERYL A. HOWELL,
UNITED STATES DISTRICT COURT CHIEF JUDGE**


**<u>APPEARANCES</u>:**

FOR THE UNITED STATES:
        JAMIE CARTER
        555 4th Street, NW
        Washington, DC 20530
        (202) 252-6741
        Email: jamie.carter@usdoj.gov


FOR THE DEFENDANT:  PAUL BRUNO
        P.O. Box 398
        Murfreesboro, TN 37133
        (615) 896-4154
        Email: pauljbruno@bfhelaw.com


ALSO PRESENT:     ROBERT WALTERS, Probation Officer

Court Reporter:   Elizabeth Saint-Loth, RPR, FCRR
        Official Court Reporter


Proceedings reported by machine shorthand, transcript
produced by computer-aided transcription.

1                         **P R O C E E D I N G S**

2              THE COURTROOM DEPUTY:  Matter before the Court,

3     Criminal Case No. 21-204-03, United States of America versus

4     Blake Austin Reed.

5              Your Honor, for the record, Probation Officer

6     Robert Walters is joining us via videoconference.

7              THE COURT:  All right.

8              THE COURTROOM DEPUTY:  Counsel, please state your

9     names for the record, starting with the government.

10             MS. CARTER:  Good morning, Your Honor.

11             Good afternoon.  Jamie Carter, on behalf of the

12    United States.

13             THE COURT:  Yes.  Good morning.

14             Good afternoon, Ms. Carter.  I usually do these in

15    the morning.

16             MR. BRUNO:  Good afternoon, Your Honor.

17             I am Paul Bruno.  I am here on behalf of Blake

18    Reed, and he is present in the courtroom.

19             THE COURT:  All right.  And, Mr. Bruno, are you

20    vaccinated?

21             MR. BRUNO:  Yes, Your Honor.  Yes, Your Honor.  I

22    have been vaccinated, and have one booster.

23             THE COURT:  Okay.  So then, when you are speaking,

24    you may remove your mask.

25             MR. BRUNO:  Okay.  Thank you.

 1                THE COURT:  Is Mr. Reed vaccinated?

 2                MR. BRUNO:  I don't believe so, Your Honor.

 3                THE COURT:  Then you will keep your mask on at all

 4        times.

 5                Okay.  So we're here for the sentencing of

 6        Mr. Blake Austin Reed, who pleaded guilty to Count 2 of the

 7        indictment against him, for entering or remaining in a

 8        restricted building or grounds, in violation of 18 U.S.C.

 9        Section 1752(a)(1), which is a Class A misdemeanor.

10                So the sentencing hearing is being held in person,

11        but the public access line is being made available for

12        persons to listen to these proceedings remotely, since we're

13        still trying to keep the numbers of people in the courthouse

14        down given the COVID pandemic.

15                And anyone listening to the sentencing hearing

16        over the public teleconference line is reminded that, under

17        my Standing Order 20-20, recording and rebroadcasting of

18        public proceedings, including those held by videoconference,

19        is strictly protected.  Violation of these prohibitions may

20        result in sanctions, including removal of court-issued media

21        credentials, restricted or denial of entry to future

22        hearings, or any other sanctions deemed necessary by the

23        presiding judge.

24                All right.  As I start every sentencing hearing, I

25        am going to start this one, which is:  I am going to list

1    all of the materials that I have reviewed in connection with

2    sentencing to make sure I haven't missed anything, and all

3    the parties are all working from the same set of documents.

4         I have reviewed the probation office's presentence

5    investigation report docketed at ECF 165, and the probation

6    office's sentencing recommendation docketed at ECF 166.

7         I have also reviewed the government's sentencing

8    memo docketed at ECF 171, and the 25 videos and photos

9    listed in the government's report itemizing the photo and

10   video evidence referenced in the government's sentencing

11   memorandum; and that notice was docketed at ECF 172.

12        I have also reviewed the defendant's sentencing

13   memorandum docketed at ECF 170, along with the 18 letters of

14   support submitted on the defendant's behalf by his friends

15   and family docketed at ECF 170-1.

16        Does the government have all of those documents?

17        MS. CARTER:  Yes, Your Honor.

18        THE COURT:  Am I missing anything?

19        MS. CARTER:  No, Your Honor.

20        THE COURT:  Does the defendant have all of those

21   documents?

22        MR. BRUNO:  Yes, Your Honor.

23        THE COURT:  Am I missing anything from the --

24        MR. BRUNO:  No, Your Honor.

25        THE COURT:  Because I didn't -- I don't believe I

1   got a letter submitted by Mr. Reed himself.

2                MR. BRUNO:  He did not submit a letter himself; it

3   was our intent for him to allocute, if that's permissible --

4                THE COURT:  Okay.  That's fine.

5                MR. BRUNO:  -- to the Court.

6                THE COURT:  That's fine.

7                Okay.  So, Mr. Reed, just so you know what's

8   coming up during the course of this hearing, I do my

9   sentencing hearings in four different stages; and I like to

10  tell defendants, at the very outset, how the sentencing

11  hearing proceeds so that you know what is coming up.

12               So the first step is to decide or to determine

13  whether the government or you and your lawyer have any

14  objections to any parts of the presentence investigation

15  report and, if so, I will resolve those objections.

16               The second step is to determine how the federal

17  sentencing guidelines apply in your case.  This is a Class A

18  misdemeanor, so the federal sentencing guidelines do apply

19  to both felonies and Class A, unlike Class B misdemeanors;

20  and so I will resolve any objections to how the guidelines

21  apply in this case.

22               The third step is to hear from the government, and

23  then I will hear from your counsel.  And then the next step

24  is I will hear from you directly, if you wish to address the

25  Court about sentencing in the case.

1          And then, at the last step, I will explain the

2     sentence I am about to impose, and impose sentence.

3          Do you have any questions about what is going to

4     be happening?

5          THE DEFENDANT:  No, Your Honor.

6          THE COURT:  Okay.  So let's start with the

7     presentence investigation report and the recommendation,

8     both of which were filed on March 17, 2022.

9          I understand, Ms. Carter, from the PSR, that the

10    government has no objections to any parts of the PSR; is

11    that correct?

12         MS. CARTER:  Yes, Your Honor.

13         THE COURT:  All right.  And, Mr. Reed, could you

14    just stand right where you are?

15         Are you fully satisfied with your attorney in this

16    case?

17         THE DEFENDANT:  Yes, Your Honor.

18         THE COURT:  And do you feel that you have had

19    enough time to talk to your lawyers about the evidence

20    against you, the presentence investigation report, and the

21    papers filed by the government in connection with your

22    sentencing here today?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  All right.  You may be seated.

25         All right.  For defense counsel -- you are

1      Mr. Evans?

2                MR. BRUNO:  I am Paul Bruno, Your Honor.

3                THE COURT:  You are Mr. Bruno.

4                Mr. Bruno, okay.  I want to keep that straight.

5                So, Mr. Bruno, have you and your client read and

6      discussed the presentence investigation report?

7                MR. BRUNO:  Yes, Your Honor, we have.

8                THE COURT:  And I understand that you had raised

9      two objections to the final PSR, neither of which affect how

10     the guidelines apply in this case.

11               MR. BRUNO:  That's correct.

12               THE COURT:  All right.  And so let me just turn to

13     the objections.  You object to -- step forward to the

14     podium.

15               Thank you.

16               You object, as I understand it, to paragraph 30,

17     which references that:  On January 16th, 2021, when the FBI

18     executed the arrest warrant and search warrant on Mr. Reed

19     and on his home, they found a handwritten note on the door

20     that Defendant Reed apparently wrote to law enforcement that

21     states:  Please don't break down the door.  Both my dogs are

22     inside, in their kennels, and are not aggressive.  Please

23     call me if you need in, and I can give you the code for the

24     garage.  Thanks.

25               And that was in the PSR.  And that also, according

1      to the probation office, and is correct, is what is in the

2      statement of offense underlying the plea in the case.

3                    MR. BRUNO:  Right.

4                    THE COURT:  And you indicate that you object to

5      that paragraph because you say -- despite the statement of

6      offense that was agreed to by the defendant at the plea, you

7      say that he left the note for law enforcement on the door

8      the day before the arrest warrant was executed, and prior to

9      the officers' arrival it was removed and placed in the

10     trash.

11                    So it's hard for me to -- not only does it not

12     affect the -- doesn't affect the guidelines application

13     here, but it is -- I guess you are trying to mitigate

14     whatever taunting that might be for law enforcement

15     reflected in that note on the door by saying that it

16     actually wasn't on the door, and that he must have removed

17     it before law enforcement got there?

18                    What's your point?

19                    MR. BRUNO:  I can tell you it has nothing to do

20     with taunting.  Mr. Reed was aware that law enforcement was

21     coming for him; and he figured that they would be coming to

22     his house to arrest him.

23                    On the Saturday evening -- on a Saturday evening

24     he was not home.  And he put the note on the door because he

25     didn't want them coming to the door, knocking on the door,

1    nobody answering, and then just busting his door in.  So he

2    put a note that says, basically, if you are here, call my

3    number --

4            THE COURT:  Well, I just read the note.

5            MR. BRUNO:  Right.  I will give you the garage

6    code.  You don't have to tear up my door on my house.  Well,

7    they didn't come on Saturday.  So when he returned back

8    home --

9            THE COURT:  Surprise.

10           MR. BRUNO:  When he didn't -- when he came back

11   home, there was no need to leave the note on the door

12   because he was at home.  So he took the note off the door,

13   and the note was found inside the house.  It has nothing to

14   do with taunting anybody.  It's a matter of:  He knows

15   they're coming.

16           And if anybody watches television or anything

17   else, the normal protocol is to blow in somebody's door if

18   they don't answer.  And he was trying to prevent them from

19   tearing up his house by saying:  If you show up and I am not

20   here, I am going to give you the code.  You can just come

21   in, there is no issue.

22           THE COURT:  Well, why does the statement of the

23   offense underlying the plea indicate that it was on the door

24   when the FBI arrived?

25           MR. BRUNO:  I would have to go back and look.

1    I have to look at the statement of the offense specifically

2    to see if that still says it was on the door because we had

3    multiple discussions with the government about it was not on

4    the door at the time -- that there was entry by law

5    enforcement.  I can go back and look --

6             THE COURT:  So there is a picture -- there is a

7    picture of the note hanging on the door, and -- that appears

8    to be hanging on the door in the government's sentencing

9    memo.

10            So perhaps I am going to interrupt you and just

11   have the government -- do you have the statement of the

12   offense?  And does it say that the note was on the door?

13            MR. BRUNO:  That's a picture he took.

14            Law enforcement didn't take that -- my

15   understanding is law enforcement didn't take that picture;

16   he took the picture when he put the note on the door.  We

17   subsequently turned over all pictures and videos that he

18   had; and then the government has used that to put that in

19   here.  Again, you are seeing a picture of the note on the

20   door; but it's my understanding it's not taken by law

21   enforcement, it's taken by Mr. Reed on his own phone.

22            When we turned over everything to the government,

23   they downloaded it and then they have put that in there.

24            THE COURT:  So, on the date that they actually

25   executed the arrest and search warrant, he was there and so

1    he had taken the note down.

2               MR. BRUNO:  When he came back Saturday night and

3    nobody had gone into his house, he took the note off,

4    brought it in the house with him.  They executed the warrant

5    the next morning, and he was home; and so there was no need

6    to have the note.

7               So the note was on there Saturday, but law

8    enforcement never saw it; never -- it didn't affect them

9    because they didn't show up Saturday.  When he came home, he

10   took it off the door because he was at home.  They could

11   knock on the door; he could answer the door at that point.

12              So the picture is accurate, that it's a note on

13   the door; but that's not what law enforcement took.  They

14   didn't take that picture when they got there; that's off his

15   phone.

16              THE COURT:  Okay.  Let me hear from Ms. Carter.

17              So does this -- was the statement of offense

18   incorrect?

19              MS. CARTER:  I don't believe so.

20              So my understanding of that -- I am going to, with

21   the Court's permission, log into my cell phone, because I

22   think that this photo came from the agent, and that it was a

23   photo of it still on the door.

24              With the Court's permission --

25              THE COURT:  Yes.

1              PROBATION OFFICER:  Your Honor, this is Officer

2    Walters with probation.

3              THE COURT:  Yes.

4              PROBATION OFFICER:  If I may, paragraph 30 does

5    not say the note was on the door.  It just says they found a

6    note.  I don't know if that matters, one way or the other --

7              THE COURT:  Oh.  They saw a handwritten note.

8              Okay.  So perhaps I was combining paragraph 30

9    with the picture, which actually has it hanging on the door.

10             MS. CARTER:  So, Your Honor, I received the

11   photograph, which is the government exhibit Your Honor has

12   been referencing on January 17, 2021, at 8:42 a.m., from

13   Agent Daniel Centers [sic].  I did not receive that

14   photograph from the defense; I received it from the agent.

15             And my understanding from the agent is that it was

16   on the door, which is why it's referenced that way in our

17   pleadings.

18             THE COURT:  And the picture that was taken was

19   taken by the agent who was participating in the execution of

20   the warrant?

21             MS. CARTER:  So this agent, Agent Centers, is a

22   local agent.

23             THE COURT:  I see.

24             MS. CARTER:  The agents that were there -- I had

25   understood it that the agents that were there sent him this.

1    I could be incorrect.  I can go and double-check if Your

2    Honor needs that information.  But that is how I received

3    that photograph; it was from Agent Centers when we were

4    communicating about the arrest on January 17th.

5              THE COURT:  Well.

6              MR. BRUNO:  I can clear it up, Your Honor.

7              THE COURT:  Okay.

8              MR. BRUNO:  So I thought that it was off the --

9    there are two phones that we're dealing with in this case.

10   When the agents --

11             THE COURT:  I am going to get to that.

12             MR. BRUNO:  When the agents arrived and they went

13   in the house, they found a phone.  According to Mr. Reed, on

14   that phone is the picture of the note on the door, which

15   would make sense because that was the phone that he was

16   using during this time.

17             That phone was confiscated by the agents and the

18   picture would have been on that telephone.  So she probably

19   did receive the picture from the agent.  But he is as

20   certain as he can be, that's off the phone that they seized

21   in there; that this is not a picture of a sign -- of a note

22   on the door taken by an agent; and she can -- it's easily

23   confirmable.

24             MS. CARTER:  I am happy to step out and ask the

25   agent.  That is not my understanding of where we got this.

1    But I can call the agent right now and come right back into

2    the Court if Your Honor would like that information

3    confirmed.

4             THE COURT:  Well, it's too bad the agent isn't

5    here.

6             MS. CARTER:  Yes, Your Honor.

7             THE COURT:  Since, I mean, this is -- I mean, I am

8    not -- I have to resolve objections to the presentence

9    investigation report; that's my job.

10            So, I mean, my view is -- with probation office's

11   assistance, it doesn't say that the note was actually

12   hanging on the door, despite what the picture says.  It says

13   that they saw a handwritten note.  Presumably, they did see

14   it.  I don't know.

15            Did they see the handwritten note?

16            They certainly saw a photograph of it, so they saw

17   a handwritten note.  And with clarification -- so I don't

18   think that there is anything to correct in paragraph 30.  It

19   doesn't say it was hanging on the door at the time of the

20   execution, although the picture does suggest that, and the

21   government's sentencing memo does suggest that.

22            MS. CARTER:  Yes, Your Honor.

23            THE COURT:  And I thought the statement of

24   offense -- which, for some reason, I just can't put my hands

25   on right now -- did say it was hanging on the door when they

1    went to execute the search warrant.

2           Do you have that?

3           Hold on one second.

4           Yes.  Paragraph 19 of the statement of offense

5    reads as follows:  On January 19th, 2021, FBI executed an

6    arrest warrant for Blake Reed in the case and also executed

7    a search warrant of his home.

8           Upon the FBI's arrival to Reed's residence, they

9    saw a handwritten note that Reed wrote to law enforcement:

10   Please don't break down the door -- et cetera -- that I have

11   already read.

12          So it certainly suggested --

13          MS. CARTER:  Yes.

14          THE COURT:  -- that the FBI saw it when they

15   arrived at the residence.  They didn't wait to see it when

16   they got a phone; and that was already sworn to.

17          But whether it was on the door of the residence,

18   whether they saw it someplace when they went inside, or

19   whether they just saw it on the phone, whether that

20   photograph in the government's sentencing memo -- which

21   suggested that it was taken by law enforcement when they saw

22   it actually came from the phone, I don't think it makes any

23   particular difference.

24          The point is the defendant wrote the note; the

25   defendant had put it on his door when he wasn't there,

1    and -- or while he was there, I don't know; and the PSR

2    doesn't make any more definitive statement about when it was

3    found.

4            But in the future, when there is an objection to a

5    report of the PSR, I would like the government to compare it

6    with the evidence to demonstrate how I am supposed to

7    resolve that --

8            MS. CARTER:  Yes, Your Honor.  I will.

9            THE COURT:  -- because this was not particularly

10   helpful.

11           But thanks to the careful crafting of the PSR by

12   our probation office, I don't think that there is anything

13   to correct here.

14           MS. CARTER:  Yes, Your Honor.

15           THE COURT:  I think, for purposes of the hearing,

16   this is just a clarification.

17           MR. BRUNO:  That's exactly what it is.

18           My memory is, I think the government and I

19   negotiated that language because I think initially it was --

20   said "on the door"; and that was the contention.

21           We don't dispute the fact that they arrived and

22   that they went in and saw the note; that's not in dispute.

23           What the dispute was is:  If it comes up and it

24   says that it's on the door when they arrived, that's the

25   dispute.  So I think the specific language in the statement

1    of offense and specific language in the PSR is correct.

2    They did arrive; they went in, and they saw the note.  But

3    the issue was the note was not on the door when they

4    arrived.

5              I know it doesn't affect the calculations.  And

6    perhaps post hearing if the -- I would be interested if the

7    government can confirm where that picture came from

8    specifically just for my knowledge, I would appreciate it.

9    Because Mr. Reed is adamant of how this happened and where

10   that picture came from and who took that picture; that it

11   was not on the door when they arrived.

12             THE COURT:  I think when this case is sentenced,

13   the government is going to move on to a lot of other things.

14   So your curiosity of where they got the photograph will

15   remain one of the mysteries of this case.

16             All right.  So to the extent that the defendant is

17   asking for any change in paragraph 30, which is how I had

18   understood the objection, denied.  It's -- as written, it's

19   just going to stand as consistent with the statement of

20   offense.

21             The other -- the second objection that I

22   understood the defendant had was to different references in

23   the PSR about not signing -- the defendant not signing

24   release forms to enable the probation office to request

25   records from educational institutions, medical providers, or

1    employers.  And I think the defense position is that they

2    sent -- they sent those release forms to the probation

3    office on February 19th.

4                MR. BRUNO:  There's multiple references in the PSR

5    that due to the defendant's failure to sign a release they

6    couldn't verify things.  Well, I have the email with me.

7    Whereas we --

8                THE COURT:  Okay.  Let me just ask the probation

9    officer.

10               So why are those references in the PSR to not

11   receiving the release forms when defense counsel says that

12   he did submit the release forms?

13               PROBATION OFFICER:  Your Honor, I am looking

14   through my email right now.  That -- I was not aware of that

15   objection; it wasn't made as part of the receipt -- of my

16   receipt of acknowledgment, unless I overlooked it.

17               THE COURT:  No, you didn't.  It's in his -- it's

18   in the sentencing memorandum docketed at ECF 170, on page 5,

19   which says:  One final issue that needs to be addressed.

20   And it was not indicated as an objection to the PSR.  It was

21   in his sentencing memo.

22               MR. BRUNO:  To help him, the email date is

23   February 19th, at 1:35 central time.

24               PROBATION OFFICER:  I will look into that.

25               THE COURT:  When the release forms were sent to

1    the probation office on February 19th, 2022, was that within

2    any deadlines that were set by the probation office for

3    receipt of the release forms so that you could complete the

4    presentence investigation report on a timely basis?

5               PROBATION OFFICER:  So I am looking now.  I had --

6               THE COURT:  It's -- the original, I guess,

7    presentence investigation report was prepared on

8    February 23.

9               PROBATION OFFICER:  The information was requested

10   by February 15th.  It was, as Mr. Bruno said, sent on

11   February 19th.  And I am looking now.  And, yes, they

12   weren't actual, like, PDF documents; they're unopenable

13   files.

14              MR. BRUNO:  They're what?  I missed that.

15              PROBATION OFFICER:  I am pulling them now, that's

16   what is taking so long.  They're nearly crashing my computer

17   trying to open them -- but I will stop the responding.

18              Yes.  They stopped responding.  So they're not --

19   they're not PDFs; they're not usable documents.

20              THE COURT:  So you're saying that the release

21   forms in whatever format the defendant's counsel sent them

22   to you were not accessible?

23              PROBATION OFFICER:  It looks like they were sent

24   through a Google Drive link rather than a usable PDF.  And,

25   of course, I will -- I don't recall if I responded asking

1      for corrected documents, so I will take the blame for that.

2                   But, yes, looking at this, the original documents

3      were sent in an unusable form.

4                   THE COURT:  I see.  All right.

5                   PROBATION OFFICER:  And, of course, if I would

6      have known this at the time of the receipt acknowledgment, I

7      would -- like I said, it wasn't made as an objection.  I

8      would have corrected it then.

9                   THE COURT:  Okay.  And I am looking at the

10     received objections.  I am looking on page 23 of the PSR,

11     which lists the objections that the probation office is

12     alerted to to respond to; and this objection about the

13     release forms was not noted.

14                  So did you note this in any way to the probation

15     office other than in your sentencing memo to the Court?

16                  MR. BRUNO:  I did not because, when I went through

17     and I looked for the objections -- at the time I was focused

18     on factual objections, legal objections -- things like that.

19                  I did not notice the failure to verify based on

20     not turning over the release.

21                  In going back and preparing the sentencing

22     memorandum -- I am going through every single line, I

23     noticed it once, and then I noticed it again and noticed it

24     again.  So then I went back and looked at my emails because

25     I was, like:  I thought that we had turned that over.  And

1    then I noticed it, and then I put it in the sentencing

2    memorandum at that point.

3            What had happened was, we had had a -- he

4    basically had a PSR interview with Mr. Reed --

5            THE COURT:  Could you stand closer to the

6    microphone, please?

7            MR. BRUNO:  He had done a PSR interview with

8    Mr. Reed and with me via telephone.  And subsequent to that

9    he wanted certain things, like a photo ID or a photo that he

10   could use to put in the presentence report for Mr. Reed.

11   Mr. Reed has a business in which he's self-employed, and he

12   wanted information with regard to that; he wanted the

13   releases.  And so that's when I sent all of that information

14   back in this email.

15           The answer to your question is:  I did not notify

16   him as part of my objections in the normal course of

17   business on the PSR.  When I was preparing the sentencing

18   memorandum and I started noticing -- that's when I noticed

19   he's saying that he can't verify because we didn't send

20   releases.  I went back to the email.  And I wanted to put

21   that in there because I didn't want the Court to think that

22   we were not sending releases for there to be verification.

23           Now, with that said, the things that were to be

24   verified, like college degree, employment -- things like

25   that -- I think most of that is verified through his family.

1      I don't think, in the end, it makes a difference; but I

2      didn't want the Court to come away with the impression that

3      we just blew off releases and weren't going to participate

4      in any way where they could verify.

5              So it was sent.  It was sent before the first PSR

6      came out; then, obviously, he had it before the revised PSR

7      came out.  But I didn't realize that he couldn't open it

8      because I could open it.  In one of my sent emails, I didn't

9      realize he could not open one of the things.

10             THE COURT:  All right.  So I think the PSR

11     probably needs to be corrected in those parts that reference

12     that no releases were provided.

13             I think the statement that it couldn't be verified

14     continues; but I think it needs to be clarified that the

15     defendant did submit releases that could not be accessed --

16     or something like that -- and that fully reflects what

17     occurred.

18             What is your suggestion for the correction?

19             MR. BRUNO:  I am fine with the correction.

20             The more important issue for me was that we didn't

21     walk in here with the Court thinking that we did not provide

22     releases for there to be verification.

23             THE COURT:  Right.

24             MR. BRUNO:  I think the Court understands we did;

25     that's the issue for me.

1          As far as the wording in the PSR, I will just

2     defer to the Court because that's not really the most

3     important issue to me; it's that the Court knows that we did

4     comply.

5          THE COURT:  Right.  Well, I think it's on -- there

6     are a number of places that I have counted up where that

7     reference is made.

8          MR. BRUNO:  Yes.  I think I listed them in the

9     last paragraph --

10         THE COURT:  Yes.  I think you listed page 12,

11    note 2, paragraphs 68, 70, 72, 75; and page 17, note 8.

12    There is also page 15, note 6 that says the same issue.

13         So I will just direct that the PSR be corrected to

14    add a sentence that the defendant's submission of release --

15    did submit release forms that were not accessible by the

16    probation office; an issue that only came to the attention

17    of the probation office at the time of the sentencing

18    hearing.  And that will be a fair reflection, I think, of

19    the record -- an accurate reflection of the record.

20         PROBATION OFFICER:  Your Honor, I will make that

21    correction.  Yes, Your Honor.

22         THE COURT:  Thank you so much.

23         All right.  So other than those corrections to the

24    page numbers I have just listed -- and for purposes of the

25    probation officer, I will list them again:  Page 12, note 2;

1    page 15, note 6, paragraphs 68, 70, 72, 75; and page 17,

2    note 8.

3            The rest of the presentence investigation report

4    will be accepted as undisputed and as my findings of fact at

5    sentencing, as supplemented by my review of the video

6    exhibits in the case.

7            We're now at the next step of the sentencing

8    hearing to discuss how the federal sentencing guidelines

9    apply here.

10           The parties agree to the guideline calculation

11   that was reflected in the plea agreement; it's also the same

12   one reflected in the PSR.

13           The presentence investigation found that Mr. Reed

14   has no prior criminal convictions, thus, his criminal

15   history score is zero; his criminal history category is 1.

16           The guideline applicable to the defendant's

17   conviction, under 18 U.S.C. Section 1752(a)(1) for entering

18   and remaining in a restricted building or grounds is the

19   guideline at Section 2B2.3, which provides a base offense

20   level of 4, under the guideline at 2B2.3(a); and then two

21   offense levels were added because the trespass occurred at a

22   restricted building or grounds, under the guideline at

23   2.3(b)(1)(A)(vii).

24           An additional two offense levels are added because

25   the defendant willfully obstructed, impeded, or attempted to

1      obstruct or impede the administration of justice with

2      respect to the investigation and prosecution of the instant

3      offense of conviction under the guideline at 3C1.1; and two

4      offense levels are subtracted for his acceptance of

5      responsibility under the guideline at 3E1.1(a); resulting in

6      a total offense level of 6 which, in combination with his

7      criminal history category of 1, results in an advisory

8      sentencing range of zero to 6 months' imprisonment or up to

9      5 years' probation.  And if a period of imprisonment is

10     imposed, that may be followed by up to one year of

11     supervised release, which is both the guideline and the

12     statutory maximum; a fine range of 1,000 to $9500; and a

13     special assessment of $25 due to the single count of

14     conviction on a Class A misdemeanor; and, here, restitution

15     of $500.

16              Are there any objections, for the record, to this

17     guideline determination from the government?

18              MS. CARTER:  No, Your Honor.

19              THE COURT:  And from the defense?

20              MR. BRUNO:  No, Your Honor.

21              THE COURT:  All right.  We're now at the part of

22     the hearing -- the third step of the hearing, Mr. Reed,

23     where I will hear from the parties about application of the

24     factors, under 18 U.S.C. Section 3553(a), which every

25     sentencing judge is required to consider, and their

1    recommendation for an appropriate sentence in the case.

2            So I will turn first to the government.

3            And just to lay this out, the government's

4    recommending 3 months' incarceration, which is within the

5    advisory sentencing range of zero to six months; followed by

6    12 months' supervised release, which also matches the

7    probation office's recommendation in this case, compared to

8    the defendant's recommendation of a term of probation only.

9            So let's turn to the government first.

10           Ms. Carter.

11           MS. CARTER:  Thank you, Your Honor.

12           One note.  In preparing yesterday and going back

13   over all of my notes --

14           THE COURT:  Ms. Carter, you are fully

15   vaccinated --

16           MS. CARTER:  I am.

17           THE COURT:  -- so you may, if you feel comfortable

18   only, you may remove your mask if you want; otherwise, you

19   can keep it on.  If you are going to keep it on, just speak

20   a little bit more slowly.

21           MS. CARTER:  Perhaps if I keep just one; is that

22   okay?

23           THE COURT:  Sure.

24           MS. CARTER:  That could help a little bit with my

25   volume.

1          THE COURT:  That does help.

2          MS. CARTER:  When I was going over everything

3    yesterday to make sure that I had all my notes in order, I

4    did want to notify the Court of one correction to a

5    statement in the government's sentencing memorandum.

6          When the -- on page 5, when the defendant's

7    posting on Facebook is referenced, where he says:  "Mike,

8    Mike, Mike" -- et cetera -- "Why Mike?"  That posting was

9    not actually on the 6th, it was on the very early morning,

10   around 12:40-ish, on the 7th.  So to the extent that that

11   matters -- I don't think it's a particularly integral part,

12   but I did want to notify the Court of our error, and

13   apologize.

14         THE COURT:  Okay.  So this is on page 5, where he

15   posted "Mike, Mike, Mike, Mike, Mike, Mike" -- et cetera --

16   "Why Mike?," that was on the 5th?

17         MS. CARTER:  Yes.  On the 7th --

18         THE COURT:  On the 7th, I see.

19         MS. CARTER:  -- in the morning, just past

20   midnight.

21         THE COURT:  Okay.  Got it.

22         MS. CARTER:  Yes.  Your Honor, I am happy to go

23   over the factors if that would be helpful to the Court.  But

24   I am also happy --

25         THE COURT:  Well, let me just ask you some

1    questions here.  So the cell phone issue, what was recovered

2    when, and what, and so on.

3              So, as I understand it, the FBI executes a search

4    warrant on January 16th, 2021, at the defendant's home.

5    They seize one cell phone; and they see a charger plugged in

6    for another cell phone which -- or another phone that's not

7    compatible with the phone they seized.  And so they know

8    that there might be another phone floating around, but they

9    seized the one single cell phone that they find.

10             I am going to call that Phone Number 1.

11             And from review of Phone Number 1, the FBI

12    determined that this was not the phone the defendant used on

13    January 6th.

14             MS. CARTER:  Correct.

15             THE COURT:  I have that correct so far, right?

16             MS. CARTER:  Yes, Your Honor.

17             THE COURT:  And they came to the conclusion that

18    this phone, Number 1, was not the one used on January 6th

19    based on what?

20             MS. CARTER:  Based on how new -- my understanding

21    is based on how new the phone was and how little information

22    was on the phone.

23             This was not a phone which he had had in a

24    long-standing capacity.  And that was the reason they

25    believed that -- combined with the plugged-in charger that

1    did not match it, led them to believe that he had hidden his

2    original cell phone which he was using on the 6th.  That's

3    their basis.

4         THE COURT:  So that's interesting because the

5    defendant says he had been using Phone Number 1 for over two

6    and a half years.

7         So, I mean, did the government look at Phone

8    Number 1 and say:  There is no usage on this phone prior to

9    January 7th, 2021, or some date close in time to

10   January 16th, 2021, when they seized it?  And if that's the

11   case, how am I supposed to reconcile the defendant saying he

12   actually had been using Phone Number 1 for over two and a

13   half years?

14        MS. CARTER:  So the defendant's statement that he

15   had been using it for that length of time is inconsistent

16   with my understanding of what our evidence showed.

17        That said, I don't think the defendant's statement

18   actually gives a great deal of detail.  So to the extent

19   that he used it with a different SIM card or used it on a

20   different plan -- I know there are burner phones from

21   Walmart, which is, I think, essentially what he has

22   described his phone as -- where you can buy a SIM card,

23   which might have a number of minutes on it; use it, like, in

24   your car as an emergency phone just in case your original

25   phone doesn't work, or what have you.

1       So I think the lack of information as to the

2   capacity in how he was using the phone for that length of

3   time might be where some of the confusion lay; but that was

4   the reason that we thought it was not his phone that he had

5   been actively using.

6       THE COURT:  All right.  And so then the government

7   says that on January 7th, 2021 -- this was after the

8   execution of the search warrants -- Mr. Reed messaged a

9   friend saying how all the government took was a $60 phone

10  from Walmart, and implied they didn't have his primary

11  phone.

12      So is that when the government realized that the

13  defendant, in fact, hadn't produced the phone he was using

14  on January 6th, when they saw that message?

15      MS. CARTER:  We were suspicion originally based on

16  the evidence I laid out.  And then, once we got the Facebook

17  post, which was later, then that did confirm for us that he,

18  in fact, had swapped out one phone for the next.

19      THE COURT:  Okay.  So now let's turn to the time

20  period after the defendant was indicted.

21      MS. CARTER:  Yes, Your Honor.

22      THE COURT:  He then turned over a second phone --

23  I am going to call that Phone Number 2.  The government

24  contends that Phone Number 2 had no memory card or SIM card.

25  And the FBI has not been able to access that phone,

1    Number 2, despite using the codes provided by the defendant?

2              MS. CARTER:  Correct.

3              THE COURT:  Do I have that right?

4              MS. CARTER:  Yes.  That is my understanding.

5              THE COURT:  Okay.  So yet another puzzle.

6         The defendant says that the SIM card for Phone

7    Number 2 was actually in Phone Number 1, so that's why Phone

8    Number 2 had no SIM card.  And, as I understand it, a SIM

9    card simply stores -- you know, just enables a phone to

10   connect to a network.

11        Does a SIM card actually store any information

12   like text messages, pictures, or videos?

13             MS. CARTER:  It can.

14             THE COURT:  It can.  Okay.

15             MS. CARTER:  Yes, but it depends on the phone and

16   the SIM card and how you're saving things.  And that's based

17   on my personal -- having had past phones, where, like -- I

18   was, like, why did I not get all my stuff back when I

19   switched phones?  They were, like, because it wasn't saved

20   on your SIM card; it was saved on your phone.  That is why I

21   believe that SIM cards -- depending on where you are saving

22   it -- to your actual physical phone or to a SIM card, that

23   could make a difference.

24        The other alternative -- which, again, we don't

25   know because we are not privy to this information -- would

1     be the potential to delete things off the SIM card before

2     swapping it to a different thing after saving it to another,

3     like, hard drive, computer -- what have you.

4              THE COURT:  Okay.  So -- but Phone Number 2 didn't

5     have a SIM card.  And to the extent Phone Number 2 was the

6     phone he was using on January 6th, and he had saved

7     material -- information or content -- on the SIM card, you

8     would have gotten that already from Phone Number 1 because

9     he says that had the SIM card?

10             MS. CARTER:  Assuming that things weren't deleted

11    in such a way that we would not be able to recover them --

12    which I am not -- I don't have that great level of technical

13    knowledge; I know we did a download.  But assuming that's

14    not the issue then, yes, we would already have them.

15             THE COURT:  All right.  Now, Phone Number 2 had no

16    memory card.  And is it on the memory card in cell phones

17    that mostly hold the content like texts, pictures, and

18    videos?

19             MS. CARTER:  Again, I think that is due to

20    settings in a particular phone, so it would depend on the

21    particular item itself.  I am unable to answer based on the

22    defendant's specific phones -- what that would or would not

23    hold, memory versus --

24             THE COURT:  Okay.  So why should I be concerned

25    if, when he turned over Phone Number 2, it didn't have a

1    memory and it didn't have the SIM card if the SIM card was

2    already in the government's possession because they had it

3    from Phone Number 1, and you're saying that the memory card

4    may not have anything?

5         So why should I be concerned that Phone Number 2,

6    when the defendant turned it over post indictment, didn't

7    have a memory card?

8         MS. CARTER:  So if it was turned over

9    effectively -- I'm sorry.  Let me back up.

10        If Phone Number 1 had the SIM card as the

11   defendant has stated that was originally in Phone Number 2,

12   and Phone Number 2 was what he used on January 6th, then I

13   would say the absence of the large number of videos and

14   photos from SIM Card Number 1, during that download, is a

15   red flag that the defendant has continued his obstructive

16   practice of deleting and otherwise destroying evidence.  So

17   I do think the Court should still consider it as part of a

18   larger pattern.

19        The other thing I would note is that it was not

20   turned over with the communication about that.  It was

21   turned over.  We reached out and said:  Why is there no SIM

22   card, memory card, and the communication that's in it?  So

23   it's, again, just a pattern over time and as part of that

24   pattern.  In and of itself -- isolated -- I don't think it

25   carries a lot of weight.

1          THE COURT:  All right.  So with this confusion

2     over -- or maybe it's just confusing to me as to what was

3     missing from which phone and did it make a difference.

4          You know, I then look at the government's list of

5     all of this video and pictures that have been produced in

6     this case, 25 in total, and a number of them have, as a

7     source, defense.

8          So I am presuming that a lot -- a lot of the

9     videos, a number of the videos and pictures came from the

10    defense.  And so was the defense source -- I mean, the

11    government doesn't detail precisely what the source is other

12    than a broad category of defense.  So were some of those

13    videos and photographs from either Phone 1 or Phone 2?

14          MS. CARTER:  Those were from defense counsel.

15          The government indicated to counsel, as part of

16    our plea negotiations, that if he wanted the particular plea

17    that we were negotiating about that, as part of the terms of

18    our agreement, he was responsible for turning over all video

19    and photos.  And so those -- that chunk of video and photos

20    that Your Honor sees referenced as from the defense, those

21    are from that disclosure from the defense attorney to us,

22    our office.

23          THE COURT:  I see.  And do you know where the

24    defense counsel got them?

25          MS. CARTER:  Presumably, from his client.  Other

1    than that, I do not have specifics.  That was my

2    understanding as to any --

3            THE COURT:  Well, this is very unusual because the

4    government usually takes the phone so it can forensically

5    examine it and identify precisely what's on there; rather

6    than relying on a go-between to cherry pick -- figure out

7    what they're going to pick to -- produce.

8            So, really, that's how -- that's how the

9    government here investigated this case -- and just relied on

10   defense counsel to go and figure out what he was going to

11   produce to the government?

12           MS. CARTER:  We are still actively working on

13   Phone Number 2, trying to get that open and get that

14   information; that is still an ongoing process.

15           But as far as this -- this was based on

16   representations of counsel.  And we made very clear that we

17   needed any and all photos, video, or other media that was

18   gathered during January 6th turned over.  And so based on

19   the representations of counsel, that's what we have.

20           THE COURT:  Well, isn't it part of the limited

21   quasi-cooperation provision in the plea agreement that the

22   defendant is supposed to allow the government to review his

23   cell phones or social media, or is that wrong?  Or is it

24   just part of the quasi-cooperation term of the plea

25   agreement that the government is just supposed to accept

 1    whatever the defense counsel decides should be turned over?

 2          MS. CARTER:  We have a provision that we are able

 3    to review any posting -- in this case, we have Mr. Reed's

 4    Facebook; so that was part of a search warrant return that

 5    we already have in our possession, and then any photos and

 6    videos.  But as far as the means by which that was carried

 7    out, it was handled through counsel -- from our office

 8    through counsel; that's how things got to us.

 9          THE COURT:  Okay.  And I know you say you are

10    still working on getting access to Phone Number 2, but this

11    defendant is at sentencing here today; so what good is that

12    going to do anything?  It's certainly not going to help the

13    sentencing judge figure out if there is additional

14    evidence -- or the government.

15          MS. CARTER:  Yes, Your Honor.

16          Mr. Bledsoe is still proceeding to trial in the

17    fall, and so he has not waived his right to discovery; and

18    so because of that we are continuing --

19          THE COURT:  I see.  And your access troubles with

20    Phone Number 2 are what?

21          MS. CARTER:  So we tried the codes that were given

22    to us.  My understanding from counsel's representations is

23    that Mr. Reed also tried, at their office, to open the phone

24    unsuccessfully.  And so now we're just waiting on whatever

25    machine it is that sits there and tries to unlock the phone

1    for however many months it takes the machine.  That is the

2    process that we are in right now.

3              THE COURT:  I see.  Mr. Reed doesn't remember his

4    access code, is that what is going on?

5              MS. CARTER:  That is my understanding, yes.  He

6    has provided us with codes; they have not worked.

7              THE COURT:  I see.  Okay.  So you don't know if

8    all of the videos that have been produced are really all of

9    the videos from January 6th based on the FBI's own

10   investigation and examination of original electronic

11   devices; is that correct?

12             MS. CARTER:  Yes.  And I can note for the Court

13   there is at least one photograph that appears in Mr. Reed's

14   Facebook that is not found in the photographs that were

15   produced by the defense, so it is possible that we do not

16   have everything.

17             THE COURT:  Okay.  So let me just now turn to some

18   of the video evidence in the case.  There are two files or

19   videos that show the crowd outside the House Chamber door

20   demanding that they be let in, with other photographs that

21   the government has put in its brief, on page 20, that shows

22   lawmakers sheltered in place, as officers stood with guns

23   drawn and barricaded at the door, with the crowd of which

24   Mr. Reed was a part outside -- you know, shouting and trying

25   to break into the House Chamber door.

1          Are the date timestamps on the photographs of the

2    cowering staffers and Congress people, on page 20 --

3    correspond to the times of -- the date timestamps on the

4    videos?

5          MS. CARTER:  I apologize, Your Honor.

6          I am just moving back to look at the timestamps

7    because I don't think I realized there were timestamps on

8    the photographs.

9          I can give Your Honor a timeline as I calculated

10   it as to why I believed those two things happened around the

11   same time; although, obviously, second to second I cannot

12   match them up.

13         THE COURT:  Well, certainly your briefing

14   indicates that this was all happening at the same time --

15         MS. CARTER:  Yes.

16         THE COURT:  -- so I thought, perhaps, it was date

17   and timestamped; and I was just so curious about that.

18         MS. CARTER:  Yes, Your Honor.

19         So the reason that I believe these two events are

20   occurring during the same time period is based off of the

21   U.S. Capitol Police timeline, combined with the timeline

22   that I created as part of my investigation in this case.

23         So based on those two things, Mr. Reed would have

24   joined the crowd out in the Statuary Hall connector, which

25   is that hallway immediately in front of the door, around

1    2:35 p.m.

2            At 2:37 p.m., per the Capitol Police timeline, the

3    corridor to the House Chamber was breached.

4            At 2:39, U.S. Capitol Police personnel began

5    evacuating members inside the House Chamber.

6            At 2:42, he turns the corner to move towards the

7    east side of the building down the hall; and the shooting

8    occurs in the back of the House Chamber, in a side hall, at

9    2:43.

10           And at 2:43 to 2:44, he turns the corner into the

11   stairwell.

12           At 2:44, there are still 12 to 15 members of

13   Congress in the gallery who have been ordered to shelter in

14   place because SWAT is being dispatched to those people.

15           And then, at 2:49, Mr. Reed exits the building.

16           So based on that timeline, the combined Capitol

17   Police information, and Mr. Reed's information, as I

18   determined based on all of the information I had, those two

19   events were happening at the same time.

20           THE COURT:  Okay.  And this is during this short

21   period of time where -- I guess it's a defense video that

22   the defense produced, that Mr. Reed took, shows him standing

23   with this mob, one of whom is holding up a big sign, "Stop

24   the Steal"; and they're all chanting loudly, "Stop the

25   Steal."

1           And how far back would you say from the door of

2     the house chamber, with these members and staffers cowering

3     inside under the seats -- how far is this defendant from

4     that door?  Would you say 50 feet?  Less than that, more

5     than that?

6           MS. CARTER:  So if I may, Your Honor -- I am not

7     the best with distances; but I would estimate that where I

8     currently am, which is just past the beginning of counsel's

9     chambers [sic] -- to where Your Honor's bench is, is

10    approximately the distance between where Mr. Reed would have

11    been, in that hallway, and the door into the House Chamber.

12          That would be my estimate.

13          THE COURT:  Okay.  Well, that's about 20 feet, 25

14    feet.

15          MS. CARTER:  I am not good at -- I am not good at

16    distances.  I'm sorry.

17          THE COURT:  So that was pretty close.

18          MS. CARTER:  Yes, Your Honor.

19          THE COURT:  All right.  So let me just talk about

20    the sentencing scheme here because -- in sentencing other

21    defendants who plainly were susceptible to believing lies

22    about a stolen presidential election and participating in

23    mob action based on those mistaken beliefs to stop the

24    peaceful transition of power -- a number of judges in these

25    cases have thought it would be important to this community

1   in D.C., and the broader American community, to ensure that

2   they have supervision for at least three years through the

3   next mid-term elections and presidential election to make

4   sure that whatever they may believe -- they can believe the

5   moon is made of Swiss cheese -- whatever they believe, fine;

6   they can believe it.

7        But to the extent that they believe political lies

8   and have been demonstrably willing to act on those beliefs,

9   it would be helpful to have them under supervision at least

10  for 36 months.

11       And here, if the defendant is sentenced to the

12  term of imprisonment that the government's recommending, the

13  statutory maximum period of supervised release that could be

14  imposed is only 1 year, not 36 months, not for 3 years.  So

15  if you want to ensure that the defendant is supervised for

16  the next 3 years, it requires a period of probation to be

17  imposed because the statute allows up to a 5-year period of

18  probation.

19       So there is this tradeoff in the statutory scheme

20  between harsher punishment with a jail term or longer

21  supervision, but not both, for a Class A misdemeanor.

22       Does the government consider it more important to

23  subject individuals like the defendant to the harsher

24  punishment of a period of incarceration as opposed to

25  keeping them under supervision in the federal criminal

1    justice system for several years?

2              MS. CARTER:  I think both have merit in different

3    ways.

4              So for the incarceration, by using that on the

5    front end, we demonstrate that like things only go down from

6    here.  And Your Honor is aware of the massive disruption

7    that incarceration causes to a life.  So it's a very real

8    and visceral time for three months where the defendant is

9    separated from his job, his family, and his friends; and he

10   is sent to an entirely different location and he surrenders

11   a lot of the freedoms that you have in everyday life.  That,

12   I think, carries a lot of weight, to be frank.

13             And, certainly, having a supervised probation

14   officer keeping an eye on, being in close contact with,

15   monitoring a person, certainly, also has its benefits; but

16   remembering that has weight if a person is making future

17   decisions.  So I do think they both have good reasoning

18   behind them; but I think that's why we're asking for the

19   time in jail.

20             THE COURT:  And I have looked at the government's

21   very helpful and ever-growing chart of other sentences

22   imposed on January 6th cases.  And from looking at the chart

23   submitted with the government's sentencing memorandum in

24   this case, it lists 15 cases involving conviction under

25   1752(a)(1), this same Class A misdemeanor.  And out of those

1    15 cases, 10 of the defendants were given a period of

2    incarceration, either as a straight term of incarceration or

3    intermittent confinement as a condition of probation.

4            So based on that, is it the government's position

5    that some period of incarceration would not be an

6    unwarranted sentencing disparity in this case?

7            MS. CARTER:  I don't think it would be an

8    unwarranted sentencing disparity.

9            As Your Honor knows, I was before you before in

10   two of the other defendants in this case.  To some extent,

11   we're still creating what the norms are in these cases.

12   We're very early on.  We think 2000 to 2500 people were in

13   the Capitol that day unlawfully, and so we are in the very

14   beginning.  And I think, to that extent, one, we're still

15   setting all of those norms.

16           But we offered the Court three people,

17   Mr. Schornak, Tryon, and Bonet, which we thought were

18   applicable -- like analogous to the sort of factors that are

19   here with Mr. Reed.  And Your Honor has acknowledged in past

20   sentencings, each person is an individual; and this is one

21   of many factors that the Court has to balance.

22           THE COURT:  All right.  So let me turn to the two

23   other defendants in this case.  Well, let me start with the

24   factors in this case.  And the government has also provided,

25   you know, a fairly transparent list of the factors that the

1    government is looking at in making its recommendation for

2    three months of incarceration here.  I just want to focus on

3    a couple of those factors to make sure I am understanding

4    them.

5              One of the factors is that the -- that the

6    government cites is that this defendant traveled through

7    many nonpublic areas, including the hall near the Senate

8    wing door, the area around the Memorial door, and the

9    hallways around the House Chamber.

10             When you say "nonpublic areas," you mean those are

11   areas that even, under normal circumstances, tourists are

12   not allowed to go; is that correct?

13             MS. CARTER:  Yes.

14             THE COURT:  And tourists, even when they have gone

15   through security checks, have been screened for firearms and

16   dangerous weapons, bear spray, and everything else -- even

17   tourists are not allowed to go to these nonpublic areas

18   because they're so sensitive because of staff, elected

19   representatives who are working in and around those areas?

20             MS. CARTER:  Correct.

21             THE COURT:  Because -- I just want to make that

22   clear because, frankly, on January 6th, the entire Capitol

23   was supposed to be a nonpublic area.

24             MS. CARTER:  Correct.

25             THE COURT:  The public wasn't allowed anywhere in

1    that building, but these nonpublic areas you have designated

2    are nonpublic even to tourists; is that right?

3              MS. CARTER:  Yes.

4              THE COURT:  So one of the factors that the

5    government also has highlighted is that this defendant had

6    discussed joining the Proud Boys.  And the government

7    describes this, in its memo at page 30, as part of an

8    escalating behavior by the defendant pre-January 6th.

9              And I just want you to explain -- this was before

10   most people in America had ever heard of the Proud Boys, who

11   had gained some prominence or -- infamy, I should say --

12   post January 6th.  So why does considering membership of the

13   Proud Boys count as "escalated behavior."

14             MS. CARTER:  So the Proud Boys -- leading up to

15   the January 6th event had already had a violent incident or

16   two here in the District, Your Honor will recall.

17             So, in and of itself, their appearances in -- I

18   want to say it was December the year before, but I am not

19   100 percent certain of the exact date.  I recall there were

20   incidences of violence, that they were tearing down a banner

21   at a Black church here in town; there were attacks and

22   fights amongst their members and members of our community.

23   So, in and of itself, that is of concern.

24             I would also note that there is the whole

25   "standby" comment that was made by the former President; I

1    would note that as well.  And then, also, that they are

2    listed -- that they have similar behaviors as a gang; they

3    have initiation rituals.  They have colors that they

4    normally wear; although some of the groups chose not to wear

5    those, chose to go incognito on January 6th.

6              Also, we have asserted, in various papers, that

7    they had planned for January 6th specifically, where they

8    did intend to come and go into the Capitol.

9              THE COURT:  And other than this -- I think it's

10   just one email or text exchange --

11             MS. CARTER:  Yes.

12             THE COURT:  -- where this defendant evidences

13   interest in joining the Proud Boys.

14             Is there any other evidence that the government

15   has uncovered that this defendant pursued that?

16             MS. CARTER:  No.

17             THE COURT:  All right.  Or any other evidence that

18   this defendant engaged in other communications directly with

19   any Proud Boy representatives?

20             MS. CARTER:  No.  I have no further evidence, just

21   that one piece.

22             THE COURT:  But, of course, you have never gotten

23   access to his phone?

24             MS. CARTER:  Correct.  The phone that we

25   believe -- Phone 2, we have not had access.

```
 1                  THE COURT:  Phone 2.

 2                  And the defense counsel didn't voluntarily produce

 3       to you any text messages or anything else from that phone

 4       that indicated communications with the Proud Boys?

 5                  MS. CARTER:  No, Your Honor.

 6                  THE COURT:  Okay.  Did you inquire of defense

 7       counsel where he was getting all of the information he was

 8       producing to you or to the government?

 9                  MS. CARTER:  I had understood that -- from defense

10       counsel, that Mr. Reed had held on to said video and photos

11       because he wanted to have evidence of his behavior on that

12       day, and he was not sure if we would have video evidence;

13       and that was the reason that he held on to things.  That is

14       the extent to which I understand where the photos and videos

15       were.  They were with Mr. Reed for purposes of his defense.

16                  THE COURT:  And you don't understand in what

17       medium -- what kind of electronic device, whatever, Mr. Reed

18       was holding on to it?

19                  MS. CARTER:  No, Your Honor.

20                  THE COURT:  Okay.  So another factor cited by the

21       government is that this defendant climbed a purloined bike

22       rack and used it as a ladder, and stood on the balustrade of

23       the northwest terrace stairs in the Capitol.  And there were

24       thousands of people who were doing that based on the videos

25       I have seen in this case and in other cases.
```

 1           So why is this a particularly aggravating factor?

 2           MS. CARTER:  So there is actually a separate

 3    crime -- and Your Honor will forgive me, I don't remember

 4    the exact statute -- for climbing on things you are not

 5    supposed to climb on, like statues and balustrades, and

 6    other items at the Capitol grounds.  You are just not

 7    supposed to do it for obvious reasons -- not the least of

 8    which is the Capitol itself is historic, and we would like

 9    to keep it in one piece for future generations.

10           Aside from that, it could be argued that by

11    purloining the property in order to move it from point A to

12    point B, to put it up there, that you have effectively

13    stolen it; it's a theft charge, potentially.

14           THE COURT:  Or conversion.

15           MS. CARTER:  Yeah.  Conversion, exactly.

16           So with the potential of those two charges, that's

17    why we note it for the Court.  We did not choose to go

18    forward with those charges because we came to a plea

19    agreement, but we do think that's an aggravating factor.

20           THE COURT:  Okay.  And then another factor that

21    the government cites is that he entered the Capitol Building

22    not long after it was violently breached, with the damage

23    visible and the alarms sounding.

24           So what's the government's best estimate of how

25    soon after the initial breach of the Capitol -- which I

1    think happened on at least one Senate wing door around 2:13

2    p.m. -- that this defendant entered?

3                  MS. CARTER:  Yes.

4                  Court's indulgence.

5                  Your Honor, my recollection is the same as Your

6    Honor's.  At 2:13 p.m., the Senate wing door -- the doors

7    and windows were broken as the crowd was gaining access to

8    the building.  And at 2:25 p.m., yes, is when Mr. Reed

9    entered the same door that had been broken open by other

10   rioters.

11                 I would note that his codefendant has video.  He

12   comes in shortly before Mr. Reed -- not at the exact moment,

13   but I would say within a minute or two minutes.  You can

14   actually hear the alarm on that video.

15                 THE COURT:  Right.  Okay.  And the government says

16   that this defendant did not plead early like his

17   codefendants.  And I wanted to inquire about that because --

18   I mean, early pleas are just sort of one of those normal

19   things that sentencing judges look at, in terms of

20   acceptance of responsibility; so I am looking at that in

21   these cases, how quickly is a defendant accepting

22   responsibility by entering a plea and resolving the cases as

23   a sign of remorse or acceptance of responsibility, and some

24   acknowledgment of what was done on January 6th at the

25   Capitol, to this country.

1          And I look at the plea offer in this case, and I

2      see that it's dated November 12, 2021 -- that's the date on

3      the signed plea agreement; and the defendant signed the plea

4      offer on November 16th, four days later, which seems pretty

5      prompt to me.

6          So I was just wondering why it is, when the

7      defendant signed the plea offer four days after it was

8      offered, why isn't that prompt?  Unless the plea offer had

9      been outstanding for some time, which I don't know about.

10         But what is the basis for the government then to

11     say that he did not plead early?

12         MS. CARTER:  So there were extensive plea

13     negotiations back and forth, between the parties.  And I

14     apologize, I don't have access to my email right now because

15     I don't have Wi-Fi so I can't verify the exact dates.  I

16     didn't come prepared with the dates, so I apologize.

17         But it was the extended period of time that we

18     were negotiating back and forth specifics of the various,

19     like, aspects of the plea offer.  I recall having -- I

20     recall having finished drafting and going back and forth

21     with defense about language; but I do not recall the exact

22     timing to give Your Honor dates.  I'm sorry.

23         THE COURT:  Okay.  Based on the facts in front of

24     me, it looks like a fairly prompt plea -- acceptance of a

25     plea offer.

1          Okay.  The government also says the defendant has

2     demonstrated a complete lack of remorse for his actions and

3     goes on to say:  Based on his conduct post riot, including

4     by sharing Facebook posts of his participation and his

5     active steps to conceal his crimes.

6          Did the government [sic] -- as part of his

7     compliance with the quasi-cooperation term in the plea

8     agreement have to agree to an FBI interview in this case?

9          MS. CARTER:  He did agree to do it.  The FBI

10    declined to do the interview.  We reached out to the FBI and

11    offered them the opportunity, and they decided not to.

12          THE COURT:  I see.  Okay.

13          So when the government says, "The defendant has

14    demonstrated a complete lack of remorse for his actions,"

15    what's the basis for that if the FBI didn't have an

16    opportunity to evaluate Mr. Reed in an interview?

17          MS. CARTER:  The basis is his social media posting

18    afterwards.  I would specifically reference -- let me get

19    the Court the number of the posting.

20          Court's indulgence.

21          Item No. 22 -- I'm sorry.  On page 22, what we had

22    originally turned over as part of the larger disclosure of

23    video and photos, Item 201, which is titled MB6 [sic],

24    photos from tips; that is a posting on Facebook.  And having

25    done a little bit of research -- because I am not a Facebook

1    person -- there is a little globe on that item to the right

2    of the Washington, D.C. caption.

3            My understanding, based on that research, is that

4    that is a public posting and not a posting to particular

5    people but, rather, to the world at large via his Facebook

6    account.  And he makes the statement:  "We the people have

7    spoken, and we are pissed."  "No Antifa."  "No BLM."  "We,

8    the people, took the Capitol."  "Every American ethnicity

9    was here."  "DEMOCRATIC TYRANNY WILL NOT STAND" -- all in

10   caps.  "WE HAVE SPOKEN" -- all in caps, and in various

11   hashtags.

12           That, combined with his communications with his

13   friend regarding the Walmart phone, his arrest, his

14   disregard for the FBI's ability to find things, et cetera,

15   all indicate a lack of remorse.  So his postings are the

16   primary way in which I am determining that.  I do not have

17   the benefit, as Your Honor has noted, of his words yet.

18   There was no letter submitted, and I do not have an

19   interview.

20           THE COURT:  All right.  Is there anything else you

21   would like to add?

22           MS. CARTER:  No, Your Honor.  Thank you.

23           THE COURT:  All right.  Mr. Bruno.

24           MR. BRUNO:  I certainly can answer any of Your

25   Honor's questions.  But I can clear up the phone situation,

```
1     if you want to know what happened to --

2              THE COURT:  It's a little late at a sentencing

3     hearing, actually --

4              MR. BRUNO:  Well, but you have got a --

5              THE COURT:  Go ahead.

6              MR. BRUNO:  The government is aware of this; I

7     have told them this many times.

8              He had one phone in the Capitol.  You can see him

9     walking around videoing things, and all that kind of stuff.

10             THE COURT:  I have seen it.

11             MR. BRUNO:  When he came back from D.C. to

12    Tennessee, became aware that the police basically knew he

13    was there and were probably coming for him; he took the SIM

14    card out of that phone.  Okay?  He wanted to keep that

15    phone.  He was not aware of what video was going to be in

16    the Capitol and how all of this was going to play out.  But

17    he knew on that phone, videoing all of the stuff, taking

18    pictures -- that it was proof that he walked in there;

19    calmly and peacefully walked all the way through, and walked

20    out.  He didn't tear anything up; he didn't threaten

21    anybody.  He knew that was on there.

22             Now, he is in there, and he has pled guilty.  He

23    didn't know how this was going to play out.  He took the SIM

24    card out of the phone.

25             He had another phone.  Your Honor refers to that
```

1   as the phone he had used for two and a half years.  The word

2   is he had owned it for two and a half years, not used.  He

3   bought that phone in June of '18.

4          When we were discussing the statement of the

5   offense, I made the government aware of that.  Instead of

6   putting that in the statement of offense, they just left

7   that out of the statement of offense.  So the government was

8   aware that he had purchased that phone in June of '18, two

9   and a half years before January 6th of 2021.

10         He took the SIM card out of the phone that he had

11   at the Capitol and put it in the phone he had owned for two

12   and a half years.  Okay?  He was using that phone at the

13   time of the search warrant.

14         The original phone was in the house.  When the

15   search warrant was conducted, law enforcement found what you

16   referred to as Phone Number 1 and the charger; but they did

17   not locate Phone Number 2 when they left.

18         Phone Number 2 -- also part of Phone Number 2, he

19   had downloaded videos and images, and stuff like this, to a

20   thumb drive.

21         When -- after we were hired, we came in possession

22   of Phone Number 2, and the thumb drive.  The government

23   requested that we turn over everything we had.  We turned

24   over the phone, and if I am not mistaken, the thumb drive.

25   I think it was two different times an agent had to come to

1    our office to get it.  That's how the government got a

2    ton -- a lot of what's in their sentencing memorandum; we

3    turned it over to them.  The whole time -- and so that's the

4    explanation between where Phone Number 1 is and Phone Number

5    2 is.

6           The government has been aware that he had Phone

7    Number 1 for two and a half years.  But he -- right, wrong,

8    or indifferent, he did not want that phone to be snatched up

9    by law enforcement; don't know what happens to it, and then

10   he can't say:  I've got proof of exactly what I did while

11   I'm in the Capitol.  Now -- and he has no obligation -- I

12   don't believe -- when law enforcement is there to do a

13   search warrant to say anything, let alone:  Here is where

14   everything is.  But when requested to turn it over, we

15   turned over the phone; we turned over the thumb drive.  So

16   that's the answer to where the phones -- what phone was

17   what, and how they got the information.

18           THE COURT:  So you did not cherry-pick which

19   things were going to be produced?  You took the thumb drive

20   and turned the whole thing over to the FBI?

21           MR. BRUNO:  I turned over the phone as I received

22   it from Mr. Reed.  I turned over the thumb drive as I

23   received it from Mr. Reed.

24           THE COURT:  Okay.

25           MR. BRUNO:  I don't know even know if I would know

1    how to take something off that phone, quite frankly; but I

2    have turned over the phone.

3              THE COURT:  Well, that's an important

4    clarification because it was a bit puzzling that the FBI

5    would just let you cherry-pick evidence you wanted to

6    produce.

7              MR. BRUNO:  There was no cherry-picking.  I turned

8    over that phone exactly as I received it, in the same

9    condition from Mr. Reed.

10             Do you remember the thumb drive?

11             I am 99 percent certain there was a thumb drive --

12   and we turned that over as well -- exactly as I had received

13   it from Mr. Reed; so there was no cherry-picking of turning

14   over anything to the government.

15             We did that --

16             THE COURT:  I think, Ms. Carter, are you

17   confirming that?

18             MS. CARTER:  We received a thumb drive.  I was not

19   aware of the process by which the thumb drive contained the

20   items; but we received a thumb drive.  An agent went to his

21   office and picked up the thumb drive.

22             THE COURT:  Okay.

23             MR. BRUNO:  So that's the answer to how they got

24   everything.

25             THE COURT:  Thank you.

1          MR. BRUNO:  We did that as part of our obligation

2     to cooperate.  And I figured that the government might want

3     as much video and photos as they can get so they can

4     continue to investigate other people, and stuff like that;

5     and lo and behold, it turns up in their sentencing

6     memorandum against us.  But that's how they got the

7     information; that's how it came across.

8          So I don't know if --

9          THE COURT:  Okay.  The government -- I mean, one

10    of the things that the defendant says on December 8, 2020,

11    before January 6th, is he says he absolutely, 100 percent,

12    disagrees with acknowledging Biden being elected anything;

13    and he characterizes the 2020 election as the biggest scam

14    even from statistical data.  As I said before, the defendant

15    can believe whatever he wants.

16          MR. BRUNO:  Sure.

17          THE COURT:  It really is irrelevant in many

18    respects.  As I said before, if he wants to believe the moon

19    is green cheese, let him.  Really.

20          But for purposes of sentencing, it is my job to

21    protect the public from further crimes by this defendant, so

22    I am tasked with making an assessment of what risk this

23    defendant poses to the community.

24          MR. BRUNO:  Yes, Your Honor.

25          THE COURT:  And his beliefs which led him to

1    participate in the riot on January 6th, 2021, and violate

2    the law so egregiously, makes his beliefs pertinent in

3    making the assessment of risk.

4           So simple question, does the defendant believe now

5    that there was a massive voter fraud in the 2020

6    presidential election?

7           MR. BRUNO:  I don't know.  I am going to let him

8    answer that because he is going to allocute.  I don't

9    believe that he continues to believe that today.  I think

10   when this happened he wholeheartedly believed that.

11          THE COURT:  Well, that's clear, that he

12   wholeheartedly believed that.

13          MR. BRUNO:  But, quite frankly, I haven't had a

14   recent conversation with him about:  Do you still believe

15   that at this point in time?

16          But he is going to allocute; and I will let Your

17   Honor just ask him directly that.

18          My understanding is at the time he wholeheartedly

19   believed that.  And that's why he came here -- was to go to

20   the speech, believing that the proof would be shown at the

21   speech; and that's how he ended up in D.C.  That was what he

22   believed, and then things --

23          THE COURT:  And there was something he heard at

24   that rally on the Ellipse that confirmed his belief, and so

25   that's why he went to the Capitol?

1          MR. BRUNO:  Again, I will tell you what he's told

2    me, and then he can answer; but no.

3          He was there; the speech was going on.  He noticed

4    a lot of people leaving the speech going towards the

5    Capitol.  So he -- basically, out of curiosity, went that

6    way with everybody else.

7          He is not in the front; he is not leading, stuff

8    like that.  He goes that way, then everybody gets to the

9    Capitol.  He is on the grounds.  He sees what is happening

10   and then, obviously, should have stepped away, but did not.

11   He chose to go up and walk in the Capitol, and go in and

12   come out.  He can explain that to you in detail, but that's

13   what the situation is with that.

14         Today -- I can't make a representation to the

15   Court because I haven't asked him that question recently.

16         My -- he would have to answer that question for

17   the Court.  But I do believe that, when it happened, he

18   wholeheartedly was believing that is what was happening.

19         THE COURT:  All right.  And the letters that have

20   been submitted -- and there have been a number indicating

21   that Mr. Reed is a helpful friend, a very caring son -- you

22   know, positive letters, as one would expect, you know, from

23   letters submitted about a defendant's character at

24   sentencing.

25         MR. BRUNO:  Right.

1          THE COURT:  But they all seem, in some way, to

2     deflect responsibility that this defendant had for his own

3     actions; and I will just give you some examples.

4          I mean, you know, his sister wrote:  I feel in

5     this case the defendant was in the wrong place at the wrong

6     time.  I feel certain he had no intent to harm anyone.  He

7     was standing up for what he believed in and ended up being

8     in the crowd and was curious to see what was happening

9     inside, I am sure.

10          His brother says he was not at the Capitol with

11     malicious intent; it was a weakness of impulsivity.  He had

12     been diagnosed with ADHD; and he imagines that he would have

13     had a difficult time making a conscience-wise decision to

14     leave the rally.

15          Another friend says:  He got caught up in the

16     passion he has for the country, and did a stupid thing.

17          Another one says:  He was caught up in the moment,

18     swept along with the emotion and intensity of the crowd.  He

19     would never have gone along if he had known people would be

20     hurt and, let alone, lose their lives on that sad day.

21          So they sort of suggest that this is an impulsive

22     act, that he got caught up in a crowd, he can't make a wise

23     decision in the face of seeing people run at police, alarms

24     going -- flash-bang bombs.  I mean, what?

25          I actually am finding it very surprising.  Perhaps

1     they're believing Mr. Reed, if he's only describing his

2     action as following a peaceful crowd and going peacefully

3     and walking around the Capitol -- just like you sort of

4     described it; and that is not what is observable on those

5     tapes.

6              MR. BRUNO:  Okay.  So I have read what you have

7     read.  But the way I read it --

8              THE COURT:  And none of them say this is a man who

9     is a grown-up.  He is a grown-up.  And he is there

10    videotaping crowds rushing police lines, seeing people tear

11    down scaffolding for the inauguration, climb-  -- using bike

12    racks as ladders, going through broken doors and windows,

13    yelling things -- oh my goodness.

14             It is just chilling.  The videotape of people

15    walking around the House Chamber yelling:  "Nancy, Nancy,

16    Nancy," like this is some kind of game of hide-and-seek,

17    when people are being terrorized inside the House Chamber

18    and sheltering in place.  I mean, I'm sorry, but what --

19    this was not just a stupid thing.

20             This was not just an impulsive thing.  This

21    defendant was inside the Capitol following in these crowds

22    chanting, taunting -- breaking through police lines in the

23    face of the police being overrun, clearly; going through

24    tear gas clouds to get in.

25             How is that "calmly" -- to quote you -- walking

1    through the Capitol?

2             And is that how he has described his conduct to

3    his friends? -- to reflect this -- their -- that's how it's

4    reflected in their letters.

5             MR. BRUNO:  Okay.  So I think -- I have read the

6    letters as you have read the letters.

7             I believe that the intent is -- he didn't come to

8    Washington, D.C. to end up in that Capitol.  He didn't come

9    here to harm anybody or do any -- he came here to hear the

10   President of the United States explain to him how the

11   election was stolen.

12            THE COURT:  Then why did he come with goggles and

13   a gas mask to protect himself from police tear gas?

14            MR. BRUNO:  Because in this city -- okay, so the

15   gas mask he has for his work, that respirator that he has.

16   But in this city --

17            THE COURT:  He wasn't coming here to work.

18            MR. BRUNO:  Prior to that time in this city, law

19   enforcement had deployed tear gas, gas items, during other

20   protests, and other things that had happened in this city.

21            It would not -- with the number of people coming

22   here, with the crowd that was coming here, I don't think it

23   would be -- I don't think it would be something that you

24   might not anticipate might happen at some point with the

25   number of people that were here, given the fact it had

1    happened previously in this city under -- recently, under

2    other circumstances.  So I don't think that it would be

3    naïve --

4              THE COURT:  There was nothing about --

5              MR. BRUNO:  -- for a person to think that given --

6              THE COURT:  Let me interrupt you for a second and

7    correct you when you say he was walking through.

8              MR. BRUNO:  Okay.

9              THE COURT:  There is nothing calm about what

10   happened on January 6th.  And there is nothing that I have

11   seen on these videotapes that reflects a calm crowd.

12             MR. BRUNO:  I am not referring to the crowd.  I am

13   not referring to what happened on January 6th.  I am

14   referring to him.

15             And I have watched the video from first foot in

16   the Capitol to last foot out of the Capitol -- him.  And

17   from first foot in the Capitol to last foot out of the

18   Capitol, what I see is him walking the entire time -- most

19   of the time by himself, most of the time -- or a lot of the

20   time videoing different things.  At one point he looks at

21   himself and he says:  There is some really great

22   architecture here.

23             I am talking about him and what he's doing.  He is

24   not tearing things up.  He is not yelling, "Nancy."  He is

25   not yelling "Stop the Steal."  He is not threatening people.

64

1    He is not kicking doors, breaking things, picking up

2    things -- that's not what he is doing.

3              Now, he's guilty of the crime, that's why he's

4    pled guilty.  But when I referred to calmly walking through,

5    I am not talking about the rest of the people.  I am not

6    talking about what happened on the outside.  I am talking

7    about when he entered into a restricted area in the Capitol,

8    you can see -- I am talking about what he did.  And I

9    think --

10             THE COURT:  All right.  And in your sentencing

11   memo, you request probation.  And you note that the

12   defendant may be sentenced up to 5 years of probation with

13   conditions associated with probation, but you don't -- how

14   much probation are you recommending?

15             MR. BRUNO:  Up to 5 years, if that's what the

16   Court gives, because --

17             THE COURT:  Up to 5 years.

18             And you understand that one of the conditions that

19   you acknowledge can be imposed on probation is intermittent

20   confinement?

21             MR. BRUNO:  It -- I probably -- I think that the

22   Court can certainly do a home confinement.  But as far as if

23   there is intermittent, like, weekend time as a condition of

24   probation, I would have to go back and look at the specific

25   statutes and guidelines on that.

1          But I know you can do house arrest or home

2     detention as a condition of it -- of the probation.

3          THE COURT:  But that's not what you are

4     recommending?

5          MR. BRUNO:  I am recommending whatever allowable

6     conditions of probation that the Court wants to impose for

7     the Court to impose that.  So if the Court says he needs to

8     be on home detention for a period of time -- generally, when

9     I have had other people on home detention, that means:  If

10    you have a job, you leave in the morning, be back at a

11    certain time in the afternoon.  You go to work, you check

12    in.  Sometimes there is some, I think, GPS or electronic

13    monitoring that's associated with that.

14         But I can't sit here and just -- I am not going to

15    sit here and just ask for straight probation and say it

16    would be unfair to put conditions on that, that's -- I don't

17    think that's a reasonable, rational argument.

18         I think the argument for probation with conditions

19    that the Court thinks is appropriate, I think, is a

20    reasonable request in this particular case.

21         And I hit on the point that you hit on about

22    deterrence, and it really goes to specific deterrence.  At

23    the end of this, does the government want to have,

24    basically, supervision over him for a year?

25         Or, to further specific deterrence:  Does the

```
 1    government want to have supervision over him for a longer

 2    period of time, even up to 5 years --

 3              THE COURT:  That is the conundrum that the

 4    sentencing judges in these cases with misdemeanors face

 5    because, if it was a felony --

 6              MR. BRUNO:  Right.

 7              THE COURT:  -- we could give 36 months of

 8    probation, also give straight prison time without question.

 9              MR. BRUNO:  Right.

10              THE COURT:  With misdemeanors -- if it's a Class A

11    misdemeanor, we give straight prison time.  We're limited to

12    one year of supervision afterwards --

13              MR. BRUNO:  Right.

14              THE COURT:  -- which is, perhaps, as I have

15    already said, given the susceptibility that these defendants

16    have already demonstrated --

17              MR. BRUNO:  Right.

18              THE COURT:  -- of believing people and conspiracy

19    theories, and "the big lie," as people call it --

20              MR. BRUNO:  And that goes to the point of --

21              THE COURT:  -- you want a longer supervision.

22              MR. BRUNO:  Right.

23              THE COURT:  And so it's part of the sentencing

24    structure that creates some tension here that, I think, all

25    the judges on this court look at each individual defendant
```

1     in front of them to figure out:  What is the best solution

2     here --

3               MR. BRUNO:  Right.

4               THE COURT:  -- to protect public safety?

5               Frankly, to be honest, Mr. Reed, it's to protect

6     our democracy from other people like you with beliefs that

7     you at least held on January 6th engaging in the same kind

8     of political violence that shook our democracy and shook the

9     standing of this country in the world.  It is paramount that

10    we not have this happen again, so it's the conundrum.

11              MR. BRUNO:  It is.

12              I just -- for this type of situation, this type of

13    case, I think that society has more of an interest in

14    monitoring him -- if they're really concerned that he would

15    do something like this again, then the answer to the

16    question is to monitor him and restrict his movement over a

17    period of years more so than it is to, say, go to jail for a

18    period of time --

19              THE COURT:  A short period of time.

20              MR. BRUNO:  -- I didn't want to say that.  But to

21    go to jail, and then come out --

22              THE COURT:  Well, it's only a misdemeanor.

23              MR. BRUNO:  -- and then come out at that point,

24    and then you are limited in the supervision.  I think that

25    society has more of an interest in being able to monitor and

1    restrict his movements over a longer period of time if there

2    is that concern of:  Is he likely or possibly going to do

3    something like this again, much better opportunity to keep

4    that from happening with a longer term of supervision?

5              THE COURT:  All right.  Mr. Bruno, anything else?

6              I would like to hear from Mr. Reed.

7              MR. BRUNO:  I think the Court knows exactly where

8    I am at on this.  Thank you.

9              THE COURT:  Okay.  Thank you, and for your

10   clarifications of the record.

11             Mr. Reed, you may step forward.

12             I am willing to listen to anything you have to

13   say.

14             THE DEFENDANT:  Yes, Your Honor.  Thank you for

15   seeing me today.

16             I would like to apologize for my actions and say

17   that I was caught up in everything that day.  I did wander

18   through, I do acknowledge that.  I was not supposed to be on

19   those grounds.  Curiosity got the better of me; and I wanted

20   to see what was going on.

21             It was almost like I was just watching it through

22   a viewfinder because I was videoing what all was going on,

23   trying to document what was happening, so that I could show

24   other people.  I never had any malicious intent towards

25   anybody; I just wanted to document what was going on.

1        I did walk through.  And then, when I got out and

2    I got back, I wanted to preserve the evidence that I had

3    that I had not done anything vicious towards anybody,

4    yelling any racial slurs or anything like that.

5        So what I done is took all of the photos and

6    videos off the phone and I loaded them onto a thumb drive to

7    preserve them.  I didn't want to lose the phone; so that's

8    when I took the SIM card out and put it in the other phone

9    to use that one so that I could protect the evidence of the

10   other one if it were to end up in a situation like this.

11       Being in -- when they executed, I guess, the

12   warrant, I did go to jail for two days.  It was a Sunday

13   morning, and that Monday was a holiday -- it was Martin

14   Luther King Day; so I was in jail for two days.  I can say,

15   without a shadow of a doubt, I would not want to have to go

16   back to jail for any period of time; that was enough.  I

17   would never have to want to do that again, period; that is

18   enough to deter me from doing anything else in the future.

19   I don't know how to say it any other way than that; but that

20   is the truth.  And I'd much rather be on probation or to be

21   watched for any amount of time.

22       THE COURT:  So, Mr. Reed, based on your Facebook

23   posts, on January 6th and before January 6th, you clearly

24   articulated your belief that the 2020 presidential election

25   was stolen.

```
 1              Do you still believe that?

 2              THE DEFENDANT:  No, Your Honor.  As of right now,

 3      the President of the United States is Joe Biden.

 4              THE COURT:  And when you took videos of people

 5      running around yelling this weird chant of, "Nancy, Nancy,

 6      Nancy" -- thank goodness the Speaker of the House had been

 7      evacuated because I fear what would have happened had that

 8      mob come upon Nancy Pelosi.

 9              THE DEFENDANT:  Yes, Your Honor.

10              THE COURT:  Would you have just videotaped them if

11      they had come across her?  It looked like a lynching mob.

12              THE DEFENDANT:  Correct.  It did.  I did see that.

13              And when I approached the Capitol, I guess, from

14      the side -- and they were talking about "hang them high,"

15      the crowd was chanting that -- and at that moment it changed

16      in my mind -- no one, at any given point, deserves to be

17      hung for anything.  That's not justice, that's not right.

18              So I knew that if I could watch and observe

19      enough -- if anything like that were to happen, that I would

20      be able to stop something like that from happening.

21              THE COURT:  And so when you saw people and you

22      videotaped people -- I had not seen this before, it was on

23      your videotapes I saw this -- that they had taken a sign

24      with Nancy Pelosi's name on it and broke the wood sign --

25      wooden sign.
```

1            THE DEFENDANT:  I did not see that myself, Your

2      Honor.  That was not my video.

3            THE COURT:  Sorry.  Yes?

4            MS. CARTER:  Your Honor, that video is from

5      another investigation.  They showed -- a portion of it

6      showed Mr. Reed, but that was not Mr. Reed's --

7            THE COURT:  Oh.  That was not Mr. Reed's

8      videotape.

9            MS. CARTER:  Yes.

10           THE COURT:  Okay.  But he was in that area when

11     the person was taking the Nancy Pelosi sign and breaking it?

12           MS. CARTER:  He was in the area of the Statuary

13     Hall connector, which is at the tail end of that video; that

14     was the overlap between his movements and the person who

15     took that video.  It was not --

16           THE COURT:  I see.  Thank you for that

17     clarification.

18           So you don't remember seeing somebody taking the

19     Nancy Pelosi wooden sign and just --

20           THE DEFENDANT:  I never saw that, Your Honor.

21           THE COURT:  -- and breaking it violently into

22     little pieces?

23           THE DEFENDANT:  I never saw that, Your Honor.

24           THE COURT:  Okay.  All right.

25           Thank you for that clarification.

1          THE DEFENDANT:  I also did not -- I watched a

2    documentary on it afterwards.  And I didn't know about the

3    actual real violence down in the tunnel.  I did not see that

4    until later on, in the documentary.  I was, like, "Wow,"

5    that was pretty bad.  I mean, like, worse than I was seeing

6    everywhere else; that was much worse in my mind.

7          One of the things that I did do, as I was going

8    through, right before I exited, there was a guy that was

9    kicking a door.  And I mentioned to him, like, "Hey, man,

10   stop kicking in the door."  "We don't need to be doing stuff

11   like that here"; and I did deter him from kicking the door

12   in any more.

13         THE COURT:  Well, your father wrote in his letter

14   that he raised his children to respect the law.

15         And your youth pastor wrote that you, "Exhibit a

16   respect for authority."  And I actually was very surprised

17   by those comments because I saw what you did record when you

18   were outside the building.

19         I saw you filming people just like you did;

20   climbing up the scaffolding and climbing up places that were

21   clearly restricted with, you know, the flash-bangs going and

22   the alarms going, and people taunting the police.

23         How -- how is that respectful -- showing respect

24   for the law?

25         THE DEFENDANT:  It was not, Your Honor.

1              I got caught up in the moment.  My adrenalin was

2      going.  When I first sat down with Paul and Luke, they said:

3      Well, how long do you think you were in the Capitol?  I was,

4      like, I don't know.  Maybe like four to seven minutes.

5              And then, to go back and look at the pictures and

6      document the time, it was 24 minutes.  So, I mean, it was

7      just like everything was happening extremely fast.  And I

8      got caught up in the moment, and it was a poor decision; one

9      that I would not make again.

10             THE COURT:  All right.  Is there anything else you

11     want to say?

12             THE DEFENDANT:  No.  Just, again, that the two

13     days that I did spend in jail was more than enough.  And I

14     absolutely do not want to go back under any circumstances.

15     I'm sorry for my actions, and it will not happen again.

16             THE COURT:  All right.  Well, you can just remain

17     right where you are.

18             I am going to explain the sentence I am going to

19     impose.  You can stand right there.

20             So after considering the parties' sentencing

21     memoranda, the probation department's presentence

22     investigation report, the sentencing recommendations I have

23     received from the government, probation office, and from the

24     defense, I am required to consider the factors set out in

25     18 U.S.C. Section 3553(a) where Congress has directed that

1      all sentencing courts ensure that I impose a sentence

2      sufficient but not greater than necessary to comply with the

3      purposes of sentencing, and those purposes include:

4              The need for the sentence imposed to reflect the

5      seriousness of the offense; promote respect for the law;

6      provide just punishment for the offense; deter criminal

7      conduct; protect the public from future crimes by the

8      defendant; and promote rehabilitation.

9              So having already considered how the guidelines

10     apply and the policy statements of the sentencing

11     guidelines, pursuant to 3553(a), I must consider the nature

12     and circumstances of the offense; your history and

13     characteristics, Mr. Reed; the types of sentences available;

14     the need to avoid unwarranted sentence disparities among

15     defendants with similar records found guilty of similar

16     conduct; and the need to provide restitution to any victims

17     of the offense.

18              I am going to begin with the restitution amount.

19              The plea agreement in the case provides a

20     restitution payment of $500, which this Court finds is the

21     best available estimate of damages done to identifiable

22     victims, here:  The Architect of the Capitol, the House

23     Chief Administrative Officer, the Secretary of the Senate,

24     the Senate Sergeant of Arms, and the Capitol Police on the

25     limited record presented in the case; and I so order this

1       amount pursuant to 18 U.S.C. Section 3663(a)(1)(A).

2                The mandatory restitution provisions under

3       18 U.S.C. Section 3663(a) also apply here.  But I can waive

4       application of that mandatory restitution if I find that

5       determining complex issues of facts related to the cause or

6       amount of the victims' loss would complement or prolong the

7       sentencing process to a degree that the need to provide

8       restitution to any victim is outweighed by the burden of the

9       sentencing process.  And so I do make that finding here to

10      avoid going into an analysis of restitution with evidence,

11      and so on, beyond the $500 already fixed by the parties in

12      the plea agreement.

13               Regarding the nature and circumstances of the

14      offense, this defendant has been convicted of entering and

15      remaining in a restricted building or grounds, in violation

16      of 18 U.S.C. Section 1752(a)(1), a Class A misdemeanor.

17               This is a trespass offense.  But even for

18      defendants like this one, who didn't engage in overt direct

19      violence against police officers or directly try and damage

20      the building, this was not a garden-variety episode of

21      unlawful entry or merely being unlawfully present in a

22      sensitive place like the Capitol, when the Vice President

23      was present and members of Congress were meeting to perform

24      a constitutionally mandated task.

25               This defendant -- by his conduct starting outside

1    the building in the grounds with a crowd that overwhelmed

2    the police officers from the outset, and then entering and

3    overwhelming the police inside the building -- was

4    successful, actually, in overwhelming law enforcement to

5    such an extent that Congress had to stop its proceedings and

6    ensuring the peaceful transition of power in this democracy,

7    and paused those proceedings for hours so that people could

8    be evacuated.  They terrorized -- this defendant was part of

9    a mob that terrorized our elected representatives and

10   elected Vice President.

11           He traveled all the way from Tennessee; came

12   equipped with goggles and a respirator mask.  And he first

13   attended the Stop the Steal rally, and then followed the

14   crowd there to the Capitol.  This was intentional action.

15   This was not an impulsive jaunt.

16           On December 8th, he posted on Facebook that he was

17   "feeling pissed off"; "absolutely 100% disagree with

18   acknowledging Biden being elect anything."  He called the

19   election:  "The biggest scam even from statistical data";

20   and threatened if it "doesn't get overturned, you will see

21   the Republican side of this country go into anarchy"...

22   "because we've tried to work with the government, we've

23   tried the court system, and it has utterly failed so far!"

24   And he promised, "The Republican Rebellion is coming soon."

25           Later that same month, he exchanged messages with

1    a friend discussing how they could join the Proud Boys; and

2    there is no other evidence that he did anything else to

3    pursue that.

4              (Whereupon, the defendant confers with counsel.)

5              THE COURT:  Mr. Reed, did you want to say

6    something about the Proud Boys?

7              THE DEFENDANT:  I wanted to make it clear that I

8    never did join the Proud Boys or any affiliation with them

9    at all, period.

10             THE COURT:  All right.  But you were interested at

11   one point?

12             THE DEFENDANT:  My friend had sent it to me; and I

13   never did go to the website, Your Honor.

14             THE COURT:  Are you still friends with that person

15   who was interested and encouraging you to join the Proud

16   Boys?

17             THE DEFENDANT:  I do still know them, ma'am, yes;

18   but I am not, you know, in daily conversation --

19             THE COURT:  Well, that's a milieu of people who

20   are leading you astray.

21             Do you understand that?

22             THE DEFENDANT:  Yes, ma'am.  Yes, Your Honor.

23             THE COURT:  I would do a double-check on your

24   friends.

25             On January 4th -- but I appreciate you making

1    clear and confirming that the government said they had no

2    evidence of you joining the Proud Boys.

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  On January 4th, 2021, you used

5    Facebook to announce your intent to go to D.C.  You asked if

6    anyone else was going.  And, in the end, you did go to the

7    Capitol and you went prepared with your goggles and

8    respirator mask, which is a step of preplanning for

9    potential violence; that, if you saw tear gas and police

10   trying to control mobs, you were ready to proceed, as

11   opposed to follow police instructions and not go where you

12   shouldn't be; and that's exactly what you did on

13   January 6th.

14             You went where you were not supposed to be,

15   despite the tear gas, despite the flash-bangs, alarms, and

16   so on; and you went and continuously filmed your progress

17   through the Capitol grounds, into the Capitol Building,

18   capturing the chaos that was occurring -- and threatening

19   behavior occurring that day inside the Capitol.

20             At around 2:09 p.m., you filmed several

21   confrontations between law enforcement and the mob,

22   including instances of rioters attacking law enforcement as

23   they tried to keep the crowd away from the Capitol Building.

24             You filmed a crowd chanting:  "Hang 'em high," as

25   the rioters closest to the police hyped up the crowd and

1    attempted to force their way to the building.  You continued

2    filming as the police deployed tear gas in a failed attempt

3    to keep the crowd at bay.

4         A tear gas canister actually landed within feet of

5    this defendant; but you remained unbothered, and calmly

6    proceeded by donning your ski goggles and your respirator

7    mask, and continued right on into the Capitol Building.

8         You filmed a section of the crowd pushing down

9    metal crowd-control fences, physically forcing the police to

10   retreat, and then attacking them once the police were

11   cornered.

12        After the rioters had finally overwhelmed the

13   officers holding back the crowd on the stairs, you were very

14   excited.  You yelled, "This is insane!" "Whoohooohooo!" --

15   and began making your way into the Capitol Building because

16   the path had been cleared.

17        You used a crowd-control fence as a ladder to gain

18   access to a courtyard on the Capitol's upper west terrace,

19   near the Senate wing entrance, and you made it onto the

20   terrace.  And you filmed a large crowd still on the streets

21   taunting Biden about his election votes yelling, "Where's

22   your 80 million now Biden?"

23        Once inside the Capitol, you remained very busy.

24        At this point, members of Congress were not yet

25   evacuated or in a place of safety.  They were still trying

1    to do their job.

2          As the videos filmed that day show, you followed

3    the mob in their hunt to find members of Congress.  You

4    followed this crowd into the Crypt, up a set of stairs going

5    past Speaker Pelosi's office as the crowd chanted, "Nancy,

6    Nancy," sounding, as I have already said, like a lynching

7    mob.  Very chilling.  And you recorded this event like it

8    was a game of hide-and-seek, instead of turning around and

9    leaving.  This was not a mob or crowd you wanted to be part

10   of; that is not the choice you made -- again, and again, and

11   again.

12         You then joined the mob as they arrived at the

13   door leading to the House Chamber.  You witnessed and filmed

14   how members of the mob chanted, "Stop the Steal"; demanded

15   that the remaining members of Congress, who were still

16   sheltering in place inside -- cowering underneath the

17   desks -- with the mob outside shouting, "Open the door."

18   When that demand was not met, the mob began chanting, "Break

19   it down," and attempted to break through the door.  This is

20   when members of Congress, as the pictures show in the

21   government's sentencing memo, literally were laying under

22   their tables in fear for their lives.

23         You may not -- you may remember your two days in

24   jail after your arrest for the rest of your life; but I am

25   sure those members of Congress and all those staffers just

1    trying to be good public servants -- I am sure they're going

2    to remember that day also for the rest of their lives -- and

3    that's your fault because you were there helping the mob do

4    that.

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  In total, you spent 24 minutes inside

7    the Capitol, and more than an hour and a half on restricted

8    Capitol grounds.

9            You took pride in your petition -- in your

10   participation in that Capitol riot because you posted a

11   compilation of photos showing the violence and the chaos

12   with you there; saying, "We The People have spoken and we

13   are pissed!"  "No Antifa."  "No BLM."  "We The People took

14   the Capitol" -- which you did.  "Democratic tyranny WILL NOT

15   STAND!"  "WE HAVE SPOKEN!"

16           And you exchanged messages with your codefendant

17   Bledsoe characterizing the conduct at the Capitol as "good

18   times"; this was after January 6th.  When you realized that

19   those "good times" might place you in legal jeopardy, when

20   true American patriots were pretty shocked by what they were

21   witnessing on TV screens across the country on

22   January 6th -- but when you realized that those "good times"

23   might place you in legal jeopardy, you texted your

24   codefendant Bledsoe on January 8th, 2021, saying that you

25   had taken down your Facebook, Instagram, and Twitter

1     accounts which you had used to make posts during and before

2     January 6th.  And the next day you texted your codefendant

3     Bledsoe again, claiming that there were no -- there were not

4     any "no trespassing" signs; that you thought you were in a

5     public building where you could document what was going on.

6     We were press, documenting the event for our followers.  We

7     never obstructed anything, only documented -- as if you were

8     members of the press as opposed to members of the mob.

9          And on January 12th, you texted your codefendant

10    Bledsoe again, asking if he had removed all the pictures and

11    videos of defendant from his social media.  And you took an

12    obstructive conduct further and you put away the cell phone

13    you were using on January 6th when -- in anticipation of the

14    government executing a search warrant on your house.

15         So among the factors that I look at in assessing

16    your role in this overall mob attack on the Capitol on

17    January 6th, as I look at whether you engaged in

18    preplanning, and you did -- you engaged in preplanning for

19    potential violence prior to coming from Tennessee to D.C. by

20    securing protective gear, including goggles and a respirator

21    mask.

22         You entered the Capitol Building very shortly

23    after the building -- the Senate wing door had been broken

24    into, at about 2:13 p.m.  You were there at so much of the

25    front of the crowd that all of the members of the House of

1     Representatives had not even been fully evacuated yet and

2     were still in the House Chamber, when you were with the mob

3     circling the House Chamber with the crowd yelling, "Knock

4     the door down."

5              You were part of the crowd that took advantage of

6     overwhelming the police.  You blatantly filmed officers

7     being attacked and confronted by rioters as they attempted

8     unsuccessfully to prevent the mob from entering the

9     building.  And even while seeing that, you didn't turn

10    around; you happily followed the mob right into the Capitol

11    Building, among this first wave of very aggressive rioters.

12             You covered a lot of ground during your 24 minutes

13    inside the Capitol.  There were some people who were members

14    of the mob who walked in and out within a few minutes, who

15    just stayed in what are totally public corridors where

16    tourists go -- not you; not you, Mr. Reed.

17             You went into the Crypt, the Rotunda, Statuary

18    Hall, and you made it to the nonpublic areas of the House of

19    Representatives in the Capitol, while police were waiting

20    for SWAT teams to come and save the rest of the elected

21    representatives and staff cowering inside the House Chamber.

22             You may not have physically attacked any police

23    officer that day, but you certainly didn't try and stop any

24    of the violence; you contributed to it.

25             Your social media postings surrounding January 6th

1    were very concerning, threatening, before the riot on

2    January 6th, that the country would go into anarchy.

3         On January 6th you posted a video of the crowd

4    marching to the Capitol with the title, "We are coming for

5    you" -- which was so concerning to Facebook that Facebook

6    banned you from Facebook for some period of time.

7         You posted a compilation of photos of the ongoing

8    riot and your presence at the Capitol claiming, "We The

9    People Have Spoken." "We Took The Capitol." "The

10   Democratic tyranny WILL NOT STAND."

11        Even after all you had seen on January 6th inside

12   the Capitol -- all you had seen, you were proud of what had

13   occurred that day.

14        In sum, the nature and circumstances of the

15   offense, and the need for the sentence to reflect the

16   seriousness of the offense and promote respect for the law

17   would favor a custodial sentence.  You did more than rioters

18   who briefly wandered in and out of the building and only

19   some public corridors, and for very short periods of time.

20        You did planning for your visit, equipping

21   yourself with goggles and a respirator mask -- which

22   certainly came in handy as you were going through tear gas

23   clouds to go into the Capitol.  And you went so near the

24   House Chamber door that police inside were -- had their guns

25   drawn to try and protect members of elected representatives

1     still there in case the mob came in.

2          You have no criminal history, but you have a

3     bachelor's degree in organizational leadership, and you have

4     consistently maintained gainful employment.  This only shows

5     that you are college educated.  As I said, you are a

6     grown-up engaging in this kind of conduct.  You should be

7     better educated about what our system of government and what

8     our democracy is.

9          Your letters from your friends, your family, talk

10    about your work ethic, your respect for authority, your

11    generally helpful demeanor towards family and neighbors --

12    that is very hard to reconcile with what I saw on

13    January 6th and these posts you were making.

14         The need for the sentence imposed to deter

15    criminal conduct and protect the public from further crimes

16    by you are critical considerations for every sentencing

17    judge, including this one.  And the criminal conduct we

18    witnessed on January 6th is among the most serious because

19    it threatens not just the people who were there -- the

20    members of Congress and the staff, press -- who were inside

21    the building legitimately; but it threatens all of us who do

22    believe in the rule of law and the foundations of our

23    democracy, where a peaceful transition of power has -- up

24    until January 6, 2021, was always the norm.  We want to make

25    sure it stays the norm.

1            As I have made clear, in sentencings of other

2       January 6th defendants, being a crowd follower or an

3       uncritical believer in news and conspiracy theories --

4       regardless of how incredible -- does not absolve a defendant

5       for engaging in criminal activity, when the following of

6       such weird conspiracy theories -- particularly by a

7       college-educated person, amplifies the criminal conduct of

8       others; nor does dissatisfaction with our country's

9       legitimate and peaceful avenues for expression of discontent

10      give any single citizen license to disobey the law and

11      overthrow democratically elected representatives.  Anarchy,

12      rebellion -- they're not the answer to disrupt the peaceful

13      transition of power after an election.

14            When determining the sentence to be imposed, the

15      importance of deterring future malcontents from advocating,

16      planning for, and then disrupting the peaceful transition of

17      power after an election weighs very heavily in this Court's

18      consideration.

19            Your decision, at sort of the front of the pack to

20      enter the Capitol at this early stage of the breach --

21      spending a significant 24 minutes inside the building, going

22      into the most highly-secure nonpublic areas of the building,

23      at a time when people were being terrorized inside the House

24      Chamber and as they were being evacuated; being in a crowd

25      that was engaged in looking for Nancy Pelosi, the Speaker of

1   the House, engaging in chants that were only revving each

2   other up and continuing to join that mob -- because it was

3   the numbers that were overwhelming the police -- and not

4   leaving; seeing that chaos and the effects of that chaos,

5   and then posting about your pride and your conduct that day

6   favors imposition of a custodial sentence to promote respect

7   for the law, deter you from future criminal activities that

8   are detrimental to our democracy.

9        The Class A misdemeanor provides a maximum term of

10  imprisonment of 1 year or up to 5 years' probation, which

11  can be subject to some special conditions, including

12  intermittent confinement.

13       Regarding the need to avoid unwarranted sentencing

14  disparities, both probationary and custodial sentences have

15  been imposed on January 6th defendants convicted of the same

16  Class A misdemeanor as you.

17       Most defendants convicted -- the majority of

18  defendants convicted of this Class A misdemeanor have been

19  given some term of incarceration.  And given the specific

20  offense conduct of Mr. Reed, I am going to impose a sentence

21  of 3 years of probation, with the special conditions of

22  intermittent custodial sentence totaling 42 days of

23  intermittent confinement, as well as a period of home

24  detention, and a criminal fine.

25       So based on my consideration of these and other

1       factors, I will now state the sentence to be imposed.

2               Pursuant to the Sentencing Reform Act of 1984 and

3       in consideration of the provisions of 18 U.S.C. Section

4       3553, it is the judgment of the Court that you, Blake Austin

5       Reed, are hereby sentenced to a term of 36 months, or

6       3 years, of probation on Count 2 of the indictment, with

7       special conditions of a total of 42 days of intermittent

8       confinement to be served in three increments of 14 days

9       each, and 3 months of home detention.

10              In addition, you are ordered to pay a special

11      assessment of $25 in accordance with 18 U.S.C. Section 31 --

12      3013, and a criminal fine of $2500.

13              While on supervision, you shall abide by the

14      following mandatory conditions as well as the standard

15      conditions of supervision, which are imposed to establish

16      the basic expectations for your conduct while on

17      supervision.

18              The mandatory conditions include:  One, you must

19      not commit another federal, state, or local crime.

20              Two, you must not unlawfully possess a controlled

21      substance, which includes marijuana -- no matter what your

22      state law is regarding marijuana.  You must refrain from any

23      unlawful use of a controlled substance.  You must submit to

24      one drug test within 15 days of placement on supervision,

25      and at least two periodic drug tests thereafter as

1    determined by the Court.

2              You must make restitution in accordance with

3    18 U.S.C. Section 3663 and 3663(a) or any other statute

4    authorizing a sentence of restitution.  The Court -- you are

5    ordered to make restitution to the Architect of the Capitol,

6    in the amount of $500.  The Court determined you do not have

7    the ability to pay interest and, therefore, waives any

8    interest or penalties that may accrue on the balance of that

9    restitution.

10             You are ordered to pay a criminal fine in the

11   amount of $2500.  The Court has determined you do not have

12   the ability to pay interest and, therefore, waives any

13   interest or penalties that may accrue on the balance.

14             You shall also comply with the following special

15   conditions:  Pursuant to 18 U.S.C. Section 3563(b)(10), you

16   must serve a total of 42 days of intermittent confinement.

17   The intermittent confinement shall be served in three

18   periods of 14 days each, within your first year of

19   probation, at a facility designated by the Bureau of

20   Prisons.  You must follow the rules and regulations of the

21   facility in which you are designated.

22             You must also submit to home detention for a

23   period of three months as soon as practicable, and comply

24   with the location monitoring program requirement, as

25   directed by the U.S. Probation Office.  You will be

1    restricted to your residence at all times, except for

2    employment, education, religious services, medical,

3    substance abuse, and mental health treatment, court-ordered

4    obligations, and any other time specifically authorized by

5    the U.S. Probation Office.  The location monitoring

6    technology is at the discretion of the U.S. Probation

7    Office, and you must pay the cost of the monitoring.

8           You must also pay the financial penalty in

9    accordance with the schedule of payments sheet of the

10   judgment.  You must also notify the Court of any changes in

11   economic circumstances that might affect the ability to pay

12   this financial penalty.

13          Having assessed the defendant's ability to pay,

14   payment of the total criminal monetary penalties is due as

15   follows:  Payment in equal monthly installments of $200 to

16   commence 30 days after the date of this judgment.

17          You must disclose to the probation officer -- you

18   must provide the probation officer access to any requested

19   financial information and authorize the release of any

20   financial information.  The probation office may share

21   financial information with the U.S. Attorney's Office.  You

22   must not incur new credit charges or open additional lines

23   of credit without the approval of the probation officer.

24          Restitution payments shall be made to the Clerk of

25   the Court for the U.S. District Court, District of Columbia,

1    for disbursement to the following victim -- the victim's

2    name is:  Architect of the Capitol, Office of the Chief

3    Financial Officer; Attention, Kathy Sherrill, CPA, Ford

4    House Office Building, Room H2-205B, Washington, D.C. 20515,

5    in the amount of loss, $500.

6          The financial obligations are immediately payable

7    to the Clerk of the Court for the U.S. District Court, 333

8    Constitution Avenue, Northwest, Washington, D.C. 20001.

9    Within 30 days of any change of address, you shall notify

10   the Clerk of the Court of the change until such time as the

11   financial obligation is paid in full.

12         The probation office shall release the presentence

13   investigation report to all appropriate agencies, which

14   includes the U.S. Probation Office in the approved district

15   of residence in order to execute the sentence of the Court.

16         Pursuant to 18 U.S.C. Section 3742, you have a

17   right to appeal the sentence imposed by this Court if the

18   period of imprisonment is longer than the statutory maximum

19   or the sentence departs upward from the applicable

20   sentencing guideline range.  If you choose to appeal, you

21   must file any appeal within 14 days after the Court enters

22   judgment.

23         As defined in 28 U.S.C. Section 2255, you also

24   have the right to challenge the conviction entered or

25   sentence imposed if new and currently unavailable

1    information becomes available to you or on a claim you

2    received ineffective assistance of counsel in entering a

3    plea of guilty to the offense of conviction or in connection

4    with sentencing.  If you are unable to afford the cost of an

5    appeal, you may request permission from the Court to file an

6    appeal without cost to you.

7            Are there objections to the sentence imposed not

8    already noted for the record from the government?

9            MS. CARTER:  No, Your Honor.  Thank you.

10           THE COURT:  And from the defense?

11           MR. BRUNO:  No other objections.

12           THE COURT:  All right.  You may be seated.

13           Does the government have a motion to dismiss any

14   open counts of indictment?

15           MS. CARTER:  Yes, Your Honor.

16           We would move to dismiss Counts 3 through 5 as to

17   Blake Austin Reed.

18           THE COURT:  And that motion is granted.

19           Is there anything else to deal with today from the

20   government?

21           MS. CARTER:  No, Your Honor.  Thank you.

22           THE COURT:  And from the defense?

23           MR. BRUNO:  No, Your Honor.

24           THE COURT:  All right.  You are all excused.

25           PROBATION OFFICER:  Your Honor.

1          Your Honor, this is Officer Walters from the

2     probation office.

3          THE COURT:  Yes?

4          PROBATION OFFICER:  For purposes of the

5     intermittent confinement and home detention, did you have a

6     preference as to how they should be served; one before the

7     other, concurrently with each other?  What is your

8     preference?

9          THE COURT:  The home detention should come first

10    because it's going to take some time for the Bureau of

11    Prisons to designate a facility.

12         PROBATION OFFICER:  Okay.  Yes, ma'am.  I will let

13    his district know.

14         THE COURT:  And I know that the probation office

15    requested that transfer of jurisdiction of this case be made

16    to Tennessee; and I am not transferring jurisdiction of this

17    case.

18         PROBATION OFFICER:  Yes, ma'am.  Thank you.

19         THE COURT:  All right.  Anything further from the

20    probation office?

21         PROBATION OFFICER:  One more time, could you tell

22    me how much the monthly payment was for the total --

23         THE COURT:  $200 per month, to begin 30 days after

24    the judgment is entered.

25         PROBATION OFFICER:  Thank you, Your Honor.

1          THE COURT:  All right.  Thank you.

2          You are all excused.

3          (Whereupon, the proceeding concludes, 2:34 p.m.)

4                    *  *  *  *  *

5                    **CERTIFICATE**

6

7          I, ELIZABETH SAINT-LOTH, RPR, FCRR, do hereby

8    certify that the foregoing constitutes a true and accurate

9    transcript of my stenographic notes, and is a full, true,

10   and complete transcript of the proceedings to the best of my

11   ability.

12

13          This certificate shall be considered null and void

14   if the transcript is disassembled and/or photocopied in any

15   manner by any party without authorization of the signatory

16   below.

17

18   Dated this 31st day of May, 2022.

19   /s/ Elizabeth Saint-Loth, RPR, FCRR
     Official Court Reporter

20

21

22

23

24

25

## $

**$200** [2] - 90:15, 93:23
**$25** [2] - 25:13, 88:11
**$2500** [2] - 88:12, 89:11
**$500** [5] - 25:15, 74:20, 75:11, 89:6, 91:5
**$60** [1] - 30:9
**$9500** [1] - 25:12

## '

**'18** [2] - 54:3, 54:8
**'em** [1] - 78:24

## /

**/s** [1] - 94:19

## 1

**1** [19] - 24:15, 25:7, 28:10, 28:11, 28:18, 29:5, 29:8, 29:12, 31:7, 32:8, 33:3, 33:10, 33:14, 34:13, 41:14, 54:16, 55:4, 55:7, 87:10
**1,000** [1] - 25:12
**10** [1] - 43:1
**100** [2] - 45:19, 57:11
**100%** [1] - 76:17
**12** [5] - 23:10, 23:25, 26:6, 39:12, 50:2
**12:28** [1] - 1:5
**12:40-ish** [1] - 27:10
**12th** [1] - 82:9
**14** [4] - 1:5, 88:8, 89:18, 91:21
**15** [6] - 23:12, 24:1, 39:12, 42:24, 43:1, 88:24
**15th** [1] - 19:10
**165** [1] - 4:5
**166** [1] - 4:6
**16th** [4] - 7:17, 28:4, 29:10, 50:4
**17** [4] - 6:8, 12:12, 23:11, 24:1
**170** [2] - 4:13, 18:18
**170-1** [1] - 4:15
**171** [1] - 4:8
**172** [1] - 4:11
**1752(a)(1** [4] - 3:9, 24:17, 42:25, 75:16

**17th** [1] - 13:4
**18** [13] - 3:8, 4:13, 24:17, 25:24, 73:25, 75:1, 75:3, 75:16, 88:3, 88:11, 89:3, 89:15, 91:16
**19** [1] - 15:4
**1984** [1] - 88:2
**19th** [5] - 15:5, 18:3, 18:23, 19:1, 19:11
**1:35** [1] - 18:23

## 2

**2** [27] - 3:6, 23:11, 23:25, 30:23, 30:24, 31:1, 31:7, 31:8, 32:4, 32:5, 32:15, 32:25, 33:5, 33:11, 33:12, 34:13, 35:13, 36:10, 36:20, 46:25, 47:1, 54:17, 54:18, 54:22, 55:5, 88:6
**2.3(b)(1)(A)(vii)** [1] - 24:23
**20** [3] - 37:21, 38:2, 40:13
**20-20** [1] - 3:17
**2000** [1] - 43:12
**20001** [1] - 91:8
**201** [1] - 51:23
**202** [1] - 1:13
**2020** [4] - 57:10, 57:13, 58:5, 69:24
**2021** [13] - 7:17, 12:12, 15:5, 28:4, 29:9, 29:10, 30:7, 50:2, 54:9, 58:1, 78:4, 81:24, 85:24
**2022** [4] - 1:5, 6:8, 19:1, 94:18
**20515** [1] - 91:4
**20530** [1] - 1:13
**21-204-03** [2] - 1:3, 2:3
**22** [2] - 51:21
**2255** [1] - 91:23
**23** [2] - 19:8, 20:10
**24** [4] - 73:6, 81:6, 83:12, 86:21
**25** [3] - 4:8, 34:6, 40:13
**2500** [1] - 43:12
**252-6741** [1] - 1:13
**28** [1] - 91:23
**2:09** [1] - 78:20
**2:13** [3] - 49:1, 49:6, 82:24
**2:25** [1] - 49:8
**2:34** [1] - 94:3

**2:35** [1] - 39:1
**2:37** [1] - 39:2
**2:39** [1] - 39:4
**2:42** [1] - 39:6
**2:43** [2] - 39:9, 39:10
**2:44** [2] - 39:10, 39:12
**2:49** [1] - 39:15
**2B2.3** [1] - 24:19
**2B2.3(a** [1] - 24:20

## 3

**3** [7] - 26:4, 41:14, 41:16, 87:21, 88:6, 88:9, 92:16
**30** [9] - 7:16, 12:4, 12:8, 14:18, 17:17, 45:7, 90:16, 91:9, 93:23
**3013** [1] - 88:12
**31** [1] - 88:11
**31st** [1] - 94:18
**333** [1] - 91:7
**3553** [1] - 88:4
**3553(a** [3] - 25:24, 73:25, 74:11
**3563(b)(10** [1] - 89:15
**36** [4] - 41:10, 41:14, 66:7, 88:5
**3663** [1] - 89:3
**3663(a** [2] - 75:3, 89:3
**3663(a)(1)(A)** [1] - 75:1
**37133** [1] - 1:17
**3742** [1] - 91:16
**398** [1] - 1:16
**3C1.1** [1] - 25:3
**3E1.1(a** [1] - 25:5

## 4

**4** [1] - 24:20
**42** [3] - 87:22, 88:7, 89:16
**4th** [3] - 1:12, 77:25, 78:4

## 5

**5** [10] - 18:18, 25:9, 27:6, 27:14, 64:12, 64:15, 64:17, 66:2, 87:10, 92:16
**5-year** [1] - 41:17
**50** [1] - 40:4
**555** [1] - 1:12
**5th** [1] - 27:16

## 6

**6** [5] - 23:12, 24:1, 25:6, 25:8, 85:24
**615** [1] - 1:17
**68** [2] - 23:11, 24:1
**6th** [39] - 27:9, 28:13, 28:18, 29:2, 30:14, 32:6, 33:12, 35:18, 37:9, 42:22, 44:22, 45:8, 45:12, 45:15, 46:5, 46:7, 49:24, 54:9, 57:11, 58:1, 63:10, 63:13, 67:7, 69:23, 78:13, 81:18, 81:22, 82:2, 82:13, 82:17, 83:25, 84:2, 84:3, 84:11, 85:13, 85:18, 86:2, 87:15

## 7

**70** [2] - 23:11, 24:1
**72** [2] - 23:11, 24:1
**75** [2] - 23:11, 24:1
**7th** [5] - 27:10, 27:17, 27:18, 29:9, 30:7

## 8

**8** [3] - 23:11, 24:2, 57:10
**80** [1] - 79:22
**896-4154** [1] - 1:17
**8:42** [1] - 12:12
**8th** [2] - 76:16, 81:24

## 9

**99** [1] - 56:11

## A

**a.m** [1] - 12:12
**abide** [1] - 88:13
**ability** [6] - 52:14, 89:7, 89:12, 90:11, 90:13, 94:11
**able** [5] - 30:25, 32:11, 36:2, 67:25, 70:20
**absence** [1] - 33:13
**absolutely** [3] - 57:11, 73:14, 76:17
**absolve** [1] - 86:4
**abuse** [1] - 90:3
**accept** [1] - 35:25

**acceptance** [4] - 25:4, 49:20, 49:23, 50:24
**accepted** [1] - 24:4
**accepting** [1] - 49:21
**access** [11] - 3:11, 30:25, 36:10, 36:19, 37:4, 46:23, 46:25, 49:7, 50:14, 79:18, 90:18
**accessed** [1] - 22:15
**accessible** [2] - 19:22, 23:15
**accordance** [3] - 88:11, 89:2, 90:9
**according** [2] - 7:25, 13:13
**account** [1] - 52:6
**accounts** [1] - 82:1
**accrue** [2] - 89:8, 89:13
**accurate** [3] - 11:12, 23:19, 94:8
**acknowledge** [2] - 64:19, 68:18
**acknowledged** [1] - 43:19
**acknowledging** [2] - 57:12, 76:18
**acknowledgment** [3] - 18:16, 20:6, 49:24
**Act** [1] - 88:2
**act** [2] - 41:8, 60:22
**action** [3] - 40:23, 61:2, 76:14
**Action** [1] - 1:3
**actions** [5] - 51:2, 51:14, 60:3, 68:16, 73:15
**active** [1] - 51:5
**actively** [2] - 30:5, 35:12
**activities** [1] - 87:7
**activity** [1] - 86:5
**actual** [3] - 19:12, 31:22, 72:3
**adamant** [1] - 17:9
**add** [2] - 23:14, 52:21
**added** [2] - 24:21, 24:24
**addition** [1] - 88:10
**additional** [3] - 24:24, 36:13, 90:22
**address** [2] - 5:24, 91:9
**addressed** [1] - 18:19
**ADHD** [1] - 60:12
**administration** [1] - 25:1
**Administrative** [1] - 74:23

**adrenalin** [1] - 73:1
**advantage** [1] - 83:5
**advisory** [2] - 25:7, 26:5
**advocating** [1] - 86:15
**affect** [6] - 7:9, 8:12, 11:8, 17:5, 90:11
**affiliation** [1] - 77:8
**afford** [1] - 92:4
**afternoon** [4] - 2:11, 2:14, 2:16, 65:11
**afterwards** [3] - 51:18, 66:12, 72:2
**agencies** [1] - 91:13
**agent** [13] - 11:22, 12:14, 12:15, 12:19, 12:21, 12:22, 13:19, 13:22, 13:25, 14:1, 14:4, 54:25, 56:20
**Agent** [3] - 12:13, 12:21, 13:3
**agents** [5] - 12:24, 12:25, 13:10, 13:12, 13:17
**aggravating** [2] - 48:1, 48:19
**aggressive** [2] - 7:22, 83:11
**agree** [3] - 24:10, 51:8, 51:9
**agreed** [1] - 8:6
**agreement** [9] - 24:11, 34:18, 35:21, 35:25, 48:19, 50:3, 51:8, 74:19, 75:12
**ahead** [1] - 53:5
**aided** [1] - 1:23
**alarm** [1] - 49:14
**alarms** [4] - 48:23, 60:23, 72:22, 78:15
**alerted** [1] - 20:12
**allocute** [3] - 5:3, 58:8, 58:16
**allow** [1] - 35:22
**allowable** [1] - 65:5
**allowed** [3] - 44:12, 44:17, 44:25
**allows** [1] - 41:17
**almost** [1] - 68:21
**alone** [2] - 55:13, 60:20
**ALSO** [1] - 1:20
**alternative** [1] - 31:24
**America** [2] - 2:3, 45:10
**AMERICA** [1] - 1:3
**American** [3] - 41:1, 52:8, 81:20
**amount** [7] - 69:21, 74:18, 75:1, 75:6,

89:6, 89:11, 91:5
**amplifies** [1] - 86:7
**analogous** [1] - 43:18
**analysis** [1] - 75:10
**anarchy** [2] - 84:2, 86:11
**anarchy"..** [1] - 76:21
**announce** [1] - 78:5
**answer** [12] - 9:18, 11:11, 21:15, 32:21, 52:24, 55:16, 56:23, 58:8, 59:2, 59:16, 67:15, 86:12
**answering** [1] - 9:1
**anticipate** [1] - 62:24
**anticipation** [1] - 82:13
**Antifa** [1] - 52:7, 81:13
**apologize** [5] - 27:13, 38:5, 50:14, 50:16, 68:16
**appeal** [5] - 91:17, 91:20, 91:21, 92:5, 92:6
**appearances** [1] - 45:17
**APPEARANCES** [1] - 1:10
**applicable** [3] - 24:16, 43:18, 91:19
**application** [3] - 8:12, 25:23, 75:4
**apply** [7] - 5:17, 5:18, 5:21, 7:10, 24:9, 74:10, 75:3
**appreciate** [2] - 17:8, 77:25
**approached** [1] - 70:13
**appropriate** [3] - 26:1, 65:19, 91:13
**approval** [1] - 90:23
**approved** [1] - 91:14
**April** [1] - 1:5
**Architect** [3] - 74:22, 89:5, 91:2
**architecture** [1] - 63:22
**area** [5] - 44:8, 44:23, 64:7, 71:10, 71:12
**areas** [8] - 44:7, 44:10, 44:11, 44:17, 44:19, 45:1, 83:18, 86:22
**argued** [1] - 48:10
**argument** [2] - 65:17, 65:18
**Arms** [1] - 74:24
**arrest** [9] - 7:18, 8:8, 8:22, 10:25, 13:4, 15:6, 52:13, 65:1,

80:24
**arrival** [2] - 8:9, 15:8
**arrive** [1] - 17:2
**arrived** [8] - 9:24, 13:12, 15:15, 16:21, 16:24, 17:4, 17:11, 80:12
**articulated** [1] - 69:24
**aside** [1] - 48:10
**aspects** [1] - 50:19
**asserted** [1] - 46:6
**assessed** [1] - 90:13
**assessing** [2] - 82:15
**assessment** [4] - 25:13, 57:22, 58:3, 88:11
**assistance** [2] - 14:11, 92:2
**associated** [2] - 64:13, 65:13
**assuming** [2] - 32:10, 32:13
**astray** [1] - 77:20
**attack** [1] - 82:16
**attacked** [2] - 83:7, 83:22
**attacking** [2] - 78:22, 79:10
**attacks** [1] - 45:21
**attempt** [1] - 79:2
**attempted** [4] - 24:25, 79:1, 80:19, 83:7
**attended** [1] - 76:13
**Attention** [1] - 91:3
**attention** [1] - 23:16
**attorney** [2] - 6:15, 34:21
**Attorney's** [1] - 90:21
**Austin** [4] - 2:4, 3:6, 88:4, 92:17
**AUSTIN** [1] - 1:5
**authority** [2] - 72:16, 85:10
**authorization** [1] - 94:15
**authorize** [1] - 90:19
**authorized** [1] - 90:4
**authorizing** [1] - 89:4
**available** [4] - 3:11, 74:13, 74:21, 92:1
**Avenue** [1] - 91:8
**avenues** [1] - 86:9
**avoid** [3] - 74:14, 75:10, 87:13
**aware** [10] - 8:20, 18:14, 42:6, 53:6, 53:12, 53:15, 54:5, 54:8, 55:6, 56:19

# B

**bachelor's** [1] - 85:3
**bad** [2] - 14:4, 72:5
**balance** [3] - 43:21, 89:8, 89:13
**balustrade** [1] - 47:22
**balustrades** [1] - 48:5
**bang** [1] - 60:24
**bangs** [2] - 72:21, 78:15
**banned** [1] - 84:6
**banner** [1] - 45:20
**barricaded** [1] - 37:23
**base** [1] - 24:19
**based** [22] - 20:19, 28:19, 28:20, 28:21, 30:15, 31:16, 32:21, 35:15, 35:18, 37:9, 38:20, 38:23, 39:16, 39:18, 40:23, 43:4, 47:24, 50:23, 51:3, 52:3, 69:22, 87:25
**basic** [1] - 88:16
**basis** [5] - 19:4, 29:3, 50:10, 51:15, 51:17
**bay** [1] - 79:3
**bear** [1] - 44:16
**became** [1] - 53:12
**becomes** [1] - 92:1
**BEFORE** [1] - 1:8
**began** [3] - 39:4, 79:15, 80:18
**begin** [2] - 74:18, 93:23
**beginning** [2] - 40:8, 43:14
**behalf** [3] - 2:11, 2:17, 4:14
**behavior** [4] - 45:8, 45:13, 47:11, 78:19
**behaviors** [1] - 46:2
**behind** [1] - 42:18
**behold** [1] - 57:5
**belief** [2] - 58:24, 69:24
**believer** [1] - 86:3
**below** [1] - 94:16
**bench** [1] - 40:9
**benefit** [1] - 52:17
**benefits** [1] - 42:15
**BERYL** [1] - 1:8
**best** [5] - 40:7, 48:24, 67:1, 74:21, 94:10
**better** [3] - 68:3, 68:19, 85:7

**between** [7] - 35:6, 40:10, 41:20, 50:13, 55:4, 71:14, 78:21
**beyond** [1] - 75:11
**Biden** [5] - 57:12, 70:3, 76:18, 79:21, 79:22
**big** [2] - 39:23, 66:19
**biggest** [2] - 57:13, 76:19
**bike** [2] - 47:21, 61:11
**bit** [4] - 26:20, 26:24, 51:25, 56:4
**Black** [1] - 45:21
**BLAKE** [1] - 1:5
**Blake** [6] - 2:4, 2:17, 3:6, 15:6, 88:4, 92:17
**blame** [1] - 20:1
**blatantly** [1] - 83:6
**Bledsoe** [5] - 36:16, 81:17, 81:24, 82:3, 82:10
**blew** [1] - 22:3
**BLM** [2] - 52:7, 81:13
**blow** [1] - 9:17
**bombs** [1] - 60:24
**Bonet** [1] - 43:17
**booster** [1] - 2:22
**bought** [1] - 54:3
**Box** [1] - 1:16
**Boy** [1] - 46:19
**Boys** [11] - 45:6, 45:10, 45:13, 45:14, 46:13, 47:4, 77:1, 77:6, 77:8, 77:16, 78:2
**breach** [2] - 48:25, 86:20
**breached** [2] - 39:3, 48:22
**Break** [1] - 80:18
**break** [4] - 7:21, 15:10, 37:25, 80:19
**breaking** [4] - 61:22, 64:1, 71:11, 71:21
**brief** [1] - 37:21
**briefing** [1] - 38:13
**briefly** [1] - 84:18
**broad** [1] - 34:12
**broader** [1] - 41:1
**broke** [1] - 70:24
**broken** [4] - 49:7, 49:9, 61:12, 82:23
**brother** [1] - 60:10
**brought** [1] - 11:4
**BRUNO** [70] - 1:16, 2:16, 2:21, 2:25, 3:2, 4:22, 4:24, 5:2, 5:5, 7:2, 7:7, 7:11, 8:3,

8:19, 9:5, 9:10, 9:25, 10:13, 11:2, 13:6, 13:8, 13:12, 16:17, 18:4, 18:22, 19:14, 20:16, 21:7, 22:19, 22:24, 23:8, 25:20, 52:24, 53:4, 53:6, 53:11, 55:21, 55:25, 56:7, 56:23, 57:1, 57:16, 57:24, 58:7, 58:13, 59:1, 59:25, 61:6, 62:5, 62:14, 62:18, 63:5, 63:8, 63:12, 64:15, 64:21, 65:5, 66:6, 66:9, 66:13, 66:17, 66:20, 66:22, 67:3, 67:11, 67:20, 67:23, 68:7, 92:11, 92:23
**Bruno** [9] - 2:17, 2:19, 7:2, 7:3, 7:4, 7:5, 19:10, 52:23, 68:5
**building** [20] - 3:8, 24:18, 24:22, 39:7, 39:15, 45:1, 49:8, 72:18, 75:15, 75:20, 76:1, 76:3, 79:1, 82:5, 82:23, 83:9, 84:18, 85:21, 86:21, 86:22
**Building** [8] - 48:21, 78:17, 78:23, 79:7, 79:15, 82:22, 83:11, 91:4
**burden** [1] - 75:8
**Bureau** [2] - 89:19, 93:10
**burner** [1] - 29:20
**business** [2] - 21:11, 21:17
**busting** [1] - 9:1
**busy** [1] - 79:23
**buy** [1] - 29:22

**C**

**calculated** [1] - 38:9
**calculation** [1] - 24:10
**calculations** [1] - 17:5
**calm** [2] - 63:9, 63:11
**calmly** [4] - 53:19, 61:25, 64:4, 79:5
**canister** [1] - 79:4
**cannot** [1] - 38:11
**capacity** [2] - 28:24, 30:2
**Capitol** [64] - 38:21, 39:2, 39:4, 39:16, 43:13, 44:22, 46:8,

47:23, 48:6, 48:8, 48:21, 48:25, 49:25, 52:8, 53:8, 53:16, 54:11, 55:11, 58:25, 59:5, 59:9, 59:11, 60:10, 61:3, 61:21, 62:1, 62:8, 63:16, 63:17, 63:18, 64:7, 70:13, 73:3, 74:22, 74:24, 75:22, 76:14, 78:7, 78:17, 78:19, 78:23, 79:7, 79:15, 79:23, 81:7, 81:8, 81:10, 81:14, 81:17, 82:16, 82:22, 83:10, 83:13, 83:19, 84:4, 84:8, 84:9, 84:12, 84:23, 86:20, 89:5, 91:2
**Capitol's** [1] - 79:18
**caps** [1] - 52:10
**caption** [1] - 52:2
**capturing** [1] - 78:18
**car** [1] - 29:24
**Card** [1] - 33:14
**card** [28] - 29:19, 29:22, 30:24, 31:6, 31:8, 31:9, 31:11, 31:16, 31:20, 31:22, 32:1, 32:5, 32:7, 32:9, 32:16, 33:1, 33:3, 33:7, 33:10, 33:22, 53:14, 53:24, 54:10, 69:8
**cards** [1] - 31:21
**careful** [1] - 16:11
**caring** [1] - 59:21
**carried** [1] - 36:6
**carries** [2] - 33:25, 42:12
**CARTER** [79] - 1:12, 2:10, 4:17, 4:19, 6:12, 11:19, 12:10, 12:21, 12:24, 13:24, 14:6, 14:22, 15:13, 16:8, 16:14, 25:18, 26:11, 26:16, 26:21, 26:24, 27:2, 27:17, 27:19, 27:22, 28:14, 28:16, 28:20, 29:14, 30:15, 30:21, 31:2, 31:4, 31:13, 31:15, 32:10, 32:19, 33:8, 34:14, 34:25, 35:12, 36:2, 36:15, 36:21, 37:5, 37:12, 38:5, 38:15, 38:18, 40:6, 40:15, 40:18, 42:2, 43:7, 44:13, 44:20, 44:24, 45:3, 45:14,

46:11, 46:16, 46:20, 46:24, 47:5, 47:9, 47:19, 48:2, 48:15, 49:3, 50:12, 51:9, 51:17, 52:22, 56:18, 71:4, 71:9, 71:12, 92:9, 92:15, 92:21
**Carter** [7] - 2:11, 2:14, 6:9, 11:16, 26:10, 26:14, 56:16
**case** [36] - 5:17, 5:21, 5:25, 6:16, 7:10, 8:2, 13:9, 15:6, 17:12, 17:15, 24:6, 26:1, 26:7, 29:11, 29:24, 34:6, 35:9, 36:3, 37:18, 38:22, 42:24, 43:6, 43:10, 43:23, 43:24, 47:25, 50:1, 51:8, 60:5, 65:20, 67:13, 74:19, 74:25, 85:1, 93:15, 93:17
**Case** [1] - 2:3
**cases** [9] - 40:25, 42:22, 42:24, 43:1, 43:11, 47:25, 49:21, 49:22, 66:4
**category** [3] - 24:15, 25:7, 34:12
**caught** [6] - 60:15, 60:17, 60:22, 68:17, 73:1, 73:8
**causes** [2] - 42:7
**cell** [9] - 11:21, 28:1, 28:5, 28:6, 28:9, 29:2, 32:16, 35:23, 82:12
**Centers** [3] - 12:13, 12:21, 13:3
**central** [1] - 18:23
**certain** [6] - 13:20, 21:9, 45:19, 56:11, 60:6, 65:11
**certainly** [10] - 14:16, 15:12, 36:12, 38:13, 42:13, 42:15, 52:24, 64:22, 83:23, 84:22
**CERTIFICATE** [1] - 94:5
**certificate** [1] - 94:13
**certify** [1] - 94:8
**cetera** [4] - 15:10, 27:8, 27:15, 52:14
**challenge** [1] - 91:24
**Chamber** [15] - 37:19, 37:25, 39:3, 39:5, 39:8, 40:11, 44:9, 61:15, 61:17, 80:13, 83:2, 83:3, 83:21, 84:24, 86:24

**chamber** [1] - 40:2
**chambers** [1] - 40:9
**change** [3] - 17:17, 91:9, 91:10
**changed** [1] - 70:15
**changes** [1] - 90:10
**chant** [1] - 70:5
**chanted** [2] - 80:5, 80:14
**chanting** [5] - 39:24, 61:22, 70:15, 78:24, 80:18
**chants** [1] - 87:1
**chaos** [4] - 78:18, 81:11, 87:4
**character** [1] - 59:23
**characteristics** [1] - 74:13
**characterizes** [1] - 57:13
**characterizing** [1] - 81:17
**charge** [1] - 48:13
**charger** [3] - 28:5, 28:25, 54:16
**charges** [3] - 48:16, 48:18, 90:22
**chart** [2] - 42:21, 42:22
**check** [3] - 13:1, 65:11, 77:23
**checks** [1] - 44:15
**cheese** [2] - 41:5, 57:19
**cherry** [5] - 35:6, 55:18, 56:5, 56:7, 56:13
**cherry-pick** [2] - 55:18, 56:5
**cherry-picking** [2] - 56:7, 56:13
**Chief** [2] - 74:23, 91:2
**CHIEF** [1] - 1:9
**children** [1] - 72:14
**chilling** [2] - 61:14, 80:7
**choice** [1] - 80:10
**choose** [2] - 48:17, 91:20
**chose** [3] - 46:4, 46:5, 59:11
**chunk** [1] - 34:19
**church** [1] - 45:21
**circling** [1] - 83:3
**circumstances** [7] - 44:11, 63:2, 73:14, 74:12, 75:13, 84:14, 90:11
**cited** [1] - 47:20
**cites** [2] - 44:6, 48:21

**citizen** [1] - 86:10
**city** [5] - 62:14, 62:16, 62:18, 62:20, 63:1
**claim** [1] - 92:1
**claiming** [2] - 82:3, 84:8
**clarification** [5] - 14:17, 16:16, 56:4, 71:17, 71:25
**clarifications** [1] - 68:10
**clarified** [1] - 22:14
**Class** [12] - 3:9, 5:17, 5:19, 25:14, 41:21, 42:25, 66:10, 75:16, 87:9, 87:16, 87:18
**clear** [8] - 13:6, 35:16, 44:22, 52:25, 58:11, 77:7, 78:1, 86:1
**cleared** [1] - 79:16
**clearly** [3] - 61:23, 69:23, 72:21
**Clerk** [5] - 90:24, 91:7, 91:10
**client** [2] - 7:5, 34:25
**climb** [2] - 48:5, 61:11
**climbed** [1] - 47:21
**climbing** [3] - 48:4, 72:20
**close** [3] - 29:9, 40:17, 42:14
**closer** [1] - 21:5
**closest** [1] - 78:25
**clouds** [2] - 61:24, 84:23
**code** [4] - 7:23, 9:6, 9:20, 37:4
**codefendant** [5] - 49:11, 81:16, 81:24, 82:2, 82:9
**codefendants** [1] - 49:17
**codes** [3] - 31:1, 36:21, 37:6
**college** [3] - 21:24, 85:5, 86:7
**college-educated** [1] - 86:7
**colors** [1] - 46:3
**Columbia** [1] - 90:25
**COLUMBIA** [1] - 1:1
**combination** [1] - 25:6
**combined** [4] - 28:25, 38:21, 39:16, 52:12
**combining** [1] - 12:8
**comfortable** [1] - 26:17
**coming** [13] - 5:8, 5:11, 8:21, 8:25, 9:15, 53:13, 62:17,

62:21, 62:22, 76:24, 82:19, 84:4
**commence** [1] - 90:16
**comment** [1] - 45:25
**comments** [1] - 72:17
**commit** [1] - 88:19
**communicating** [1] - 13:4
**communication** [2] - 33:20, 33:22
**communications** [3] - 46:18, 47:4, 52:12
**community** [4] - 40:25, 41:1, 45:22, 57:23
**compare** [1] - 16:5
**compared** [1] - 26:7
**compatible** [1] - 28:7
**compilation** [2] - 81:11, 84:7
**complement** [1] - 75:6
**complete** [4] - 19:3, 51:2, 51:14, 94:10
**complex** [1] - 75:5
**compliance** [1] - 51:7
**comply** [4] - 23:4, 74:2, 89:14, 89:23
**computer** [3] - 1:23, 19:16, 32:3
**computer-aided** [1] - 1:23
**conceal** [1] - 51:5
**concern** [2] - 45:23, 68:2
**concerned** [3] - 32:24, 33:5, 67:14
**concerning** [2] - 84:1, 84:5
**concludes** [1] - 94:3
**conclusion** [1] - 28:17
**concurrently** [1] - 93:7
**condition** [4] - 43:3, 56:9, 64:23, 65:2
**conditions** [12] - 64:13, 64:18, 65:6, 65:16, 65:18, 87:11, 87:21, 88:7, 88:14, 88:15, 88:18, 89:15
**conduct** [14] - 51:3, 62:2, 74:7, 74:16, 75:25, 81:17, 82:12, 85:6, 85:15, 85:17, 86:7, 87:5, 87:20, 88:16
**conducted** [1] - 54:15
**confers** [1] - 77:4
**confinement** [9] - 43:3, 64:20, 64:22, 87:12, 87:23, 88:8,

89:16, 89:17, 93:5
**confirm** [2] - 17:7, 30:17
**confirmable** [1] - 13:23
**confirmed** [2] - 14:3, 58:24
**confirming** [2] - 56:17, 78:1
**confiscated** [1] - 13:17
**confrontations** [1] - 78:21
**confronted** [1] - 83:7
**confusing** [1] - 34:2
**confusion** [2] - 30:3, 34:1
**Congress** [1] - 38:2, 39:13, 73:25, 75:23, 76:5, 79:24, 80:3, 80:15, 80:20, 80:25, 85:20
**connect** [1] - 31:10
**connection** [3] - 4:1, 6:21, 92:3
**connector** [2] - 38:24, 71:13
**conscience** [1] - 60:13
**conscience-wise** [1] - 60:13
**consider** [5] - 25:25, 33:17, 41:22, 73:24, 74:11
**consideration** [3] - 86:18, 87:25, 88:3
**considerations** [1] - 85:16
**considered** [2] - 74:9, 94:13
**considering** [2] - 45:12, 73:20
**consistent** [1] - 17:19
**consistently** [1] - 85:4
**conspiracy** [3] - 66:18, 86:3, 86:6
**constitutes** [1] - 94:8
**Constitution** [1] - 91:8
**constitutionally** [1] - 75:24
**contact** [1] - 42:14
**contained** [1] - 56:19
**contends** [1] - 30:24
**content** [2] - 32:7, 32:17
**contention** [1] - 16:20
**continue** [1] - 57:4
**continued** [3] - 33:15, 79:1, 79:7
**continues** [2] - 22:14, 58:9

**continuing** [2] - 36:18, 87:2
**continuously** [1] - 78:16
**contributed** [1] - 83:24
**control** [3] - 78:10, 79:9, 79:17
**controlled** [2] - 88:20, 88:23
**conundrum** [2] - 66:3, 67:10
**conversation** [2] - 58:14, 77:18
**conversion** [2] - 48:14, 48:15
**convicted** [4] - 75:14, 87:15, 87:17, 87:18
**conviction** [6] - 24:17, 25:3, 25:14, 42:24, 91:24, 92:3
**convictions** [1] - 24:14
**cooperate** [1] - 57:2
**cooperation** [3] - 35:21, 35:24, 51:7
**corner** [2] - 39:6, 39:10
**cornered** [1] - 79:11
**correct** [16] - 6:11, 7:11, 8:1, 14:18, 16:13, 17:1, 28:14, 28:15, 31:2, 37:11, 44:12, 44:20, 44:24, 46:24, 63:7, 70:12
**corrected** [4] - 20:1, 20:8, 22:11, 23:13
**correction** [4] - 22:18, 22:19, 23:21, 27:4
**corrections** [1] - 23:23
**correspond** [1] - 38:3
**corridor** [1] - 39:3
**corridors** [2] - 83:15, 84:19
**cost** [3] - 90:7, 92:4, 92:6
**counsel** [19] - 2:8, 5:23, 6:25, 18:11, 19:21, 34:14, 34:15, 34:24, 35:10, 35:16, 35:19, 36:1, 36:7, 36:8, 47:2, 47:7, 47:10, 77:4, 92:2
**counsel's** [2] - 36:22, 40:8
**Count** [2] - 3:6, 88:6
**count** [2] - 25:13, 45:13
**counted** [1] - 23:6
**country** [6] - 49:25,

60:16, 67:9, 76:21, 81:21, 84:2
**country's** [1] - 86:8
**counts** [1] - 92:14
**Counts** [1] - 92:16
**couple** [1] - 44:3
**course** [5] - 5:8, 19:25, 20:5, 21:16, 46:22
**COURT** [182] - 1:1, 1:9, 2:7, 2:13, 2:19, 2:23, 3:1, 3:3, 4:18, 4:20, 4:23, 4:25, 5:4, 5:6, 6:6, 6:13, 6:18, 6:24, 7:3, 7:8, 7:12, 8:4, 9:4, 9:9, 9:22, 10:6, 10:24, 11:16, 11:25, 12:3, 12:7, 12:18, 12:23, 13:5, 13:7, 13:11, 14:4, 14:7, 14:23, 15:14, 16:9, 16:15, 17:12, 18:8, 18:17, 18:25, 19:6, 19:20, 20:4, 20:9, 21:5, 22:10, 22:23, 23:5, 23:10, 23:22, 25:19, 25:21, 26:14, 26:17, 26:23, 27:1, 27:14, 27:18, 27:21, 27:25, 28:15, 28:17, 29:4, 30:6, 30:19, 30:22, 31:3, 31:5, 31:14, 32:4, 32:15, 32:24, 34:1, 34:23, 35:3, 35:20, 36:9, 36:19, 37:3, 37:7, 37:17, 38:13, 38:16, 39:20, 40:13, 40:17, 40:19, 42:20, 43:22, 44:14, 44:21, 44:25, 45:4, 46:9, 46:12, 46:17, 46:22, 47:1, 47:6, 47:16, 47:20, 48:14, 48:20, 49:15, 50:23, 51:12, 52:20, 52:23, 53:2, 53:5, 53:10, 55:18, 55:24, 56:3, 56:16, 56:22, 56:25, 57:9, 57:17, 57:25, 58:11, 58:23, 59:19, 60:1, 61:8, 62:12, 62:17, 63:4, 63:6, 63:9, 64:10, 64:17, 65:3, 66:3, 66:7, 66:10, 66:14, 66:18, 66:21, 66:23, 67:4, 67:19, 67:22, 68:5, 68:9, 69:22, 70:4, 70:10, 70:21, 71:3, 71:7,

71:10, 71:16, 71:21, 71:24, 72:13, 73:10, 73:16, 77:5, 77:10, 77:14, 77:19, 77:23, 78:4, 81:6, 92:10, 92:12, 92:18, 92:22, 92:24, 93:3, 93:9, 93:14, 93:19, 93:23, 94:1
**court** [4] - 3:20, 66:25, 76:23, 90:3
**Court** [48] - 1:21, 1:21, 2:2, 5:5, 5:25, 14:2, 20:15, 21:21, 22:2, 22:21, 22:24, 23:2, 23:3, 27:4, 27:12, 27:23, 33:17, 37:12, 43:16, 43:21, 48:17, 51:19, 59:15, 59:17, 64:16, 64:22, 65:6, 65:7, 65:19, 68:7, 74:20, 88:4, 89:1, 89:4, 89:6, 89:11, 90:10, 90:25, 91:7, 91:10, 91:15, 91:17, 91:21, 92:5, 94:19
**Court's** [5] - 11:21, 11:24, 49:4, 51:20, 86:17
**court-issued** [1] - 3:20
**court-ordered** [1] - 90:3
**courthouse** [1] - 3:13
**COURTROOM** [2] - 2:2, 2:8
**courtroom** [1] - 2:18
**courts** [1] - 74:1
**courtyard** [1] - 79:18
**covered** [1] - 83:12
**COVID** [1] - 3:14
**cowering** [4] - 38:2, 40:2, 80:16, 83:21
**CPA** [1] - 91:3
**crafting** [1] - 16:11
**crashing** [1] - 19:16
**created** [1] - 38:22
**creates** [1] - 66:24
**creating** [1] - 43:11
**credentials** [1] - 3:21
**credit** [2] - 90:22, 90:23
**crime** [3] - 48:3, 64:3, 88:19
**crimes** [4] - 51:5, 57:21, 74:7, 85:15
**criminal** [16] - 24:14, 24:15, 25:7, 41:25, 74:6, 85:2, 85:15, 85:17, 86:5, 86:7, 87:7, 87:24, 88:12,

89:10, 90:14
**Criminal** [2] - 1:3, 2:3
**critical** [1] - 85:16
**crowd** [32] - 37:19,
37:23, 38:24, 49:7,
60:8, 60:18, 60:22,
61:2, 62:22, 63:11,
63:12, 70:15, 76:1,
76:14, 78:23, 78:24,
78:25, 79:3, 79:8,
79:9, 79:13, 79:17,
79:20, 80:4, 80:5,
80:9, 82:25, 83:3,
83:5, 84:3, 86:2,
86:24
**crowd-control** [2] -
79:9, 79:17
**crowds** [2] - 61:10,
61:21
**Crypt** [2] - 80:4, 83:17
**curiosity** [3] - 17:14,
59:5, 68:19
**curious** [2] - 38:17,
60:8
**custodial** [4] - 84:17,
87:6, 87:14, 87:22

**D**

**D.C** [10] - 1:6, 41:1,
52:2, 53:11, 58:21,
62:8, 78:5, 82:19,
91:4, 91:8
**daily** [1] - 77:18
**damage** [2] - 48:22,
75:19
**damages** [1] - 74:21
**dangerous** [1] - 44:16
**Daniel** [1] - 12:13
**data** [2] - 57:14, 76:19
**date** [9] - 10:24, 18:22,
29:9, 38:1, 38:3,
38:16, 45:19, 50:2,
90:16
**dated** [1] - 50:2
**Dated** [1] - 94:18
**dates** [3] - 50:15,
50:16, 50:22
**days** [16] - 50:4, 50:7,
69:12, 69:14, 73:13,
80:23, 87:22, 88:7,
88:8, 88:24, 89:16,
89:18, 90:16, 91:9,
91:21, 93:23
**DC** [1] - 1:13
**deadlines** [1] - 19:2
**deal** [2] - 29:18, 92:19
**dealing** [1] - 13:9
**December** [3] - 45:18,

57:10, 76:16
**decide** [1] - 5:12
**decided** [1] - 51:11
**decides** [1] - 36:1
**decision** [4] - 60:13,
60:23, 73:8, 86:19
**decisions** [1] - 42:17
**declined** [1] - 51:10
**deemed** [1] - 3:22
**defendant** [58] - 4:20,
8:6, 15:24, 15:25,
17:16, 17:22, 17:23,
22:15, 24:25, 28:12,
29:5, 29:11, 30:13,
30:20, 31:1, 31:6,
33:6, 33:11, 33:15,
35:22, 36:11, 40:3,
41:11, 41:15, 41:23,
42:8, 44:6, 45:5,
45:8, 46:12, 46:15,
46:18, 47:21, 49:2,
49:16, 49:21, 50:3,
50:7, 51:1, 51:13,
57:10, 57:14, 57:21,
57:23, 58:4, 60:2,
60:5, 61:21, 64:12,
66:25, 74:8, 75:14,
75:25, 76:8, 77:4,
79:5, 82:11, 86:4
**Defendant** [2] - 1:6,
7:20
**DEFENDANT** [20] -
1:16, 6:5, 6:17, 6:23,
68:14, 70:2, 70:9,
70:12, 71:1, 71:20,
71:23, 72:1, 72:25,
73:12, 77:7, 77:12,
77:17, 77:22, 78:3,
81:5
**defendant's** [14] -
4:12, 4:14, 18:5,
19:21, 23:14, 24:16,
26:8, 27:6, 28:4,
29:14, 29:17, 32:22,
59:23, 90:13
**defendants** [12] -
5:10, 40:21, 43:1,
43:10, 43:23, 66:15,
74:15, 75:18, 86:2,
87:15, 87:17, 87:18
**defense** [26] - 6:25,
12:14, 18:1, 18:11,
25:19, 34:7, 34:10,
34:12, 34:14, 34:20,
34:21, 34:24, 35:10,
36:1, 37:15, 39:21,
39:22, 47:2, 47:6,
47:9, 47:15, 50:21,
73:24, 92:10, 92:22
**defer** [1] - 23:2

**defined** [1] - 91:23
**definitive** [1] - 16:2
**deflect** [1] - 60:2
**degree** [3] - 21:24,
75:7, 85:3
**delete** [1] - 32:1
**deleted** [1] - 32:10
**deleting** [1] - 33:16
**demand** [1] - 80:18
**demanded** [1] - 80:14
**demanding** [1] - 37:20
**demeanor** [1] - 85:11
**democracy** [6] - 67:6,
67:8, 76:6, 85:8,
85:23, 87:8
**Democratic** [1] - 84:10
**DEMOCRATIC** [1] -
52:9
**democratic** [1] - 81:14
**democratically** [1] -
86:11
**demonstrably** [1] -
41:8
**demonstrate** [2] -
16:6, 42:5
**demonstrated** [3] -
51:2, 51:14, 66:16
**denial** [1] - 3:21
**denied** [1] - 17:18
**department's** [1] -
73:21
**departs** [1] - 91:19
**deployed** [2] - 62:19,
79:2
**DEPUTY** [2] - 2:2, 2:8
**described** [3] - 29:22,
61:4, 62:2
**describes** [1] - 45:7
**describing** [1] - 61:1
**deserves** [1] - 70:16
**designate** [1] - 93:11
**designated** [3] - 45:1,
89:19, 89:21
**desks** [1] - 80:17
**despite** [5] - 8:5,
14:12, 31:1, 78:15
**destroying** [1] - 33:16
**detail** [3] - 29:18,
34:11, 59:12
**detention** [8] - 65:2,
65:8, 65:9, 87:24,
88:9, 89:22, 93:5,
93:9
**deter** [5] - 69:18,
72:11, 74:6, 85:14,
87:7
**determination** [1] -
25:17
**determine** [2] - 5:12,
5:16

**determined** [5] -
28:12, 39:18, 89:1,
89:6, 89:11
**determining** [3] -
52:16, 75:5, 86:14
**deterrence** [3] - 65:22,
65:25
**deterring** [1] - 86:15
**detrimental** [1] - 87:8
**device** [1] - 47:17
**devices** [1] - 37:11
**diagnosed** [1] - 60:12
**difference** [4] - 15:23,
22:1, 31:23, 34:3
**different** [9] - 5:9,
17:22, 29:19, 29:20,
32:2, 42:2, 42:10,
54:25, 63:20
**difficult** [1] - 60:13
**direct** [2] - 23:13,
75:18
**directed** [2] - 73:25,
89:25
**directly** [4] - 5:24,
46:18, 58:17, 75:19
**disagree** [1] - 76:17
**disagrees** [1] - 57:12
**disassembled** [1] -
94:14
**disbursement** [1] -
91:1
**disclose** [1] - 90:17
**disclosure** [2] - 34:21,
51:22
**discontent** [1] - 86:9
**discovery** [1] - 36:17
**discretion** [1] - 90:6
**discuss** [1] - 24:8
**discussed** [2] - 7:6,
45:6
**discussing** [2] - 54:4,
77:1
**discussions** [1] - 10:3
**dismiss** [2] - 92:13,
92:16
**disobey** [1] - 86:10
**disparities** [2] - 74:14,
87:14
**disparity** [2] - 43:6,
43:8
**dispatched** [1] - 39:14
**dispute** [4] - 16:21,
16:22, 16:23, 16:25
**disregard** [1] - 52:14
**disrupt** [1] - 86:12
**disrupting** [1] - 86:16
**disruption** [1] - 42:6
**dissatisfaction** [1] -
86:8
**distance** [1] - 40:10

**distances** [2] - 40:7,
40:16
**DISTRICT** [3] - 1:1,
1:1, 1:9
**District** [4] - 45:16,
90:25, 91:7
**district** [2] - 91:14,
93:13
**docketed** [7] - 4:5,
4:6, 4:8, 4:11, 4:13,
4:15, 18:18
**document** [4] - 68:23,
68:25, 73:6, 82:5
**documentary** [2] -
72:2, 72:4
**documented** [1] - 82:7
**documenting** [1] -
82:6
**documents** [7] - 4:3,
4:16, 4:21, 19:12,
19:19, 20:1, 20:2
**dogs** [1] - 7:21
**done** [6] - 21:7, 49:24,
51:25, 69:3, 69:5,
74:21
**donning** [1] - 79:6
**door** [62] - 7:19, 7:21,
8:7, 8:15, 8:16, 8:24,
8:25, 9:1, 9:6, 9:11,
9:12, 9:17, 9:23,
10:2, 10:4, 10:7,
10:8, 10:12, 10:16,
10:20, 11:10, 11:11,
11:13, 11:23, 12:5,
12:9, 12:16, 13:14,
13:22, 14:12, 14:19,
14:25, 15:10, 15:17,
15:25, 16:20, 16:24,
17:3, 17:11, 37:19,
37:23, 37:25, 38:25,
40:1, 40:4, 40:11,
44:8, 49:1, 49:6,
49:9, 72:9, 72:10,
72:11, 80:13, 80:17,
80:19, 82:23, 83:4,
84:24
**doors** [3] - 49:6,
61:12, 64:11
**double** [2] - 13:1,
77:23
**double-check** [2] -
13:1, 77:23
**doubt** [1] - 69:15
**down** [14] - 3:14, 7:21,
11:1, 15:10, 39:7,
42:5, 45:20, 61:11,
72:3, 73:2, 79:8,
80:19, 81:25, 83:4
**download** [2] - 32:13,
33:14

**downloaded** [2] - 10:23, 54:19
**drafting** [1] - 50:20
**drawn** [2] - 37:23, 84:25
**Drive** [1] - 19:24
**drive** [14] - 32:3, 54:20, 54:22, 54:24, 55:15, 55:19, 55:22, 56:10, 56:11, 56:18, 56:19, 56:20, 56:21, 69:6
**drug** [2] - 88:24, 88:25
**due** [4] - 18:5, 25:13, 32:19, 90:14
**during** [9] - 5:8, 13:16, 33:14, 35:18, 38:20, 39:20, 62:19, 82:1, 83:12

## E

**early** [6] - 27:9, 43:12, 49:16, 49:18, 50:11, 86:20
**easily** [1] - 13:22
**east** [1] - 39:7
**ECF** [7] - 4:5, 4:6, 4:8, 4:11, 4:13, 4:15, 18:18
**economic** [1] - 90:11
**educated** [3] - 85:5, 85:7, 86:7
**education** [1] - 90:2
**educational** [1] - 17:25
**effectively** [2] - 33:9, 48:12
**effects** [1] - 87:4
**egregiously** [1] - 58:2
**either** [2] - 34:13, 43:2
**elect** [1] - 76:18
**elected** [7] - 44:18, 57:12, 76:9, 76:10, 83:20, 84:25, 86:11
**election** [10] - 40:22, 41:3, 57:13, 58:6, 62:11, 69:24, 76:19, 79:21, 86:13, 86:17
**elections** [1] - 41:3
**electronic** [3] - 37:10, 47:17, 65:12
**Elizabeth** [2] - 1:21, 94:19
**ELIZABETH** [1] - 94:7
**Ellipse** [1] - 58:24
**email** [7] - 18:6, 18:14, 18:22, 21:14, 21:20, 46:10, 50:14

**Email** [2] - 1:14, 1:18
**emails** [2] - 20:24, 22:8
**emergency** [1] - 29:24
**emotion** [1] - 60:18
**employed** [1] - 21:11
**employers** [1] - 18:1
**employment** [3] - 21:24, 85:4, 90:2
**enable** [1] - 17:24
**enables** [1] - 31:9
**encouraging** [1] - 77:15
**end** [7] - 22:1, 42:5, 62:8, 65:23, 69:10, 71:13, 78:6
**ended** [2] - 58:21, 60:7
**enforcement** [20] - 7:20, 8:7, 8:14, 8:17, 8:20, 10:5, 10:14, 10:15, 10:21, 11:8, 11:13, 15:9, 15:21, 54:15, 55:9, 55:12, 62:19, 76:4, 78:21, 78:22
**engage** [1] - 75:18
**engaged** [4] - 46:18, 82:17, 82:18, 86:25
**engaging** [4] - 67:7, 85:6, 86:5, 87:1
**ensure** [3] - 41:1, 41:15, 74:1
**ensuring** [1] - 76:6
**enter** [1] - 86:20
**entered** [7] - 48:21, 49:2, 49:9, 64:7, 82:22, 91:24, 93:24
**entering** [7] - 3:7, 24:17, 49:22, 75:14, 76:2, 83:8, 92:2
**entire** [2] - 44:22, 63:18
**entirely** [1] - 42:10
**entrance** [1] - 79:19
**entry** [3] - 3:21, 10:4, 75:21
**episode** [1] - 75:20
**equal** [1] - 90:15
**equipped** [1] - 76:12
**equipping** [1] - 84:20
**error** [1] - 27:12
**escalated** [1] - 45:13
**escalating** [1] - 45:8
**essentially** [1] - 29:21
**establish** [1] - 88:15
**estimate** [4] - 40:7, 40:12, 48:24, 74:21
**et** [4] - 15:10, 27:8, 27:15, 52:14

**ethic** [1] - 85:10
**ethnicity** [1] - 52:8
**evacuated** [5] - 70:7, 76:8, 79:25, 83:1, 86:24
**evacuating** [1] - 39:5
**evaluate** [1] - 51:16
**Evans** [1] - 7:1
**evening** [2] - 8:23
**event** [3] - 45:15, 80:7, 82:6
**events** [2] - 38:19, 39:19
**ever-growing** [1] - 42:21
**everyday** [1] - 42:11
**everywhere** [1] - 72:6
**evidence** [19] - 4:10, 6:19, 16:6, 29:16, 30:16, 33:16, 36:14, 37:18, 46:14, 46:17, 46:20, 47:11, 47:12, 56:5, 69:2, 69:9, 75:10, 77:2, 78:2
**evidences** [1] - 46:12
**exact** [5] - 45:19, 48:4, 49:12, 50:15, 50:21
**exactly** [7] - 16:17, 48:15, 55:10, 56:8, 56:12, 68:7, 78:12
**examination** [1] - 37:10
**examine** [1] - 35:5
**examples** [1] - 60:3
**except** [1] - 90:1
**exchange** [1] - 46:10
**exchanged** [2] - 76:25, 81:16
**excited** [1] - 79:14
**excused** [2] - 92:24, 94:2
**execute** [2] - 15:1, 91:15
**executed** [7] - 7:18, 8:8, 10:25, 11:4, 15:5, 15:6, 69:11
**executes** [1] - 28:3
**executing** [1] - 82:14
**execution** [2] - 12:19, 14:20, 30:8
**Exhibit** [1] - 72:15
**exhibit** [1] - 12:11
**exhibits** [1] - 24:6
**exited** [1] - 72:8
**exits** [1] - 39:15
**expect** [1] - 59:22
**expectations** [1] - 88:16
**explain** [5] - 6:1, 45:9, 59:12, 62:10, 73:18

**explanation** [1] - 55:4
**expression** [1] - 86:9
**extended** [1] - 50:17
**extensive** [1] - 50:12
**extent** [9] - 17:16, 27:10, 29:18, 32:5, 41:7, 43:10, 43:14, 47:14, 76:5
**extremely** [1] - 73:7
**eye** [1] - 42:14

## F

**face** [3] - 60:23, 61:23, 66:4
**Facebook** [15] - 27:7, 30:16, 36:4, 37:14, 51:4, 51:24, 51:25, 52:5, 69:22, 76:16, 78:5, 81:25, 84:5, 84:6
**facility** [1] - 89:19, 89:21, 93:11
**fact** [5] - 16:21, 24:4, 30:13, 30:18, 62:25
**factor** [4] - 47:20, 48:1, 48:19, 48:20
**factors** [12] - 25:24, 27:23, 43:18, 43:21, 43:24, 43:25, 44:3, 44:5, 45:4, 73:24, 82:15, 88:1
**facts** [2] - 50:23, 75:5
**factual** [1] - 20:18
**failed** [2] - 76:23, 79:2
**failure** [2] - 18:5, 20:19
**fair** [1] - 23:18
**fairly** [2] - 43:25, 50:24
**fall** [1] - 36:17
**family** [5] - 4:15, 21:25, 42:9, 85:9, 85:11
**far** [8] - 23:1, 28:15, 35:15, 36:6, 40:1, 40:3, 64:22, 76:23
**fast** [1] - 73:7
**father** [1] - 72:13
**fault** [1] - 81:3
**favor** [1] - 84:17
**favors** [1] - 87:6
**FBI** [13] - 7:17, 9:24, 15:5, 15:14, 28:3, 28:11, 30:25, 51:8, 51:9, 51:10, 51:15, 55:20, 56:4
**FBI's** [3] - 15:8, 37:9, 52:14
**FCRR** [3] - 1:21, 94:7,

94:19
**fear** [2] - 70:7, 80:22
**February** [6] - 18:3, 18:23, 19:1, 19:8, 19:10, 19:11
**federal** [5] - 5:16, 5:18, 24:8, 41:25, 88:19
**feet** [4] - 40:4, 40:13, 40:14, 79:4
**felonies** [1] - 5:19
**felony** [1] - 66:5
**fence** [1] - 79:17
**fences** [1] - 79:9
**few** [1] - 83:14
**Fi** [1] - 50:15
**fights** [1] - 45:22
**figure** [4] - 35:6, 35:10, 36:13, 67:1
**figured** [2] - 8:21, 57:2
**file** [2] - 91:21, 92:5
**filed** [2] - 6:8, 6:21
**files** [2] - 19:13, 37:18
**filmed** [8] - 78:16, 78:20, 78:24, 79:8, 79:20, 80:2, 80:13, 83:6
**filming** [2] - 72:19, 79:2
**final** [2] - 7:9, 18:19
**finally** [1] - 79:12
**financial** [7] - 90:8, 90:12, 90:19, 90:20, 90:21, 91:6, 91:11
**Financial** [1] - 91:3
**findings** [1] - 24:4
**fine** [8] - 5:4, 5:6, 22:19, 25:12, 41:5, 87:24, 88:12, 89:10
**finished** [1] - 50:20
**firearms** [1] - 44:15
**first** [11] - 5:12, 22:5, 26:2, 26:9, 63:15, 63:17, 73:2, 76:12, 83:11, 89:18, 93:9
**fixed** [1] - 75:11
**flag** [1] - 33:15
**flash** [3] - 60:24, 72:21, 78:15
**flash-bang** [1] - 60:24
**flash-bangs** [2] - 72:21, 78:15
**floating** [1] - 28:8
**focus** [1] - 44:2
**focused** [1] - 20:17
**follow** [2] - 78:11, 89:20
**followed** [6] - 25:10, 26:5, 76:13, 80:2, 80:4, 83:10

**follower** [1] - 86:2
**followers** [1] - 82:6
**following** [6] - 61:2, 61:21, 86:5, 88:14, 89:14, 91:1
**follows** [2] - 15:5, 90:15
**foot** [4] - 63:15, 63:16, 63:17
**FOR** [3] - 1:1, 1:11, 1:16
**force** [1] - 79:1
**forcing** [1] - 79:9
**Ford** [1] - 91:3
**foregoing** [1] - 94:8
**forensically** [1] - 35:4
**forgive** [1] - 48:3
**form** [1] - 20:3
**format** [1] - 19:21
**former** [1] - 45:25
**forms** [9] - 17:24, 18:2, 18:11, 18:12, 18:25, 19:3, 19:21, 20:13, 23:15
**forth** [3] - 50:13, 50:18, 50:20
**forward** [3] - 7:13, 48:18, 68:11
**foundations** [1] - 85:22
**four** [4] - 5:9, 50:4, 50:7, 73:4
**frank** [1] - 42:12
**frankly** [4] - 44:22, 56:1, 58:13, 67:5
**fraud** [1] - 58:5
**freedoms** [1] - 42:11
**friend** [6] - 30:9, 52:13, 59:21, 60:15, 77:1, 77:12
**friends** [6] - 4:14, 42:9, 62:3, 77:14, 77:24, 85:9
**front** [7] - 38:25, 42:5, 50:23, 59:7, 67:1, 82:25, 86:19
**full** [2] - 91:11, 94:9
**fully** [4] - 6:15, 22:16, 26:14, 83:1
**future** [8] - 3:21, 16:4, 42:16, 48:9, 69:18, 74:7, 86:15, 87:7

## G

**gain** [1] - 79:17
**gained** [1] - 45:11
**gainful** [1] - 85:4
**gaining** [1] - 49:7

**gallery** [1] - 39:13
**game** [2] - 61:16, 80:8
**gang** [1] - 46:2
**garage** [2] - 7:24, 9:5
**garden** [1] - 75:20
**garden-variety** [1] - 75:20
**gas** [11] - 61:24, 62:13, 62:15, 62:19, 78:9, 78:15, 79:2, 79:4, 84:22
**gathered** [1] - 35:18
**gear** [1] - 82:20
**generally** [2] - 65:8, 85:11
**generations** [1] - 48:9
**given** [9] - 3:14, 36:21, 43:1, 62:25, 63:5, 66:15, 70:16, 87:19
**globe** [1] - 52:1
**go-between** [1] - 35:6
**goggles** [6] - 62:12, 76:12, 78:7, 79:6, 82:20, 84:21
**goodness** [2] - 61:13, 70:6
**Google** [1] - 19:24
**government** [66] - 2:9, 4:16, 5:13, 5:22, 6:10, 6:21, 10:3, 10:11, 10:18, 10:22, 12:11, 16:5, 16:18, 17:7, 17:13, 25:17, 26:2, 26:9, 29:7, 30:6, 30:9, 30:12, 30:23, 34:11, 34:15, 35:4, 35:9, 35:11, 35:22, 35:25, 36:14, 37:21, 41:22, 43:24, 44:1, 44:6, 45:5, 45:6, 46:14, 47:8, 47:21, 48:21, 49:15, 50:10, 51:1, 51:6, 51:13, 53:6, 54:5, 54:7, 54:22, 55:1, 55:6, 56:14, 57:2, 57:9, 65:23, 66:1, 73:23, 76:22, 78:1, 82:14, 85:7, 92:8, 92:13, 92:20
**government's** [16] - 4:7, 4:9, 4:10, 10:8, 14:21, 15:20, 26:3, 27:5, 33:2, 34:4, 41:12, 42:20, 42:23, 43:4, 48:24, 80:21
**GPS** [1] - 65:12
**granted** [1] - 92:18
**great** [3] - 29:18, 32:12, 63:21

**greater** [1] - 74:2
**green** [1] - 57:19
**ground** [1] - 83:12
**grounds** [10] - 3:8, 24:18, 24:22, 48:6, 59:9, 68:19, 75:15, 76:1, 78:17, 81:8
**groups** [1] - 46:4
**growing** [1] - 42:21
**grown** [3] - 61:9, 85:6
**grown-up** [3] - 61:9, 85:6
**guess** [5] - 8:13, 19:6, 39:21, 69:11, 70:13
**guideline** [10] - 24:10, 24:16, 24:19, 24:20, 24:22, 25:3, 25:5, 25:11, 25:17, 91:20
**guidelines** [9] - 5:17, 5:18, 5:20, 7:10, 8:12, 24:8, 64:25, 74:9, 74:11
**guilty** [6] - 3:6, 53:22, 64:3, 64:4, 74:15, 92:3
**guns** [2] - 37:22, 84:24
**guy** [1] - 72:8

## H

**H2-205B** [1] - 91:4
**half** [8] - 29:6, 29:13, 54:1, 54:2, 54:9, 54:12, 55:7, 81:7
**Hall** [3] - 38:24, 71:13, 83:18
**hall** [3] - 39:7, 39:8, 44:7
**hallway** [2] - 38:25, 40:11
**hallways** [1] - 44:9
**handled** [1] - 36:7
**hands** [1] - 14:24
**handwritten** [6] - 7:19, 12:7, 14:13, 14:15, 14:17, 15:9
**handy** [1] - 84:22
**hang** [2] - 70:14, 78:24
**hanging** [6] - 10:7, 10:8, 12:9, 14:12, 14:19, 14:25
**happily** [1] - 83:10
**happy** [3] - 13:24, 27:22, 27:24
**hard** [3] - 8:11, 32:3, 85:12
**harm** [2] - 60:6, 62:9
**harsher** [2] - 41:20, 41:23

**hashtags** [1] - 52:11
**HAVE** [2] - 52:10, 81:15
**health** [1] - 90:3
**hear** [8] - 5:22, 5:23, 5:24, 11:16, 25:23, 49:14, 62:9, 68:6
**heard** [2] - 45:10, 58:23
**hearing** [12] - 3:10, 3:15, 3:24, 5:8, 5:11, 16:15, 17:6, 23:18, 24:8, 25:22, 53:3
**HEARING** [1] - 1:8
**hearings** [2] - 3:22, 5:9
**heavily** [1] - 86:17
**held** [5] - 3:10, 3:18, 47:10, 47:13, 67:7
**help** [4] - 18:22, 26:24, 27:1, 36:12
**helpful** [6] - 16:10, 27:23, 41:9, 42:21, 59:21, 85:11
**helping** [1] - 81:3
**hereby** [2] - 88:5, 94:7
**hidden** [1] - 29:1
**hide** [2] - 61:16, 80:8
**hide-and-seek** [2] - 61:16, 80:8
**high** [2] - 70:14, 78:24
**highlighted** [1] - 45:5
**highly** [1] - 86:22
**highly-secure** [1] - 86:22
**himself** [5] - 5:1, 5:2, 62:13, 63:19, 63:21
**hired** [1] - 54:21
**historic** [1] - 48:8
**history** [5] - 24:15, 25:7, 74:12, 85:2
**hit** [2] - 65:21
**hold** [3] - 15:3, 32:17, 32:23
**holding** [3] - 39:23, 47:18, 79:13
**holiday** [1] - 69:13
**home** [19] - 7:19, 8:24, 9:8, 9:11, 9:12, 11:5, 11:9, 11:10, 15:7, 28:4, 64:22, 65:1, 65:8, 65:9, 87:23, 88:9, 89:22, 93:5, 93:9
**honest** [1] - 67:5
**Honor** [75] - 2:5, 2:10, 2:16, 2:21, 3:2, 4:17, 4:19, 4:22, 4:24, 6:5, 6:12, 6:17, 6:23, 7:2, 7:7, 12:1, 12:10,

12:11, 13:2, 13:6, 14:2, 14:6, 14:22, 16:8, 16:14, 18:13, 23:20, 23:21, 25:18, 25:20, 26:11, 27:22, 28:16, 30:21, 34:20, 36:15, 38:5, 38:9, 38:18, 40:6, 40:18, 42:6, 43:9, 43:19, 45:16, 47:5, 47:19, 48:3, 49:5, 50:22, 52:17, 52:22, 53:25, 57:24, 58:17, 68:14, 70:2, 70:9, 71:2, 71:4, 71:20, 71:23, 72:25, 77:13, 77:22, 78:3, 81:5, 92:9, 92:15, 92:21, 92:23, 92:25, 93:1, 93:25
**Honor's** [3] - 40:9, 49:6, 52:25
**HONORABLE** [1] - 1:8
**hour** [1] - 81:7
**hours** [1] - 76:7
**House** [21] - 37:19, 37:25, 39:3, 39:5, 39:8, 40:11, 44:9, 61:15, 61:17, 70:6, 74:22, 80:13, 82:25, 83:2, 83:3, 83:18, 83:21, 84:24, 86:23, 87:1, 91:4
**house** [11] - 8:22, 9:6, 9:13, 9:19, 11:3, 11:4, 13:13, 40:2, 54:14, 65:1, 82:14
**HOWELL** [1] - 1:8
**hung** [1] - 70:17
**hunt** [1] - 80:3
**hurt** [1] - 60:20
**hyped** [1] - 78:25

## I

**ID** [1] - 21:9
**identifiable** [1] - 74:21
**identify** [1] - 35:5
**images** [1] - 54:19
**imagines** [1] - 60:12
**immediately** [2] - 38:25, 91:6
**impede** [1] - 25:1
**impeded** [1] - 24:25
**implied** [1] - 30:10
**importance** [1] - 86:15
**important** [5] - 22:20, 23:3, 40:25, 41:22, 56:3
**impose** [7] - 6:2, 65:6,

65:7, 73:19, 74:1,
87:20
**imposed** [14] - 25:10,
41:14, 41:17, 42:22,
64:19, 74:4, 85:14,
86:14, 87:15, 88:1,
88:15, 91:17, 91:25,
92:7
**imposition** [1] - 87:6
**impression** [1] - 22:2
**imprisonment** [5] -
25:8, 25:9, 41:12,
87:10, 91:18
**impulsive** [3] - 60:21,
61:20, 76:15
**impulsivity** [1] - 60:11
**inauguration** [1] -
61:11
**incarceration** [9] -
26:4, 41:24, 42:4,
42:7, 43:2, 43:5,
44:2, 87:19
**incidences** [1] - 45:20
**incident** [1] - 45:15
**include** [2] - 74:3,
88:18
**includes** [2] - 88:21,
91:14
**including** [8] - 3:18,
3:20, 44:7, 51:3,
78:22, 82:20, 85:17,
87:11
**incognito** [1] - 46:5
**inconsistent** [1] -
29:15
**incorrect** [2] - 11:18,
13:1
**incredible** [1] - 86:4
**increments** [1] - 88:8
**incur** [1] - 90:22
**indicate** [3] - 8:4,
9:23, 52:15
**indicated** [3] - 18:20,
34:15, 47:4
**indicates** [1] - 38:14
**indicating** [1] - 59:20
**indicted** [1] - 30:20
**indictment** [4] - 3:7,
33:6, 88:6, 92:14
**indifferent** [1] - 55:8
**individual** [2] - 43:20,
66:25
**individuals** [1] - 41:23
**indulgence** [2] - 49:4,
51:20
**ineffective** [1] - 92:2
**infamy** [1] - 45:11
**information** [21] -
13:2, 14:2, 19:9,
21:12, 21:13, 28:21,

30:1, 31:11, 31:25,
32:7, 35:14, 39:17,
39:18, 47:7, 55:17,
57:7, 90:19, 90:20,
90:21, 92:1
**initial** [1] - 48:25
**initiation** [1] - 46:3
**inquire** [2] - 47:6,
49:17
**insane** [1] - 79:14
**inside** [20] - 7:22,
9:13, 15:18, 39:5,
40:3, 60:9, 61:17,
61:21, 76:3, 78:19,
79:23, 80:16, 81:6,
83:13, 83:21, 84:11,
84:24, 85:20, 86:21,
86:23
**Instagram** [1] - 81:25
**installments** [1] -
90:15
**instances** [1] - 78:22
**instant** [1] - 25:2
**instead** [2] - 54:5,
80:8
**institutions** [1] - 17:25
**instructions** [1] -
78:11
**integral** [1] - 27:11
**intend** [1] - 46:8
**intensity** [1] - 60:18
**intent** [6] - 5:3, 60:6,
60:11, 62:7, 68:24,
78:5
**intentional** [1] - 76:14
**interest** [7] - 46:13,
67:13, 67:25, 89:7,
89:8, 89:12, 89:13
**interested** [2] - 17:6,
77:10, 77:15
**interesting** [1] - 29:4
**intermittent** [10] -
43:3, 64:19, 64:23,
87:12, 87:22, 87:23,
88:7, 89:16, 89:17,
93:5
**interrupt** [2] - 10:10,
63:6
**interview** [6] - 21:4,
21:7, 51:8, 51:10,
51:16, 52:19
**investigate** [1] - 57:4
**investigated** [1] - 35:9
**investigation** [16] -
4:5, 5:14, 6:7, 6:20,
7:6, 14:9, 19:4, 19:7,
24:3, 24:13, 25:2,
37:10, 38:22, 71:5,
73:22, 91:13
**involving** [1] - 42:24

**irrelevant** [1] - 57:17
**isolated** [1] - 33:24
**issue** [10] - 9:21, 17:3,
18:19, 22:20, 22:25,
23:3, 23:12, 23:16,
28:1, 32:14
**issued** [1] - 3:20
**issues** [1] - 75:5
**item** [3] - 32:21, 51:21,
52:1
**Item** [1] - 51:23
**itemizing** [1] - 4:9
**items** [3] - 48:6, 56:20,
62:19
**itself** [5] - 32:21,
33:24, 45:17, 45:23,
48:8

J

**jail** [9] - 41:20, 42:19,
67:17, 67:21, 69:12,
69:14, 69:16, 73:13,
80:24
**Jamie** [1] - 2:11
**JAMIE** [1] - 1:12
**jamie.carter@usdoj.
gov** [1] - 1:14
**January** [50] - 7:17,
12:12, 13:4, 15:5,
28:4, 28:13, 28:18,
29:9, 29:10, 30:7,
30:14, 32:6, 33:12,
35:18, 37:9, 42:22,
44:22, 45:8, 45:12,
45:15, 46:5, 46:7,
49:24, 54:9, 57:11,
58:1, 63:10, 63:13,
67:7, 69:23, 77:25,
78:4, 78:13, 81:18,
81:22, 81:24, 82:2,
82:9, 82:13, 82:17,
83:25, 84:2, 84:3,
84:11, 85:13, 85:18,
85:24, 86:2, 87:15
**jaunt** [1] - 76:15
**jeopardy** [2] - 81:19,
81:23
**job** [5] - 14:9, 42:9,
57:20, 65:10, 80:1
**Joe** [1] - 70:3
**join** [4] - 77:1, 77:8,
77:15, 87:2
**joined** [2] - 38:24,
80:12
**joining** [2] - 2:6, 45:6,
46:13, 78:2
**judge** [4] - 3:23,
25:25, 36:13, 85:17

**JUDGE** [1] - 1:9
**judges** [4] - 40:24,
49:19, 66:4, 66:25
**judgment** [5] - 88:4,
90:10, 90:16, 91:22,
93:24
**June** [2] - 54:3, 54:8
**jurisdiction** [2] -
93:15, 93:16
**justice** [3] - 25:1, 42:1,
70:17

K

**Kathy** [1] - 91:3
**keep** [11] - 3:3, 3:13,
7:4, 26:19, 26:21,
48:9, 53:14, 68:3,
78:23, 79:3
**keeping** [2] - 41:25,
42:14
**kennels** [1] - 7:22
**kicking** [4] - 64:1,
72:9, 72:10, 72:11
**kind** [5] - 47:17, 53:9,
61:16, 67:7, 85:6
**King** [1] - 69:14
**knock** [1] - 11:11
**Knock** [1] - 83:3
**knocking** [1] - 8:25
**knowledge** [2] - 17:8,
32:13
**known** [2] - 20:6,
60:19
**knows** [4] - 9:14, 23:3,
43:9, 68:7

L

**lack** [4] - 30:1, 51:2,
51:14, 52:15
**ladder** [2] - 47:22,
79:17
**ladders** [1] - 61:12
**laid** [1] - 30:16
**landed** [1] - 79:4
**language** [4] - 16:19,
16:25, 17:1, 50:21
**large** [3] - 33:13, 52:5,
79:20
**larger** [2] - 33:18,
51:22
**last** [4] - 6:1, 23:9,
63:16, 63:17
**late** [1] - 53:2
**law** [29] - 7:20, 8:7,
8:14, 8:17, 8:20,
10:4, 10:14, 10:15,

10:20, 11:7, 11:13,
15:9, 15:21, 54:15,
55:9, 55:12, 58:2,
62:18, 72:14, 72:24,
74:5, 76:4, 78:21,
78:22, 84:16, 85:22,
86:10, 87:7, 88:22
**lawmakers** [1] - 37:22
**lawyer** [1] - 5:13
**lawyers** [1] - 6:19
**lay** [2] - 26:3, 30:3
**laying** [1] - 80:21
**leadership** [1] - 85:3
**leading** [4] - 45:14,
59:7, 77:20, 80:13
**least** [7] - 37:13, 41:2,
41:9, 48:7, 49:1,
67:7, 88:25
**leave** [3] - 9:11, 60:14,
65:10
**leaving** [3] - 59:4,
80:9, 87:4
**led** [2] - 29:1, 57:25
**left** [3] - 8:7, 54:6,
54:17
**legal** [3] - 20:18,
81:19, 81:23
**legitimate** [1] - 86:9
**legitimately** [1] -
85:21
**length** [2] - 29:15,
30:2
**less** [1] - 40:4
**letter** [4] - 5:1, 5:2,
52:18, 72:13
**letters** [8] - 4:13,
59:19, 59:22, 59:23,
62:4, 62:6, 85:9
**level** [3] - 24:20, 25:6,
32:12
**levels** [3] - 24:21,
24:24, 25:4
**license** [1] - 86:10
**lie** [1] - 66:19
**lies** [2] - 40:21, 41:7
**life** [3] - 42:7, 42:11,
80:24
**likely** [1] - 68:2
**limited** [4] - 35:20,
66:11, 67:24, 74:25
**line** [3] - 3:11, 3:16,
20:22
**lines** [2] - 61:10,
61:22, 90:22
**link** [1] - 19:24
**list** [4] - 3:25, 23:25,
34:4, 43:25
**listed** [5] - 4:9, 23:8,
23:10, 23:24, 46:2
**listen** [2] - 3:12, 68:12

**listening** [1] - 3:15
**lists** [2] - 20:11, 42:24
**literally** [1] - 80:21
**lives** [3] - 60:20, 80:22, 81:2
**lo** [1] - 57:5
**loaded** [1] - 69:6
**local** [2] - 12:22, 88:19
**locate** [1] - 54:17
**location** [3] - 42:10, 89:24, 90:5
**log** [1] - 11:21
**long-standing** [1] - 28:24
**look** [14] - 9:25, 10:1, 10:5, 18:24, 29:7, 34:4, 38:6, 49:19, 50:1, 64:24, 66:25, 73:5, 82:15, 82:17
**looked** [4] - 20:17, 20:24, 42:20, 70:11
**looking** [10] - 18:13, 19:5, 19:11, 20:2, 20:9, 20:10, 42:22, 44:1, 49:20, 86:25
**looks** [3] - 19:23, 50:24, 63:20
**lose** [2] - 60:20, 69:7
**loss** [2] - 75:6, 91:5
**Loth** [2] - 1:21, 94:19
**LOTH** [1] - 94:7
**loudly** [1] - 39:24
**Luke** [1] - 73:2
**Luther** [1] - 69:14
**lynching** [2] - 70:11, 80:6

# M

**ma'am** [4] - 77:17, 77:22, 93:12, 93:18
**machine** [3] - 1:23, 36:25, 37:1
**maintained** [1] - 85:4
**majority** [1] - 87:17
**malcontents** [1] - 86:15
**malicious** [2] - 60:11, 68:24
**man** [2] - 61:8, 72:9
**mandated** [1] - 75:24
**mandatory** [4] - 75:2, 75:4, 88:14, 88:18
**manner** [1] - 94:15
**March** [1] - 6:8
**marching** [1] - 84:4
**marijuana** [2] - 88:21, 88:22
**Martin** [1] - 69:13

**mask** [10] - 2:24, 3:3, 26:18, 62:13, 62:15, 76:12, 78:8, 79:7, 82:21, 84:21
**massive** [2] - 42:6, 58:5
**match** [2] - 29:1, 38:12
**matches** [1] - 26:6
**material** [1] - 32:7
**materials** [1] - 4:1
**matter** [3] - 2:2, 9:14, 88:21
**matters** [2] - 12:6, 27:11
**maximum** [4] - 25:12, 41:13, 87:9, 91:18
**MB6** [1] - 51:23
**mean** [13] - 14:7, 14:10, 29:7, 34:10, 44:10, 49:18, 57:9, 60:4, 60:24, 61:18, 72:5, 73:6
**means** [2] - 36:6, 65:9
**media** [6] - 3:20, 35:17, 35:23, 51:17, 82:11, 83:25
**medical** [2] - 17:25, 90:2
**medium** [1] - 47:17
**meeting** [1] - 75:23
**members** [18] - 39:5, 39:12, 40:2, 45:22, 75:23, 79:24, 80:3, 80:14, 80:15, 80:20, 80:25, 82:8, 82:25, 83:13, 84:25, 85:20
**membership** [1] - 45:12
**memo** [9] - 4:8, 10:9, 14:21, 15:20, 18:21, 20:15, 45:7, 64:11, 80:21
**memoranda** [1] - 73:21
**memorandum** [10] - 4:11, 4:13, 18:18, 20:22, 21:2, 21:18, 27:5, 42:23, 55:2, 57:6
**Memorial** [1] - 44:8
**memory** [9] - 16:18, 30:24, 32:16, 32:23, 33:1, 33:3, 33:7, 33:22
**mental** [1] - 90:3
**mentioned** [1] - 72:9
**merely** [1] - 75:21
**merit** [1] - 42:2
**message** [1] - 30:14

**messaged** [1] - 30:8
**messages** [4] - 31:12, 47:3, 76:25, 81:16
**met** [1] - 80:18
**metal** [1] - 79:9
**microphone** [1] - 21:6
**mid** [1] - 41:3
**mid-term** [1] - 41:3
**midnight** [1] - 27:20
**might** [10] - 8:14, 28:8, 29:23, 30:3, 57:2, 62:24, 81:19, 81:23, 90:11
**Mike** [11] - 27:7, 27:8, 27:15, 27:16
**milieu** [1] - 77:19
**million** [1] - 79:22
**mind** [2] - 70:16, 72:6
**minute** [1] - 49:13
**minutes** [8] - 29:23, 49:13, 73:4, 73:6, 81:6, 83:12, 83:14, 86:21
**misdemeanor** [11] - 3:9, 5:18, 25:14, 41:21, 42:25, 66:11, 67:22, 75:16, 87:9, 87:16, 87:18
**misdemeanors** [3] - 5:19, 66:4, 66:10
**missed** [2] - 4:2, 19:14
**missing** [3] - 4:18, 4:23, 34:3
**mistaken** [2] - 40:23, 54:24
**mitigate** [1] - 8:13
**mob** [22] - 39:23, 40:23, 70:8, 70:11, 76:9, 78:21, 80:3, 80:7, 80:9, 80:12, 80:14, 80:17, 80:18, 81:3, 82:8, 82:16, 83:2, 83:8, 83:10, 83:14, 85:1, 87:2
**mobs** [1] - 78:10
**moment** [5] - 49:12, 60:17, 70:15, 73:1, 73:8
**Monday** [1] - 69:13
**monetary** [1] - 90:14
**monitor** [2] - 67:16, 67:25
**monitoring** [6] - 42:15, 65:13, 67:14, 89:24, 90:5, 90:7
**month** [2] - 76:25, 93:23
**monthly** [2] - 90:15, 93:22
**months** [10] - 26:5,

37:1, 41:10, 41:14, 42:8, 44:2, 66:7, 88:5, 88:9, 89:23
**months'** [3] - 25:8, 26:4, 26:6
**moon** [2] - 41:5, 57:18
**morning** [8] - 2:10, 2:13, 2:15, 11:5, 27:9, 27:19, 65:10, 69:13
**most** [8] - 21:25, 23:2, 45:10, 63:18, 63:19, 85:18, 86:22, 87:17
**mostly** [1] - 32:17
**motion** [2] - 92:13, 92:18
**move** [4] - 17:13, 39:6, 48:11, 92:16
**movement** [1] - 67:16
**movements** [2] - 68:1, 71:14
**moving** [1] - 38:6
**MR** [69] - 2:16, 2:21, 2:25, 3:2, 4:22, 4:24, 5:2, 5:5, 7:2, 7:7, 7:11, 8:3, 8:19, 9:5, 9:10, 9:25, 10:13, 11:2, 13:6, 13:8, 13:12, 16:17, 18:4, 18:22, 19:14, 20:16, 21:7, 22:19, 22:24, 23:8, 25:20, 52:24, 53:4, 53:6, 53:11, 55:21, 55:25, 56:7, 56:23, 57:1, 57:16, 57:24, 58:7, 58:13, 59:1, 59:25, 61:6, 62:5, 62:14, 62:18, 63:5, 63:8, 63:12, 64:15, 64:21, 65:5, 66:6, 66:9, 66:13, 66:17, 66:20, 66:22, 67:3, 67:11, 67:20, 67:23, 68:7, 92:11, 92:23
**MS** [78] - 2:10, 4:17, 4:19, 6:12, 11:19, 12:10, 12:21, 12:24, 13:24, 14:6, 14:22, 15:13, 16:8, 16:14, 25:18, 26:11, 26:16, 26:21, 26:24, 27:2, 27:17, 27:19, 27:22, 28:14, 28:16, 28:20, 29:14, 30:15, 30:21, 31:2, 31:4, 31:13, 31:15, 32:10, 32:19, 33:8, 34:14, 34:25, 35:12, 36:2, 36:15, 36:21, 37:5, 37:12,

38:5, 38:15, 38:18, 40:6, 40:15, 40:18, 42:2, 43:7, 44:13, 44:20, 44:24, 45:3, 45:14, 46:11, 46:16, 46:20, 46:24, 47:5, 47:9, 47:19, 48:2, 48:15, 49:3, 50:12, 51:9, 51:17, 52:22, 56:18, 71:4, 71:9, 71:12, 92:9, 92:15, 92:21
**multiple** [2] - 10:3, 18:4
**Murfreesboro** [1] - 1:17
**must** [17] - 8:16, 74:11, 88:18, 88:20, 88:22, 88:23, 89:2, 89:16, 89:20, 89:22, 90:7, 90:8, 90:10, 90:17, 90:18, 90:22, 92:21
**mysteries** [1] - 17:15

# N

**name** [2] - 70:24, 91:2
**names** [1] - 2:9
**Nancy** [14] - 61:15, 61:16, 63:24, 70:5, 70:6, 70:8, 70:24, 71:11, 71:19, 80:5, 80:6, 86:25
**nature** [3] - 74:11, 75:13, 84:14
**naïve** [1] - 63:3
**near** [3] - 44:7, 79:19, 84:23
**nearly** [1] - 19:16
**necessary** [2] - 3:22, 74:2
**need** [11] - 7:23, 9:11, 11:5, 72:10, 74:4, 74:14, 74:16, 75:7, 84:15, 85:14, 87:13
**needed** [1] - 35:17
**needs** [5] - 13:2, 18:19, 22:11, 22:14, 65:7
**negotiated** [1] - 16:19
**negotiating** [2] - 34:17, 50:18
**negotiations** [2] - 34:16, 50:13
**neighbors** [1] - 85:11
**network** [1] - 31:10
**never** [11] - 11:8, 46:22, 60:19, 68:24,

69:17, 71:20, 71:23, 77:8, 77:13, 82:7
**new** [4] - 28:20, 28:21, 90:22, 91:25
**news** [1] - 86:3
**next** [7] - 5:23, 11:5, 24:7, 30:18, 41:3, 41:16, 82:2
**night** [1] - 11:2
**nobody** [2] - 9:1, 11:3
**none** [1] - 61:8
**nonpublic** [8] - 44:7, 44:10, 44:17, 44:23, 45:1, 45:2, 83:18, 86:22
**norm** [2] - 85:24, 85:25
**normal** [4] - 9:17, 21:16, 44:11, 49:18
**normally** [1] - 46:4
**norms** [2] - 43:11, 43:15
**northwest** [1] - 47:23
**Northwest** [1] - 91:8
**NOT** [3] - 52:9, 81:14, 84:10
**note** [47] - 7:19, 8:7, 8:15, 8:24, 9:2, 9:4, 9:11, 9:12, 9:13, 10:7, 10:12, 10:16, 10:19, 11:1, 11:3, 11:6, 11:7, 11:12, 12:5, 12:6, 12:7, 13:14, 13:21, 14:11, 14:13, 14:15, 14:17, 15:9, 15:24, 16:22, 17:2, 17:3, 20:14, 23:11, 23:12, 23:25, 24:1, 24:2, 26:12, 33:19, 37:12, 45:24, 46:1, 48:17, 49:11, 64:11
**noted** [2] - 20:13, 52:17, 92:8
**notes** [3] - 26:13, 27:3, 94:9
**nothing** [5] - 8:19, 9:13, 63:4, 63:9, 63:10
**notice** [2] - 4:11, 20:19
**noticed** [6] - 20:23, 21:1, 21:18, 59:3
**noticing** [1] - 21:18
**notify** [5] - 21:15, 27:4, 27:12, 90:10, 91:9
**November** [2] - 50:2, 50:4
**null** [1] - 94:13

**Number** [34] - 28:10, 28:11, 28:18, 29:5, 29:8, 29:12, 30:23, 30:24, 31:1, 31:7, 31:8, 32:4, 32:5, 32:8, 32:15, 32:25, 33:3, 33:5, 33:10, 33:11, 33:12, 33:14, 35:13, 36:10, 36:20, 54:16, 54:17, 54:18, 54:22, 55:4, 55:7
**number** [11] - 9:3, 23:6, 29:23, 33:13, 34:6, 34:9, 40:24, 51:19, 59:20, 62:21, 62:25
**numbers** [3] - 3:13, 23:24, 87:3
**NW** [1] - 1:12

## O

**object** [3] - 7:13, 7:16, 8:4
**objection** [7] - 16:4, 17:18, 17:21, 18:15, 18:20, 20:7, 20:12
**objections** [16] - 5:14, 5:15, 5:20, 6:10, 7:9, 7:13, 14:8, 20:10, 20:11, 20:17, 20:18, 21:16, 25:16, 92:7, 92:11
**obligation** [3] - 55:11, 57:1, 91:11
**obligations** [2] - 90:4, 91:6
**observable** [1] - 61:4
**observe** [1] - 70:18
**obstruct** [1] - 25:1
**obstructed** [2] - 24:25, 82:7
**obstructive** [2] - 33:15, 82:12
**obvious** [1] - 48:7
**obviously** [3] - 22:6, 38:11, 59:10
**occurred** [3] - 22:17, 24:21, 84:13
**occurring** [3] - 38:20, 78:18, 78:19
**occurs** [1] - 39:8
**OF** [3] - 1:1, 1:3, 1:8
**offense** [29] - 8:2, 8:6, 9:23, 10:1, 10:12, 11:17, 14:24, 15:4, 17:1, 17:20, 24:19, 24:21, 24:24, 25:3, 25:4, 25:6, 54:5,

54:6, 54:7, 74:5, 74:6, 74:12, 74:17, 75:14, 75:17, 84:15, 84:16, 87:20, 92:3
**offer** [6] - 50:1, 50:4, 50:7, 50:8, 50:19, 50:25
**offered** [3] - 43:16, 50:8, 51:11
**office** [22] - 8:1, 16:12, 17:24, 18:3, 19:1, 19:2, 20:11, 20:15, 23:16, 23:17, 34:22, 36:7, 36:23, 55:1, 56:21, 73:23, 80:5, 90:20, 91:12, 93:2, 93:14, 93:20
**Office** [7] - 89:25, 90:5, 90:7, 90:21, 91:2, 91:4, 91:14
**office's** [4] - 4:4, 4:6, 14:10, 26:7
**Officer** [6] - 1:20, 2:5, 12:1, 74:23, 91:3, 93:1
**OFFICER** [16] - 12:1, 12:4, 18:13, 18:24, 19:5, 19:9, 19:15, 19:23, 20:5, 23:20, 92:25, 93:4, 93:12, 93:18, 93:21, 93:25
**officer** [7] - 18:9, 23:25, 42:14, 83:23, 90:17, 90:18, 90:23
**officers** [5] - 37:22, 75:19, 76:2, 79:13, 83:6
**officers'** [1] - 8:9
**Official** [1] - 1:21
**official** [1] - 94:19
**once** [4] - 20:23, 30:16, 79:10, 79:23
**one** [47] - 2:22, 3:25, 12:6, 15:3, 17:15, 18:19, 22:8, 22:9, 24:12, 25:10, 26:12, 26:21, 27:4, 28:5, 28:9, 28:18, 30:18, 37:13, 39:23, 43:14, 43:20, 44:5, 45:4, 46:10, 46:21, 48:9, 49:1, 49:18, 53:8, 57:9, 59:22, 60:17, 63:20, 64:18, 66:12, 69:9, 69:10, 70:16, 72:7, 73:8, 75:18, 77:11, 85:17, 88:18, 88:24, 93:6, 93:21
**ongoing** [2] - 35:14, 84:7

**open** [9] - 19:17, 22:7, 22:8, 22:9, 35:13, 36:23, 49:9, 90:22, 92:14
**Open** [1] - 80:17
**opportunity** [3] - 51:11, 51:16, 68:3
**opposed** [3] - 41:24, 78:11, 82:8
**Order** [1] - 3:17
**order** [4] - 27:3, 48:11, 74:25, 91:15
**ordered** [5] - 39:13, 88:10, 89:5, 89:10, 90:3
**organizational** [1] - 85:3
**original** [6] - 19:6, 20:2, 29:2, 29:24, 37:10, 54:14
**originally** [3] - 30:15, 33:11, 51:22
**otherwise** [2] - 26:18, 33:16
**outset** [2] - 5:10, 76:2
**outside** [6] - 37:19, 37:24, 64:6, 72:18, 75:25, 80:17
**outstanding** [1] - 50:9
**outweighed** [1] - 75:8
**overall** [1] - 82:16
**overlap** [1] - 71:14
**overlooked** [1] - 18:16
**overrun** [1] - 61:23
**overt** [1] - 75:18
**overthrow** [1] - 86:11
**overturned** [1] - 76:20
**overwhelmed** [2] - 76:1, 79:12
**overwhelming** [4] - 76:3, 76:4, 83:6, 87:3
**own** [3] - 10:21, 37:9, 60:2
**owned** [2] - 54:2, 54:11

## P

**p.m** [9] - 1:5, 39:1, 39:2, 49:2, 49:6, 49:8, 78:20, 82:24, 94:3
**P.O** [1] - 1:16
**pack** [1] - 86:19
**page** [15] - 18:18, 20:10, 23:10, 23:11, 23:12, 23:24, 23:25, 24:1, 27:6, 27:14,

37:21, 38:2, 45:7, 51:21
**paid** [1] - 91:11
**pandemic** [1] - 3:14
**papers** [2] - 6:21, 46:6
**paragraph** [8] - 7:16, 8:5, 12:4, 12:8, 14:18, 15:4, 17:17, 23:9
**paragraphs** [2] - 23:11, 24:1
**paramount** [1] - 67:9
**part** [22] - 18:15, 21:16, 25:21, 27:11, 33:17, 33:23, 34:15, 34:17, 35:20, 35:24, 36:4, 37:24, 38:22, 45:7, 51:6, 51:22, 54:18, 57:1, 66:23, 76:8, 80:9, 83:5
**participate** [2] - 22:3, 58:1
**participating** [2] - 12:19, 40:22
**participation** [2] - 51:4, 81:10
**particular** [6] - 15:23, 32:20, 32:21, 34:16, 52:4, 65:20
**particularly** [4] - 16:9, 27:11, 48:1, 86:6
**parties** [5] - 4:3, 24:10, 25:23, 50:13, 75:11
**parties'** [1] - 73:20
**parts** [3] - 5:14, 6:10, 22:11
**party** [1] - 94:15
**passion** [1] - 60:16
**past** [5] - 27:19, 31:17, 40:8, 43:19, 80:5
**pastor** [1] - 72:15
**path** [1] - 79:16
**patriots** [1] - 81:20
**pattern** [3] - 33:18, 33:23, 33:24
**PAUL** [1] - 1:16
**Paul** [3] - 2:17, 7:2, 73:2
**pauljbruno@
   bfhelaw.com** [1] - 1:18
**paused** [1] - 76:7
**pay** [8] - 88:10, 89:7, 89:10, 89:12, 90:7, 90:8, 90:11, 90:13
**payable** [1] - 91:6
**payment** [4] - 74:20, 90:14, 90:15, 93:22
**payments** [2] - 90:9,

90:24
**PDF** [2] - 19:12, 19:24
**PDFs** [1] - 19:19
**peaceful** [7] - 40:24, 61:2, 76:6, 85:23, 86:9, 86:12, 86:16
**peacefully** [2] - 53:19, 61:2
**Pelosi** [4] - 70:8, 71:11, 71:19, 86:25
**Pelosi's** [2] - 70:24, 80:5
**penalties** [3] - 89:8, 89:13, 90:14
**penalty** [2] - 90:8, 90:12
**people** [36] - 3:13, 38:2, 39:14, 43:12, 43:16, 45:10, 47:24, 52:5, 52:6, 52:8, 57:4, 59:4, 60:19, 60:23, 61:10, 61:14, 61:17, 62:21, 62:25, 63:25, 64:5, 65:9, 66:18, 66:19, 67:6, 68:24, 70:4, 70:21, 70:22, 72:19, 72:22, 76:7, 77:19, 83:13, 85:19, 86:23
**People** [3] - 81:12, 81:13, 84:9
**per** [2] - 39:2, 93:23
**percent** [3] - 45:19, 56:11, 57:11
**perform** [1] - 75:23
**perhaps** [7] - 10:10, 12:8, 17:6, 26:21, 38:16, 60:25, 66:14
**period** [24] - 25:9, 30:20, 38:20, 39:21, 41:13, 41:16, 41:17, 41:24, 43:1, 43:5, 50:17, 65:8, 66:2, 67:17, 67:18, 67:19, 68:1, 69:16, 69:17, 77:9, 84:6, 87:23, 89:23, 91:18
**periodic** [1] - 88:25
**periods** [2] - 84:19, 89:18
**permissible** [1] - 5:3
**permission** [3] - 11:21, 11:24, 92:5
**person** [10] - 3:10, 42:15, 42:16, 43:20, 52:1, 63:5, 71:11, 71:14, 77:14, 86:7
**personal** [1] - 31:17
**personnel** [1] - 39:4
**persons** [1] - 3:12

**pertinent** [1] - 58:2
**petition** [1] - 81:9
**Phone** [35] - 28:10, 28:11, 29:5, 29:7, 29:12, 30:23, 30:24, 31:6, 31:7, 32:4, 32:5, 32:8, 32:15, 32:25, 33:3, 33:5, 33:10, 33:11, 33:12, 34:13, 35:13, 36:10, 36:20, 46:25, 47:1, 54:16, 54:17, 54:18, 54:22, 55:4, 55:6
**phone** [76] - 10:21, 11:15, 11:21, 13:13, 13:14, 13:15, 13:17, 13:20, 15:16, 15:19, 15:22, 28:1, 28:5, 28:6, 28:7, 28:8, 28:9, 28:12, 28:18, 28:21, 28:22, 28:23, 29:2, 29:8, 29:22, 29:24, 29:25, 30:2, 30:4, 30:9, 30:11, 30:13, 30:18, 30:22, 30:25, 31:9, 31:15, 31:20, 31:22, 32:6, 32:20, 34:3, 35:4, 36:23, 36:25, 46:23, 46:24, 47:3, 52:13, 52:25, 53:8, 53:14, 53:15, 53:17, 53:24, 53:25, 54:1, 54:3, 54:8, 54:10, 54:11, 54:12, 54:14, 54:24, 55:8, 55:15, 55:16, 55:21, 56:1, 56:2, 56:8, 69:6, 69:7, 69:8, 82:12
**phones** [8] - 13:9, 29:20, 31:17, 31:19, 32:16, 32:22, 35:23, 55:16
**photo** [5] - 4:9, 11:22, 11:23, 21:9
**photocopied** [1] - 94:14
**photograph** [7] - 12:11, 12:14, 13:3, 14:16, 15:20, 17:14, 37:13
**photographs** [5] - 34:13, 37:14, 37:20, 38:1, 38:8
**photos** [14] - 4:8, 33:14, 34:19, 35:17, 36:5, 47:10, 47:14, 51:23, 51:24, 57:3, 69:5, 81:11, 84:7
**physical** [1] - 31:22

**physically** [2] - 79:9, 83:22
**pick** [4] - 35:6, 35:7, 55:18, 56:5
**picked** [1] - 56:21
**picking** [3] - 56:7, 56:13, 64:1
**picture** [19] - 10:6, 10:7, 10:13, 10:15, 10:16, 10:19, 11:12, 11:14, 12:9, 12:18, 13:14, 13:18, 13:19, 13:21, 14:12, 14:20, 17:7, 17:10
**pictures** [9] - 10:17, 31:12, 32:17, 34:5, 34:9, 53:18, 73:5, 80:20, 82:10
**piece** [2] - 46:21, 48:9
**pieces** [1] - 71:22
**pissed** [3] - 52:7, 76:17, 81:13
**place** [9] - 37:22, 39:14, 60:5, 61:18, 75:22, 79:25, 80:16, 81:19, 81:23
**placed** [1] - 8:9
**placement** [1] - 88:24
**places** [2] - 23:6, 72:20
**plainly** [1] - 40:21
**plan** [1] - 29:20
**planned** [1] - 46:7
**planning** [2] - 84:20, 86:16
**play** [2] - 53:16, 53:23
**plea** [23] - 8:2, 8:6, 9:23, 24:11, 34:16, 35:21, 35:24, 48:18, 49:22, 50:1, 50:3, 50:7, 50:8, 50:12, 50:19, 50:24, 50:25, 51:7, 74:19, 75:12, 92:3
**plead** [2] - 49:16, 50:11
**pleaded** [1] - 3:6
**pleadings** [1] - 12:17
**pleas** [1] - 49:18
**pled** [2] - 53:22, 64:4
**plugged** [2] - 28:5, 28:25
**plugged-in** [1] - 28:25
**podium** [1] - 7:14
**point** [15] - 8:18, 11:11, 15:24, 21:2, 48:11, 48:12, 58:15, 62:24, 63:20, 65:21, 66:20, 67:23, 70:16, 77:11, 79:24

**Police** [5] - 38:21, 39:2, 39:4, 39:17, 74:24
**police** [21] - 53:12, 60:23, 61:10, 61:22, 61:23, 62:13, 72:22, 75:19, 76:2, 76:3, 78:9, 78:11, 78:25, 79:2, 79:9, 79:10, 83:6, 83:19, 83:22, 84:24, 87:3
**policy** [1] - 74:10
**political** [2] - 41:7, 67:8
**poor** [1] - 73:8
**portion** [1] - 71:5
**poses** [1] - 57:23
**position** [2] - 18:1, 43:4
**positive** [1] - 59:22
**possess** [1] - 88:20
**possession** [3] - 33:2, 36:5, 54:21
**possible** [1] - 37:15
**possibly** [1] - 68:2
**post** [5] - 17:6, 30:17, 33:6, 45:12, 51:3
**posted** [5] - 27:15, 76:16, 81:10, 84:3, 84:7
**posting** [9] - 27:7, 27:8, 36:3, 51:17, 51:19, 51:24, 52:4, 87:5
**postings** [2] - 52:15, 83:25
**posts** [4] - 51:4, 69:23, 82:1, 85:13
**potential** [4] - 32:1, 48:16, 78:9, 82:19
**potentially** [1] - 48:13
**power** [5] - 40:24, 76:6, 85:23, 86:13, 86:17
**practicable** [1] - 89:23
**practice** [1] - 33:16
**pre** [1] - 45:8
**pre-January** [1] - 45:8
**precisely** [2] - 34:11, 35:5
**preference** [2] - 93:6, 93:8
**prepared** [3] - 19:7, 50:16, 78:7
**preparing** [3] - 20:21, 21:17, 26:12
**preplanning** [3] - 78:8, 82:18
**presence** [1] - 84:8
**present** [3] - 2:18,

75:21, 75:23
**PRESENT** [1] - 1:20
**presented** [1] - 74:25
**presentence** [13] - 4:4, 5:14, 6:7, 6:20, 7:6, 14:8, 19:4, 19:7, 21:10, 24:3, 24:13, 73:21, 91:12
**preserve** [2] - 69:2, 69:7
**President** [5] - 45:25, 62:10, 70:3, 75:22, 76:10
**presidential** [4] - 40:22, 41:3, 58:6, 69:24
**presiding** [1] - 3:23
**press** [3] - 82:6, 82:8, 85:20
**presumably** [2] - 14:13, 34:25
**presuming** [1] - 34:8
**pretty** [4] - 40:17, 50:4, 72:5, 81:20
**prevent** [2] - 9:18, 83:8
**previously** [1] - 63:1
**pride** [2] - 81:9, 87:5
**primary** [2] - 30:10, 52:16
**prison** [2] - 66:8, 66:11
**Prisons** [2] - 89:20, 93:11
**privy** [1] - 31:25
**Probation** [6] - 1:20, 2:5, 89:25, 90:5, 90:6, 91:14
**PROBATION** [16] - 12:1, 12:4, 18:13, 18:24, 19:5, 19:9, 19:15, 19:23, 20:5, 23:20, 92:25, 93:4, 93:12, 93:18, 93:21, 93:25
**probation** [49] - 4:4, 4:5, 8:1, 12:2, 14:10, 16:12, 17:24, 18:2, 18:8, 19:1, 19:2, 20:11, 20:14, 23:16, 23:17, 23:25, 25:9, 26:7, 26:8, 41:16, 41:18, 42:13, 43:3, 64:11, 64:12, 64:13, 64:14, 64:19, 64:24, 65:2, 65:6, 65:15, 65:18, 66:8, 69:20, 73:21, 73:23, 87:10, 87:21, 88:6, 89:19, 90:17, 90:18, 90:20,

90:23, 91:12, 93:2,
93:14, 93:20
**probational** [1] -
87:14
**proceed** [1] - 78:10
**proceeded** [1] - 79:6
**proceeding** [2] -
36:16, 94:3
**proceedings** [5] -
3:12, 3:18, 76:5,
76:7, 94:10
**Proceedings** [1] - 1:23
**proceeds** [1] - 5:11
**process** [5] - 35:14,
37:2, 56:19, 75:7,
75:9
**produce** [4] - 35:7,
35:11, 47:2, 56:6
**produced** [7] - 1:23,
30:13, 34:5, 37:8,
37:15, 39:22, 55:19
**producing** [1] - 47:8
**program** [1] - 89:24
**progress** [1] - 78:16
**prohibitions** [1] - 3:19
**prolong** [1] - 75:6
**prominence** [1] -
45:11
**promised** [1] - 76:24
**promote** [4] - 74:5,
74:8, 84:16, 87:6
**prompt** [3] - 50:5,
50:8, 50:24
**proof** [3] - 53:18,
55:10, 58:20
**property** [1] - 48:11
**prosecution** [1] - 25:2
**protect** [8] - 57:21,
62:13, 67:4, 67:5,
69:9, 74:7, 84:25,
85:15
**protected** [1] - 3:19
**protective** [1] - 82:20
**protests** [1] - 62:20
**protocol** [1] - 9:17
**Proud** [12] - 45:6,
45:10, 45:13, 45:14,
46:13, 46:19, 47:4,
77:1, 77:6, 77:8,
77:15, 78:2
**proud** [1] - 84:12
**provide** [5] - 22:21,
74:6, 74:16, 75:7,
90:18
**provided** [4] - 22:12,
31:1, 37:6, 43:24
**providers** [1] - 17:25
**provides** [3] - 24:19,
74:19, 87:9
**provision** [2] - 35:21,

36:2
**provisions** [2] - 75:2,
88:3
**PSR** [22] - 6:9, 6:10,
7:9, 7:25, 16:1, 16:5,
16:11, 17:1, 17:23,
18:4, 18:10, 18:20,
20:10, 21:4, 21:7,
21:17, 22:5, 22:6,
22:10, 23:1, 23:13,
24:12
**public** [13] - 3:11,
3:16, 3:18, 44:25,
52:4, 57:21, 67:4,
74:7, 81:1, 82:5,
83:15, 84:19, 85:15
**pulling** [1] - 19:15
**punishment** [3] -
41:20, 41:24, 74:6
**purchased** [1] - 54:8
**purloined** [1] - 47:21
**purloining** [1] - 48:11
**purposes** [7] - 16:15,
23:24, 47:15, 57:20,
74:3, 93:4
**pursuant** [5] - 74:11,
75:1, 88:2, 89:15,
91:16
**pursue** [1] - 77:3
**pursued** [1] - 46:15
**pushing** [1] - 79:8
**put** [16] - 8:24, 9:2,
10:16, 10:18, 10:23,
14:24, 15:25, 21:1,
21:10, 21:20, 37:21,
48:12, 54:11, 65:16,
69:8, 82:12
**putting** [1] - 54:6
**puzzle** [1] - 31:5
**puzzling** [1] - 56:4

## Q

**quasi** [3] - 35:21,
35:24, 51:7
**quasi-cooperation** [3]
- 35:21, 35:24, 51:7
**questions** [3] - 6:3,
28:1, 52:25
**quickly** [1] - 49:21
**quite** [2] - 56:1, 58:13
**quote** [1] - 61:25

## R

**racial** [1] - 69:4
**rack** [1] - 47:22
**racks** [1] - 61:12
**raised** [2] - 7:8, 72:14

**rally** [3] - 58:24, 60:14,
76:13
**range** [4] - 25:8,
25:12, 26:5, 91:20
**rather** [4] - 19:24,
35:5, 52:5, 69:20
**rational** [1] - 65:17
**reached** [2] - 33:21,
51:10
**read** [8] - 7:5, 9:4,
15:11, 61:6, 61:7,
62:5, 62:6
**reads** [1] - 15:5
**ready** [1] - 78:10
**real** [2] - 42:7, 72:3
**realize** [2] - 22:7, 22:9
**realized** [4] - 30:12,
38:7, 81:18, 81:22
**really** [8] - 23:2, 35:8,
37:8, 57:17, 57:19,
63:21, 65:22, 67:14
**reason** [5] - 14:24,
28:24, 30:4, 38:19,
47:13
**reasonable** [2] -
65:17, 65:20
**reasoning** [1] - 42:17
**reasons** [1] - 48:7
**Rebellion** [1] - 76:24
**rebellion** [1] - 86:12
**rebroadcasting** [1] -
3:17
**receipt** [4] - 18:15,
18:16, 19:3, 20:6
**receive** [2] - 12:13,
13:19
**received** [12] - 12:10,
12:14, 13:2, 20:10,
55:21, 55:23, 56:8,
56:12, 56:18, 56:20,
73:23, 92:2
**receiving** [1] - 18:11
**recent** [1] - 58:14
**recently** [2] - 59:15,
63:1
**recollection** [1] - 49:5
**recommendation** [6] -
4:6, 6:7, 26:1, 26:7,
26:8, 44:1
**recommendations** [1]
- 73:22
**recommending** [5] -
26:4, 41:12, 64:14,
65:4, 65:5
**reconcile** [1] - 29:11,
85:12
**record** [9] - 2:5, 2:9,
23:19, 25:16, 68:10,
72:17, 74:25, 92:8
**recorded** [1] - 80:7

**recording** [1] - 3:17
**records** [2] - 17:25,
74:15
**recover** [1] - 32:11
**recovered** [1] - 28:1
**red** [1] - 33:15
**REED** [1] - 1:5
**Reed** [53] - 2:4, 2:18,
3:1, 3:6, 5:1, 5:7,
6:13, 7:18, 7:20,
8:20, 10:21, 13:13,
15:6, 15:9, 17:9,
21:4, 21:8, 21:10,
21:11, 24:13, 25:22,
30:8, 36:23, 37:3,
37:24, 38:23, 39:15,
39:22, 40:10, 43:19,
47:10, 47:15, 47:17,
49:8, 49:12, 51:16,
55:22, 55:23, 56:9,
56:13, 59:21, 61:1,
67:5, 68:6, 68:11,
69:22, 71:6, 74:13,
77:5, 83:16, 87:20,
88:5, 92:17
**Reed's** [6] - 15:8,
36:3, 37:13, 39:17,
71:6, 71:7
**reference** [3] - 22:11,
23:7, 51:18
**referenced** [4] - 4:10,
12:16, 27:7, 34:20
**references** [4] - 7:17,
17:22, 18:4, 18:10
**referencing** [1] - 12:12
**referred** [2] - 54:16,
64:4
**referring** [3] - 63:12,
63:13, 63:14
**refers** [1] - 53:25
**reflect** [3] - 62:3, 74:4,
84:15
**reflected** [4] - 8:15,
24:11, 24:12, 62:4
**reflection** [2] - 23:18,
23:19
**reflects** [2] - 22:16,
63:11
**Reform** [1] - 88:2
**refrain** [1] - 88:22
**regard** [1] - 21:12
**regarding** [4] - 52:13,
75:13, 87:13, 88:22
**regardless** [1] - 86:4
**regulations** [1] - 89:20
**rehabilitation** [1] -
74:8
**related** [1] - 75:5
**release** [17] - 17:24,
18:2, 18:5, 18:11,

18:12, 18:25, 19:3,
19:20, 20:13, 20:20,
23:14, 23:15, 25:11,
26:6, 41:13, 90:19,
91:12
**releases** [7] - 21:13,
21:20, 21:22, 22:3,
22:12, 22:15, 22:22
**relied** [1] - 35:9
**religious** [1] - 90:2
**relying** [1] - 35:6
**remain** [2] - 17:15,
73:16
**remained** [2] - 79:5,
79:23
**remaining** [4] - 3:7,
24:18, 75:15, 80:15
**remember** [6] - 37:3,
48:3, 56:10, 71:18,
80:23, 81:2
**remembering** [1] -
42:16
**reminded** [1] - 3:16
**remorse** [4] - 49:23,
51:2, 51:14, 52:15
**remotely** [1] - 3:12
**removal** [1] - 3:20
**remove** [2] - 2:24,
26:18
**removed** [3] - 8:9,
8:16, 82:10
**report** [14] - 4:5, 4:9,
5:15, 6:7, 6:20, 7:6,
14:9, 16:5, 19:4,
19:7, 21:10, 24:3,
73:22, 91:13
**reported** [1] - 1:23
**Reporter** [3] - 1:21,
1:21, 94:19
**representation** [1] -
59:14
**representations** [3] -
35:16, 35:19, 36:22
**Representatives** [2] -
83:1, 83:19
**representatives** [6] -
44:19, 46:19, 76:9,
83:21, 84:25, 86:11
**Republican** [2] -
76:21, 76:24
**request** [4] - 17:24,
64:11, 65:20, 92:5
**requested** [5] - 19:9,
54:23, 55:14, 90:18,
93:15
**required** [2] - 25:25,
73:24
**requirement** [1] -
89:24
**requires** [1] - 41:16

**research** [2] - 51:25, 52:3
**residence** [5] - 15:8, 15:15, 15:17, 90:1, 91:15
**resolve** [4] - 5:15, 5:20, 14:8, 16:7
**resolving** [1] - 49:22
**respect** [8] - 25:2, 72:14, 72:16, 72:23, 74:5, 84:16, 85:10, 87:6
**respectful** [1] - 72:23
**respects** [1] - 57:18
**respirator** [6] - 62:15, 76:12, 78:8, 79:6, 82:20, 84:21
**respond** [1] - 20:12
**responded** [1] - 19:25
**responding** [2] - 19:17, 19:18
**responsibility** [5] - 25:5, 49:20, 49:22, 49:23, 60:2
**responsible** [1] - 34:18
**rest** [5] - 24:3, 64:5, 80:24, 81:2, 83:20
**restitution** [13] - 25:14, 74:16, 74:18, 74:20, 75:2, 75:4, 75:8, 75:10, 89:2, 89:4, 89:5, 89:9, 90:24
**restrict** [2] - 67:16, 68:1
**restricted** [9] - 3:8, 3:21, 24:18, 24:22, 64:7, 72:21, 75:15, 81:7, 90:1
**result** [1] - 3:20
**resulting** [1] - 25:5
**results** [1] - 25:7
**retreat** [1] - 79:10
**return** [1] - 36:4
**returned** [1] - 9:7
**review** [4] - 24:5, 28:11, 35:22, 36:3
**reviewed** [4] - 4:1, 4:4, 4:7, 4:12
**revised** [1] - 22:6
**revving** [1] - 87:1
**riot** [5] - 51:3, 58:1, 81:10, 84:1, 84:8
**rioters** [7] - 49:10, 78:22, 78:25, 79:12, 83:7, 83:11, 84:17
**risk** [2] - 57:22, 58:3
**rituals** [1] - 46:3
**Robert** [1] - 2:6

**ROBERT** [1] - 1:20
**role** [1] - 82:16
**Room** [1] - 91:4
**Rotunda** [1] - 83:17
**RPR** [3] - 1:21, 94:7, 94:19
**rule** [1] - 85:22
**rules** [1] - 89:20
**run** [1] - 60:23
**running** [1] - 70:5
**rushing** [1] - 61:10

## S

**sad** [1] - 60:20
**safety** [2] - 67:4, 79:25
**SAINT** [1] - 94:7
**Saint** [2] - 1:21, 94:19
**SAINT-LOTH** [1] - 94:7
**Saint-Loth** [2] - 1:21, 94:19
**sanctions** [2] - 3:20, 3:22
**sat** [1] - 73:2
**satisfied** [1] - 6:15
**Saturday** [6] - 8:23, 9:7, 11:2, 11:7, 11:9
**save** [1] - 83:20
**saved** [3] - 31:19, 31:20, 32:6
**saving** [3] - 31:16, 31:21, 32:2
**saw** [21] - 11:8, 12:7, 14:13, 14:16, 15:9, 15:14, 15:18, 15:19, 15:21, 16:22, 17:2, 30:14, 70:21, 70:23, 71:20, 71:23, 72:17, 72:19, 78:9, 85:12
**scaffolding** [2] - 61:11, 72:20
**scam** [2] - 57:13, 76:19
**schedule** [1] - 90:9
**scheme** [2] - 40:20, 41:19
**Schornak** [1] - 43:17
**score** [1] - 24:15
**screened** [1] - 44:15
**screens** [1] - 81:21
**search** [11] - 7:18, 10:25, 15:1, 15:7, 28:3, 30:8, 36:4, 54:13, 54:15, 55:13, 82:14
**seated** [2] - 6:24, 92:12
**seats** [1] - 40:3

**second** [7] - 5:16, 15:3, 17:21, 30:22, 38:11, 63:6
**Secretary** [1] - 74:23
**Section** [14] - 3:9, 24:17, 24:19, 25:24, 73:25, 75:1, 75:3, 75:16, 88:3, 88:11, 89:3, 89:15, 91:16, 91:23
**section** [1] - 79:8
**secure** [1] - 86:22
**securing** [1] - 82:20
**security** [1] - 44:15
**see** [24] - 10:2, 12:23, 14:13, 14:15, 15:20:4, 27:18, 28:5, 34:23, 36:19, 37:3, 37:7, 50:2, 51:12, 53:8, 60:8, 63:18, 64:8, 68:20, 70:12, 71:1, 71:16, 72:3, 76:20
**seeing** [8] - 10:19, 60:23, 61:10, 68:15, 71:18, 72:5, 83:9, 87:4
**seek** [2] - 61:16, 80:8
**seem** [1] - 60:1
**sees** [2] - 34:20, 59:9
**seize** [1] - 28:5
**seized** [4] - 13:20, 28:7, 28:9, 29:10
**self** [1] - 21:11
**self-employed** [1] - 21:11
**Senate** [7] - 44:7, 49:1, 49:6, 74:23, 74:24, 79:19, 82:23
**send** [1] - 21:19
**sending** [1] - 21:22
**sense** [1] - 13:15
**sensitive** [2] - 44:18, 75:22
**sent** [14] - 12:25, 18:2, 18:25, 19:10, 19:21, 19:23, 20:3, 21:13, 22:5, 22:8, 42:10, 77:12
**sentence** [22] - 6:2, 23:14, 26:1, 73:18, 74:1, 74:4, 74:14, 84:15, 84:17, 85:14, 86:14, 87:6, 87:20, 87:22, 88:1, 89:4, 91:15, 91:17, 91:19, 91:25, 92:7
**sentenced** [4] - 17:12, 41:11, 64:12, 88:5
**sentences** [3] - 42:21,

74:13, 87:14
**Sentencing** [1] - 88:2
**sentencing** [60] - 3:5, 3:10, 3:15, 3:24, 4:2, 4:6, 4:7, 4:10, 4:12, 5:9, 5:10, 5:17, 5:18, 5:25, 6:22, 10:8, 14:21, 15:20, 18:18, 18:21, 20:15, 20:21, 21:1, 21:17, 23:17, 24:5, 24:7, 24:8, 25:8, 25:25, 26:5, 27:5, 36:11, 36:13, 40:20, 42:23, 43:6, 43:8, 49:19, 53:2, 55:2, 57:5, 57:20, 59:24, 64:10, 66:4, 66:23, 73:20, 73:22, 74:1, 74:3, 74:10, 75:7, 75:9, 80:21, 85:16, 87:13, 91:20, 92:4
**SENTENCING** [1] - 1:8
**sentencings** [1] - 43:20, 86:1
**separate** [1] - 48:2
**separated** [1] - 42:9
**Sergeant** [1] - 74:24
**serious** [1] - 85:18
**seriousness** [2] - 74:5, 84:16
**servants** [1] - 81:1
**serve** [1] - 89:16
**served** [3] - 88:8, 89:17, 93:6
**services** [1] - 90:2
**set** [4] - 4:3, 19:2, 73:24, 80:4
**setting** [1] - 43:15
**settings** [1] - 32:20
**seven** [1] - 73:4
**several** [2] - 42:1, 78:20
**shadow** [1] - 69:15
**shall** [7] - 88:13, 89:14, 89:17, 90:24, 91:9, 91:12, 94:13
**share** [1] - 90:20
**sharing** [1] - 51:4
**sheet** [1] - 90:9
**shelter** [1] - 39:13
**sheltered** [1] - 37:22
**sheltering** [2] - 61:18, 80:16
**Sherrill** [1] - 91:3
**shocked** [1] - 81:20
**shook** [2] - 67:8
**shooting** [1] - 39:7
**short** [3] - 39:20, 67:19, 84:19

**shorthand** [1] - 1:23
**shortly** [2] - 49:12, 82:22
**shouting** [2] - 37:24, 80:17
**show** [6] - 9:19, 11:9, 37:19, 68:23, 80:2, 80:20
**showed** [3] - 29:16, 71:5, 71:6
**showing** [2] - 72:23, 81:11
**shown** [1] - 58:20
**shows** [3] - 37:21, 39:22, 85:4
**sic** [3] - 40:9, 51:6, 51:23
**sic]** [1] - 12:13
**side** [4] - 39:7, 39:8, 70:14, 76:21
**sign** [9] - 13:21, 18:5, 39:23, 49:23, 70:23, 70:24, 70:25, 71:11, 71:19
**signatory** [1] - 94:15
**signed** [3] - 50:3, 50:7
**significant** [1] - 86:21
**signing** [1] - 17:23
**signs** [1] - 82:4
**SIM** [24] - 29:19, 29:22, 30:24, 31:6, 31:8, 31:11, 31:16, 31:20, 31:21, 31:22, 32:1, 32:5, 32:7, 32:9, 33:1, 33:10, 33:14, 33:21, 53:13, 53:23, 54:10, 69:8
**similar** [3] - 46:2, 74:15
**simple** [1] - 58:4
**simply** [1] - 31:9
**single** [4] - 20:22, 25:13, 28:9, 86:10
**sister** [1] - 60:4
**sit** [2] - 65:14, 65:15
**sits** [1] - 36:25
**situation** [4] - 52:25, 59:13, 67:12, 69:10
**six** [1] - 26:5
**ski** [1] - 79:6
**slowly** [1] - 26:20
**slurs** [1] - 69:4
**snatched** [1] - 55:8
**social** [4] - 35:23, 51:17, 82:11, 83:25
**society** [2] - 67:13, 67:25
**solution** [1] - 67:1
**someplace** [1] - 15:18
**sometimes** [1] - 65:12

**son** [1] - 59:21
**soon** [3] - 48:25, 76:24, 89:23
**sorry** [6] - 33:9, 40:16, 50:22, 51:21, 61:18, 73:15
**Sorry** [1] - 71:3
**sort** [5] - 43:18, 49:18, 60:21, 61:3, 86:19
**sounding** [2] - 48:23, 80:6
**source** [3] - 34:7, 34:10, 34:11
**Speaker** [3] - 70:6, 80:5, 86:25
**speaking** [1] - 2:23
**special** [6] - 25:13, 87:11, 87:21, 88:7, 88:10, 89:14
**specific** [7] - 16:25, 17:1, 32:22, 64:24, 65:22, 65:25, 87:19
**specifically** [5] - 10:1, 17:8, 46:7, 51:18, 90:4
**specifics** [2] - 35:1, 50:18
**speech** [4] - 58:20, 58:21, 59:3, 59:4
**spend** [1] - 73:13
**spending** [1] - 86:21
**spent** [1] - 81:6
**Spoken** [1] - 84:9
**spoken** [2] - 52:7, 81:12
**SPOKEN** [2] - 52:10, 81:15
**spray** [1] - 44:16
**staff** [3] - 44:18, 83:21, 85:20
**staffers** [3] - 38:2, 40:2, 80:25
**stage** [1] - 86:20
**stages** [1] - 5:9
**stairs** [3] - 47:23, 79:13, 80:4
**stairwell** [1] - 39:11
**stand** [4] - 6:14, 17:19, 21:5, 73:19
**STAND** [3] - 52:9, 81:15, 84:10
**standard** [1] - 88:14
**standby** [1] - 45:25
**standing** [4] - 28:24, 39:22, 60:7, 67:9
**Standing** [1] - 3:17
**start** [4] - 3:24, 3:25, 6:6, 43:23
**started** [1] - 21:18
**starting** [2] - 2:9,

75:25
**state** [4] - 2:8, 88:1, 88:19, 88:22
**statement** [19] - 8:2, 8:5, 9:22, 10:1, 10:11, 11:17, 14:23, 15:4, 16:2, 16:25, 17:19, 22:13, 27:5, 29:14, 29:17, 52:6, 54:4, 54:6, 54:7
**statements** [1] - 74:10
**STATES** [4] - 1:1, 1:3, 1:9, 1:11
**States** [4] - 2:3, 2:12, 62:10, 70:3
**states** [1] - 7:21
**statistical** [2] - 57:14, 76:19
**Statuary** [3] - 38:24, 71:12, 83:17
**statues** [1] - 48:5
**statute** [3] - 41:17, 48:4, 89:3
**statutes** [1] - 64:25
**statutory** [4] - 25:12, 41:13, 41:19, 91:18
**stayed** [1] - 83:15
**stays** [1] - 85:25
**Steal** [5] - 39:24, 39:25, 63:25, 76:13, 80:14
**stenographic** [1] - 94:9
**step** [11] - 5:12, 5:16, 5:22, 5:23, 6:1, 7:13, 13:24, 24:7, 25:22, 68:11, 78:8
**stepped** [1] - 59:10
**steps** [1] - 51:5
**still** [20] - 3:13, 10:2, 11:23, 33:17, 35:12, 35:14, 36:10, 36:16, 39:12, 43:11, 43:14, 58:14, 70:1, 77:14, 77:17, 79:20, 79:25, 80:15, 83:2, 85:1
**stolen** [4] - 40:22, 48:13, 62:11, 69:25
**stood** [2] - 37:22, 47:22
**Stop** [5] - 39:23, 39:24, 63:25, 76:13, 80:14
**stop** [6] - 19:17, 40:23, 70:20, 72:10, 76:5, 83:23
**stopped** [1] - 19:18
**store** [1] - 31:11
**stores** [1] - 31:9
**straight** [5] - 7:4, 43:2,

65:15, 66:8, 66:11
**Street** [1] - 1:12
**streets** [1] - 79:20
**strictly** [1] - 3:19
**structure** [1] - 66:24
**stuff** [7] - 31:18, 53:9, 53:17, 54:19, 57:4, 59:7, 72:10
**stupid** [2] - 60:16, 61:19
**subject** [2] - 41:23, 87:11
**submission** [1] - 23:14
**submit** [6] - 5:2, 18:12, 22:15, 23:15, 88:23, 89:22
**submitted** [6] - 4:14, 5:1, 42:23, 52:18, 59:20, 59:23
**subsequent** [1] - 21:8
**subsequently** [1] - 10:17
**substance** [3] - 88:21, 88:23, 90:3
**subtracted** [1] - 25:4
**successful** [1] - 76:4
**sufficient** [1] - 74:2
**suggest** [3] - 14:20, 14:21, 60:21
**suggested** [2] - 15:12, 15:21
**suggestion** [1] - 22:18
**sum** [1] - 84:14
**Sunday** [1] - 69:12
**supervised** [5] - 25:11, 26:6, 41:13, 41:15, 42:13
**supervision** [14] - 41:2, 41:9, 41:21, 41:25, 65:24, 66:1, 66:12, 66:21, 67:24, 68:4, 88:13, 88:15, 88:17, 88:24
**supplemented** [1] - 24:5
**support** [1] - 4:14
**supposed** [9] - 16:6, 29:11, 35:22, 35:25, 44:23, 48:5, 48:7, 68:18, 78:14
**surprise** [1] - 9:9
**surprised** [1] - 72:16
**surprising** [1] - 60:25
**surrenders** [1] - 42:10
**surrounding** [1] - 83:25
**susceptibility** [1] - 66:15
**susceptible** [1] -

40:21
**suspicion** [1] - 30:15
**swapped** [1] - 30:18
**swapping** [1] - 32:2
**SWAT** [2] - 39:14, 83:20
**swept** [1] - 60:18
**Swiss** [1] - 41:5
**switched** [1] - 31:19
**sworn** [1] - 15:16
**system** [3] - 42:1, 76:23, 85:7

---

**T**

**tables** [1] - 80:22
**tail** [1] - 71:13
**tapes** [1] - 61:5
**task** [1] - 75:24
**tasked** [1] - 57:22
**taunting** [6] - 8:14, 8:20, 9:14, 61:22, 72:22, 79:21
**teams** [1] - 83:20
**tear** [11] - 9:6, 53:20, 61:10, 61:24, 62:13, 62:19, 78:9, 78:15, 79:2, 79:4, 84:22
**tearing** [1] - 9:19, 45:20, 63:24
**technical** [1] - 32:12
**technology** [1] - 90:6
**teleconference** [1] - 3:16
**telephone** [2] - 13:18, 21:8
**television** [1] - 9:16
**Tennessee** [4] - 53:12, 76:11, 82:19, 93:16
**tension** [1] - 66:24
**term** [11] - 26:8, 35:24, 41:3, 41:12, 41:20, 43:2, 51:7, 68:4, 87:9, 87:19, 88:5
**terms** [2] - 34:17, 49:19
**terrace** [3] - 47:23, 79:18, 79:20
**terrorized** [4] - 61:17, 76:8, 76:9, 86:23
**test** [1] - 88:24
**tests** [1] - 88:25
**text** [3] - 31:12, 46:10, 47:3
**texted** [3] - 81:23, 82:2, 82:9
**texts** [1] - 32:17
**THE** [205] - 1:1, 1:8, 1:11, 1:16, 2:2, 2:7,

2:8, 2:13, 2:19, 2:23, 3:1, 3:3, 4:18, 4:20, 4:23, 4:25, 5:4, 5:6, 6:5, 6:6, 6:13, 6:17, 6:18, 6:23, 6:24, 7:3, 7:8, 7:12, 8:4, 9:4, 9:9, 9:22, 10:6, 10:24, 11:16, 11:25, 12:3, 12:7, 12:18, 12:23, 13:5, 13:7, 13:11, 14:4, 14:7, 14:23, 15:14, 16:9, 16:15, 17:12, 18:8, 18:17, 18:25, 19:6, 19:20, 20:4, 20:9, 21:5, 22:10, 22:23, 23:5, 23:10, 23:22, 25:19, 25:21, 26:14, 26:17, 26:23, 27:1, 27:14, 27:18, 27:21, 27:25, 28:15, 28:17, 29:4, 30:6, 30:19, 30:22, 31:3, 31:5, 31:14, 32:4, 32:15, 32:24, 34:1, 34:23, 35:3, 35:20, 36:9, 36:19, 37:3, 37:7, 37:17, 38:13, 38:16, 39:20, 40:13, 40:17, 40:19, 42:20, 43:22, 44:14, 44:21, 44:25, 45:4, 46:9, 46:12, 46:17, 46:22, 47:1, 47:6, 47:16, 47:20, 48:14, 48:20, 49:15, 50:23, 51:12, 52:20, 52:23, 53:2, 53:5, 53:10, 55:18, 55:24, 56:3, 56:16, 56:22, 56:25, 57:9, 57:17, 57:25, 58:11, 58:23, 59:19, 60:11, 61:8, 62:12, 62:17, 63:4, 63:6, 63:9, 64:10, 64:17, 65:3, 66:3, 66:7, 66:10, 66:14, 66:18, 66:21, 66:23, 67:4, 67:19, 67:22, 68:5, 68:9, 68:14, 69:22, 70:2, 70:4, 70:9, 70:10, 70:12, 70:21, 71:1, 71:3, 71:7, 71:10, 71:16, 71:20, 71:21, 71:23, 71:24, 72:1, 72:13, 72:25, 73:10, 73:12, 73:16, 77:5, 77:7, 77:10, 77:12, 77:14, 77:17, 77:19, 77:22, 77:23, 78:3, 78:4, 81:5, 81:6, 92:10,

92:12, 92:18, 92:22,
92:24, 93:3, 93:9,
93:14, 93:19, 93:23,
94:1
**theft** [1] - 48:13
**theories** [3] - 66:19,
86:3, 86:6
**thereafter** [1] - 88:25
**therefore** [2] - 89:7,
89:12
**thinking** [1] - 22:21
**thinks** [1] - 65:19
**third** [2] - 5:22, 25:22
**thousands** [1] - 47:24
**threaten** [1] - 53:20
**threatened** [1] - 76:20
**threatening** [3] -
63:25, 78:18, 84:1
**threatens** [2] - 85:19,
85:21
**three** [7] - 41:2, 42:8,
43:16, 44:2, 88:8,
89:17, 89:23
**thumb** [13] - 54:20,
54:22, 54:24, 55:15,
55:19, 55:22, 56:10,
56:11, 56:18, 56:19,
56:20, 56:21, 69:6
**timeline** [5] - 38:9,
38:21, 39:2, 39:16
**timely** [1] - 19:4
**timestamped** [1] -
38:17
**timestamps** [4] - 38:1,
38:3, 38:6, 38:7
**timing** [1] - 50:22
**tips** [1] - 51:24
**title** [1] - 84:4
**titled** [1] - 51:23
**TN** [1] - 1:17
**today** [6] - 6:22, 36:11,
58:9, 59:14, 68:15,
92:19
**ton** [1] - 55:2
**Took** [1] - 84:9
**took** [22] - 9:12, 10:13,
10:16, 11:3, 11:10,
11:13, 17:10, 30:9,
39:22, 52:8, 53:13,
53:23, 54:10, 55:19,
69:5, 69:8, 70:4,
71:15, 81:9, 81:13,
82:11, 83:5
**total** [7] - 25:6, 34:6,
81:6, 88:7, 89:16,
90:14, 93:22
**totaling** [1] - 87:22
**totally** [1] - 83:15
**tourists** [5] - 44:11,
44:14, 44:17, 45:2,

83:16
**towards** [5] - 39:6,
59:4, 68:24, 69:3,
85:11
**town** [1] - 45:21
**tradeoff** [1] - 41:19
**TRANSCRIPT** [1] - 1:8
**transcript** [4] - 1:23,
94:9, 94:10, 94:14
**transcription** [1] -
1:23
**transfer** [1] - 93:15
**transferring** [1] -
93:16
**transition** [5] - 40:24,
76:6, 85:23, 86:13,
86:16
**transparent** [1] -
43:25
**trash** [1] - 8:10
**traveled** [2] - 44:6,
76:11
**treatment** [1] - 90:3
**trespass** [2] - 24:21,
75:17
**trespassing** [1] - 82:4
**trial** [1] - 36:16
**tried** [5] - 36:21,
36:23, 76:22, 76:23,
78:23
**tries** [1] - 36:25
**troubles** [1] - 36:19
**true** [3] - 81:20, 94:8,
94:9
**truth** [1] - 69:20
**try** [3] - 75:19, 83:23,
84:25
**trying** [10] - 3:13, 8:13,
9:18, 19:17, 35:13,
37:24, 68:23, 78:10,
79:25, 81:1
**Tryon** [1] - 43:17
**tunnel** [1] - 72:3
**turn** [9] - 7:12, 26:2,
26:9, 30:19, 37:17,
43:22, 54:23, 55:14,
83:9
**turned** [22] - 10:17,
10:22, 20:25, 30:22,
32:25, 33:6, 33:8,
33:20, 33:21, 35:18,
36:1, 51:22, 54:23,
55:3, 55:15, 55:20,
55:21, 55:22, 56:2,
56:7, 56:12
**turning** [4] - 20:20,
34:18, 56:13, 80:8
**turns** [3] - 39:6, 39:10,
57:5
**TV** [1] - 81:21

**Twitter** [1] - 81:25
**two** [29] - 7:9, 13:9,
24:20, 24:24, 25:3,
29:5, 29:12, 37:18,
38:10, 38:19, 38:23,
39:18, 43:10, 43:22,
45:16, 48:16, 49:13,
54:1, 54:2, 54:8,
54:11, 54:25, 55:7,
69:12, 69:14, 73:12,
80:23, 88:20, 88:25
**type** [1] - 67:12
**types** [1] - 74:13
**TYRANNY** [1] - 52:9
**tyranny** [2] - 81:14,
84:10

## U

**U.S** [9] - 38:21, 39:4,
89:25, 90:5, 90:6,
90:21, 90:25, 91:7,
91:14
**U.S.C** [13] - 3:8, 24:17,
25:24, 73:25, 75:1,
75:3, 75:16, 88:3,
88:11, 89:3, 89:15,
91:16, 91:23
**unable** [2] - 32:21,
92:4
**unavailable** [1] - 91:25
**unbothered** [1] - 79:5
**uncovered** [1] - 46:15
**uncritical** [1] - 86:3
**under** [17] - 3:16,
24:17, 24:20, 24:22,
25:3, 25:5, 25:24,
40:3, 41:9, 41:25,
42:24, 44:11, 63:1,
73:14, 75:2, 80:21
**underlying** [2] - 8:2,
9:23
**underneath** [1] - 80:16
**understood** [4] -
12:25, 17:18, 17:22,
47:9
**undisputed** [1] - 24:4
**unfair** [1] - 65:16
**UNITED** [4] - 1:1, 1:3,
1:9, 1:11
**United** [4] - 2:3, 2:12,
62:10, 70:3
**unlawful** [2] - 75:21,
88:23
**unlawfully** [3] - 43:13,
75:21, 88:20
**unless** [2] - 18:16,
50:8
**unlike** [1] - 5:19

**unlock** [1] - 36:25
**unopenable** [1] -
19:12
**unsuccessfully** [2] -
36:24, 83:8
**unusable** [1] - 20:3
**unusual** [1] - 35:3
**unwarranted** [4] -
43:6, 43:8, 74:14,
87:13
**up** [50] - 5:8, 5:11, 9:6,
9:19, 11:9, 13:6,
16:23, 23:6, 25:8,
25:10, 33:9, 38:12,
39:23, 41:17, 45:14,
48:12, 52:25, 53:20,
55:8, 56:21, 57:5,
58:21, 59:11, 60:7,
60:15, 60:17, 60:22,
61:9, 62:8, 63:24,
64:1, 64:12, 64:15,
64:17, 66:2, 68:17,
69:10, 72:20, 73:1,
73:8, 78:25, 80:4,
85:6, 85:23, 87:2,
87:10
**upper** [1] - 79:18
**upward** [1] - 91:19
**usable** [2] - 19:19,
19:24
**usage** [1] - 29:8
**utterly** [1] - 76:23

## V

**vaccinated** [4] - 2:20,
2:22, 3:1, 26:15
**variety** [1] - 75:20
**various** [3] - 46:6,
50:18, 52:10
**verification** [2] -
21:22, 22:22
**verified** [3] - 21:24,
21:25, 22:13
**verify** [5] - 18:6, 20:19,
21:19, 22:4, 50:15
**versus** [2] - 2:3, 32:23
**via** [3] - 2:6, 21:8, 52:5
**Vice** [2] - 75:22, 76:10
**vicious** [1] - 69:3
**victim** [2] - 75:8, 91:1
**victim's** [1] - 91:1
**victims** [2] - 74:16,
74:22
**victims'** [1] - 75:6
**video** [21] - 4:10, 24:5,
34:5, 34:18, 34:19,
35:17, 37:18, 39:21,
47:10, 47:12, 49:11,

49:14, 51:23, 53:15,
57:3, 63:15, 71:2,
71:4, 71:13, 71:15,
84:3
**videoconference** [2] -
2:6, 3:18
**videoing** [4] - 53:9,
53:17, 63:20, 68:22
**videos** [20] - 4:8,
10:17, 31:12, 32:18,
33:13, 34:9, 34:13,
36:6, 37:8, 37:9,
37:19, 38:4, 47:14,
47:24, 54:19, 69:6,
70:4, 80:2, 82:11
**videotape** [2] - 61:14,
71:8
**videotaped** [2] -
70:10, 70:22
**videotapes** [2] -
63:11, 70:23
**videotaping** [1] -
61:10
**view** [1] - 14:10
**viewfinder** [1] - 68:22
**violate** [1] - 58:1
**violation** [3] - 3:8,
3:19, 75:15
**violence** [8] - 45:20,
67:8, 72:3, 75:19,
78:9, 81:11, 82:19,
83:24
**violent** [1] - 45:15
**violently** [2] - 48:22,
71:21
**visceral** [1] - 42:8
**visible** [1] - 48:23
**visit** [1] - 84:20
**void** [1] - 94:13
**volume** [1] - 26:25
**voluntarily** [1] - 47:2
**voter** [1] - 58:5
**votes** [1] - 79:21
**vs** [1] - 1:4

## W

**wait** [1] - 15:15
**waiting** [2] - 36:24,
83:19
**waive** [1] - 75:3
**waived** [1] - 36:17
**waives** [2] - 89:7,
89:12
**walk** [3] - 22:21,
59:11, 69:1
**walked** [4] - 53:18,
53:19, 83:14
**walking** [7] - 53:9,

61:3, 61:15, 61:25,
63:7, 63:18, 64:4
**Walmart** [3] - 29:21,
30:10, 52:13
**Walters** [3] - 2:6, 12:2,
93:1
**WALTERS** [1] - 1:20
**wander** [1] - 68:17
**wandered** [1] - 84:18
**wants** [3] - 57:15,
57:18, 65:6
**warrant** [16] - 7:18,
8:8, 10:25, 11:4,
12:20, 15:1, 15:6,
15:7, 28:4, 36:4,
54:13, 54:15, 55:13,
69:12, 82:14
**warrants** [1] - 30:8
**Washington** [6] - 1:6,
1:13, 52:2, 62:8,
91:4, 91:8
**watch** [1] - 70:18
**watched** [3] - 63:15,
69:21, 72:1
**watches** [1] - 9:16
**watching** [1] - 68:21
**wave** [1] - 83:11
**ways** [1] - 42:3
**WE** [2] - 52:10, 81:15
**weakness** [1] - 60:11
**weapons** [1] - 44:16
**wear** [2] - 46:4
**website** [1] - 77:13
**weekend** [1] - 64:23
**weighs** [1] - 86:17
**weight** [3] - 33:25,
42:12, 42:16
**weird** [2] - 70:5, 86:6
**west** [1] - 79:18
**whereas** [1] - 18:7
**whole** [3] - 45:24,
55:3, 55:20
**wholeheartedly** [4] -
58:10, 58:12, 58:18,
59:18
**Whoohooohooo** [1] -
79:14
**Wi** [1] - 50:15
**Wi-Fi** [1] - 50:15
**WILL** [3] - 52:9, 81:14,
84:10
**willfully** [1] - 24:25
**willing** [2] - 41:8,
68:12
**windows** [2] - 49:7,
61:12
**wing** [5] - 44:8, 49:1,
49:6, 79:19, 82:23
**wise** [2] - 60:13, 60:22
**wish** [1] - 5:24

**witnessed** [2] - 80:13,
85:18
**witnessing** [1] - 81:21
**wondering** [1] - 50:6
**wood** [1] - 70:24
**wooden** [2] - 70:25,
71:19
**word** [1] - 54:1
**wording** [1] - 23:1
**words** [1] - 52:17
**world** [2] - 52:5, 67:9
**worse** [2] - 72:5, 72:6
**Wow** [1] - 72:4
**written** [1] - 17:18
**wrote** [6] - 7:20, 15:9,
15:24, 60:4, 72:13,
72:15

## Y

**year** [7] - 25:10, 41:14,
45:18, 65:24, 66:12,
87:10, 89:18
**years** [18] - 29:6,
29:13, 41:2, 41:14,
41:16, 42:1, 54:1,
54:2, 54:9, 54:12,
55:7, 64:12, 64:15,
64:17, 66:2, 67:17,
87:21, 88:6
**years'** [2] - 25:9, 87:10
**yelled** [1] - 79:14
**yelling** [8] - 61:13,
61:15, 63:24, 63:25,
69:4, 70:5, 79:21,
83:3
**yesterday** [2] - 26:12,
27:3
**yourself** [1] - 84:21
**youth** [1] - 72:15

## Z

**zero** [3] - 24:15, 25:8,
26:5